**Ernest PORTER, Plaintiff,**

v.

**Martin HORN, et al., Defendants.**

**No. CIV.A.99–2677.**

United States District Court,
E.D. Pennsylvania.

June 26, 2003.

Billy H. Nolas, David W. Wycoff, Robert Brett Dunham, Defender Association of Philadelphia, Federal Court Division, Philadelphia, PA, for Plaintiff.

Donna G. Zucker, Regina M. Oberholzer, Thomas W. Dolgenos, District Attorney's Office, Philadelphia, PA, for Defendants.

### MEMORANDUM

ROBERT F. KELLY, Senior District Judge.

Before this Court is the Petition for a Writ of Habeas Corpus filed by Petitioner Ernest Porter ("Petitioner").[1] Under 28 U.S.C. § 2254, Petitioner presents fourteen claims in support of his Petition for habeas corpus relief from his state murder conviction and subsequent death sentence.[2] Petitioner's fourteen claims assert constitutional error in both the guilt phase and sentencing phase of his trial. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is granted in part and denied in part. I will grant the Petition with regard to Claim V, asserting error in the penalty phase of Petitioner's trial. As a result, Petitioner's death sentence is vacated. Petitioner's case is remanded to the Commonwealth of Pennsylvania to either sentence Petitioner to life imprisonment or to conduct such further proceedings as may be appropriate under state law. Even though I shall grant the Petition for a Writ of Habeas Corpus with respect to the penalty phase of trial, I will deny the Petition with respect to each claim challenging Petitioner's conviction of first-degree murder.

### I. FACTUAL BACKGROUND [3]

Raymond Fiss, owner of Mr. Fiss's Beauty Shop, was shot to death in his shop

---

1. Petitioner's actual name is Theodore Wilson, not Ernest Porter. (N.T. 2/14/86, p. 383, lines 5–7). Apparently, Petitioner used the name Ernest Porter as one of his aliases. (*Id.*, p. 383, lines 11–16). Throughout this Memorandum Opinion Petitioner is referred to as Ernest Porter because that is the name utilized during trial and in all state and federal court documents.

2. Petitioner originally sought relief based on thirteen claims. (*See* Pet. Writ Habeas Corpus). On May 22, 2000, Petitioner filed an amendment to his Petition which included a fourteenth claim. (*See* Am. Pet. Writ Habeas Corpus).

3. This opinion details the basic background facts of this case. A more comprehensive factual background is set forth in the Pennsylvania Supreme Court's opinion in *Common-*

on the morning of April 27, 1985. At approximately 7:30 a.m., Angelina Spera, a neighbor who lives directly across the street from the beauty shop, was looking out her window. Mrs. Spera saw a black man push Mr. Fiss into the shop as he was opening the shop door and heard Mr. Fiss cry out, "Get the hell out of here." Mrs. Spera called the police and returned to the window in time to see Catherine Valente approaching the shop. Mrs. Valente was a customer of Mr. Fiss who had a hair appointment scheduled for that morning. As Mrs. Valente opened the shop door, she saw a man standing inside with a yellow bag in his hand. The man rushed past Mrs. Valente to exit the shop, saying "I'll be back." The man then got into Mr. Fiss's car, which was parked at the curb outside of the shop, and drove off. Mrs. Valente found Mr. Fiss's lifeless body laying in the bathroom of the shop. Mr. Fiss was killed by a single gunshot wound from a .38 caliber handgun. He had left that morning with approximately thirty to fifty dollars in cash, but was found without any money and with his left pants pocket turned inside-out. The killer did manage to escape, however, both Mrs. Spera and Mrs. Valente gave descriptions of the killer to the police.[4]

On April 30, 1985, three days after the shooting of Mr. Fiss, Petitioner and two other men robbed a Philadelphia jewelry store at gun point. Police arrived at the store while the crime was in progress because the store's proprietor, Vincent Gentile, activated a silent alarm. A foot chase ensued between the police and Petitioner. As he was being chased, Petitioner discarded a .38 caliber Colt revolver under a parked car. According to ballistics tests later performed by the police, the discarded revolver had fired the fatal bullet that killed Mr. Fiss. Petitioner was apprehended and was subsequently charged and found guilty for the murder of Mr. Fiss.

## II. *PROCEDURAL HISTORY*

Before the Honorable Albert F. Sabo, Petitioner was tried by a jury in the Philadelphia County Court of Common Pleas. Petitioner was represented by Michael G. Floyd, Esq. ("trial counsel"). On February 26, 1986, Petitioner was found guilty of murder in the first degree, robbery and possessing an instrument of crime.[5] On February 27, 1986, after the penalty phase, the jury found that there was one aggravating circumstance, the killing was committed during the perpetration of a felony, and no mitigating circumstances. *See* 42 Pa.C.S. § 9711(d)(6). As a result, the jury returned a sentence of death. Following the penalty phase and prior to the formal imposition of sentence, the trial court deferred sentencing pending the outcome of a court ordered psychiatric examination of Petitioner and the disposal of Petitioner's post-trial motions. After the result of Petitioner's psychiatric examination and the court's denial of Petitioner's post-trial motions, the judgment of sentence was entered on June 26, 1986. In addition to the death sentence, the sentencing judge also sentenced Petitioner to a consecutive sentence of ten to twenty years on the rob-

---

*wealth v. Porter,* 524 Pa. 162, 569 A.2d 942 (1990)("*Porter I* ").

4. Both Mrs. Valente's identification and Mrs. Spera's description of Petitioner were used as evidence at the trial. Also used as evidence at trial, was a fingerprint that police were able to lift off the glass of the beauty shop door. The fingerprint was identified by two finger-

print experts to be the fingerprint of Petitioner.

5. 18 Pa.C.S. §§ 2501; 2502(a)—Murder in the first degree.

 18 Pa.C.S. § 3701—Robbery.
 18 Pa.C.S. § 907—Possessing an instrument of crime.

bery conviction and two and one-half to five years on the conviction for possession of an instrument of crime.

Represented by new counsel, George H. Newman, Esq. ("appellate counsel"), Petitioner directly appealed the judgments of sentence to the Supreme Court of Pennsylvania. On February 8, 1990, the Pennsylvania Supreme Court affirmed the judgment of sentence. *Porter I*, 524 Pa. 162, 569 A.2d 942. The United States Supreme Court denied *certiorari* on October 15, 1990. *Porter v. Pennsylvania*, 498 U.S. 925, 111 S.Ct. 307, 112 L.Ed.2d 260 (1990). On September 7, 1994, Petitioner filed a *pro se* petition under the Post Conviction Relief Act (the "PCRA"), 42 Pa.C.S. § 9541 *et seq.* A substituted petition was filed under the PCRA on March 23, 1995. Ronald J. Sharper, Esq. was appointed to represent and assist Petitioner. Pursuant to *Commonwealth v. Turner*, 518 Pa. 491, 544 A.2d 927 (1988), Mr. Sharper filed a "no merit" letter with the court, stating the issues raised in Petitioner's PCRA petition were without merit and that his review of the case revealed no additional issues which could be raised in an amended petition.[6] The PCRA court conducted a hearing and, subsequently, on May 25, 1995, the PCRA court permitted Mr. Sharper to withdraw as counsel and dismissed Petitioner's petition.

Represented by current counsel, Billy Nolas, Esq., Petitioner filed an appeal to the Pennsylvania Supreme Court on June 22, 1995.[7] On March 16, 1999, the Pennsylvania Supreme Court affirmed the PCRA court's denial of PCRA relief. *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890 (1999)("*Porter II*"). Subsequently, Petitioner filed a petition for reconsideration, which was denied on April 19, 1999.

On January 18, 2000, Petitioner filed the instant Petition for a Writ of Habeas Corpus with this Court. On May 22, 2000, Petitioner filed his memorandum of law regarding the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"). In response, the Commonwealth filed its Memorandum of Law on October 30, 2000. On January 10, 2001, Petitioner filed his Reply Memorandum. The Court conducted a multi-part evidentiary hearing requiring numerous hearings which were intermittently conducted in July 2002, September 2002 and November 2002. The Court's evidentiary hearing was limited solely to a few specific guilt phase claims. Petitioner filed a Post–Hearing Memorandum on January 22, 2003. On January 24, 2003, Respondents filed their Post–Hearing Brief.

## III. *APPLICATION OF 28 U.S.C. § 2254*

### A. *28 U.S.C § 2254*

#### 1. Introduction to 28 U.S.C. § 2254

Petitioner brought his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Section 2254"). Section 2254 provides, in relevant part, that the court "shall entertain an application for a

---

**6.** In this case, the "no merit" letter is also commonly referred to as a *"Finley* letter." *See Commonwealth v. Finley,* 379 Pa.Super. 390, 550 A.2d 213 (1988).

**7.** Petitioner filed a second PCRA petition on January 10, 1997, raising the same constitutional claims that were on appeal to the Pennsylvania Supreme Court. Due to the pending appeal, Judge Sabo dismissed the second

PCRA petition without prejudice as "premature." Petitioner appealed. The Commonwealth then filed a Motion for Summary Disposition in the Pennsylvania Supreme Court. While the appeal was still pending, the Pennsylvania Supreme Court granted the Commonwealth's Motion for Summary Disposition on February 20, 1998.

writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2000). Accordingly, "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez,* 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). In 1996, Section 2254 was amended by the Antiterrorism and Effective Death Penalty Act of 1996.[8] The "AEDPA amended the federal habeas statutes, codifying limitations on the conditions under which the federal courts may grant either a writ of habeas corpus or an evidentiary hearing on a petition for such a writ." *Henry v. Horn,* 218 F.Supp.2d 671, 681 (E.D.Pa.2002) (citations omitted). Specifically, "[t]he AEDPA increases the deference federal courts must give to the factual findings and legal determinations of the state courts." *Werts v. Vaughn,* 228 F.3d 178, 196 (3d Cir.2000)(citing *Dickerson v. Vaughn,* 90 F.3d 87, 90 (3d Cir. 1996)).

**2. Threshold Requirements Under 28 U.S.C. § 2254**

**a. Exhaustion and Procedural Default**

Certain threshold requirements must be satisfied in order for a federal court to reach the merits of a Section 2254 petition. *Henry,* 218 F.Supp.2d at 681. "Two of these requirements, with respect to each claim in the petition, are that (1) petitioner has exhausted available state court remedies and (2) the claim has not been proce-

durally defaulted." *Id.* (citing 28 U.S.C. § 2254(b)(1)(A); *Coleman v. Thompson,* 501 U.S. 722, 729–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)).

**1.) Exhaustion of State Court Remedies**

"In the case of a person incarcerated from a judgment of a state court, a prerequisite to federal habeas review is that the petitioner have exhausted the remedies available to him in the state courts to the extent such remedies exist and are effective." *Werts,* 228 F.3d at 192 (citing 28 U.S.C. § 2254(b)(1)). The exhaustion requirement is established on the principle of comity which ensures that state courts are allowed the first opportunity to review challenges to state convictions based upon federal constitutional grounds and upholds the role of state courts in the protection of federally guaranteed rights. *Id.* (citations omitted). Specifically, 28 U.S.C. § 2254(b) provides the following:

(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be

---

**8.** The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 *et seq.,* went into effect on April 24, 1996. Since Petitioner petitioned for a writ

of habeas corpus subsequent to the effective date of the AEDPA, the provisions of the statute apply to his claims. *See Weeks v. Snyder,* 219 F.3d 245, 256 (3d Cir.2000).

estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

28 U.S.C. § 2254(b)(2000). In furtherance of the exhaustion requirement, 28 U.S.C. § 2254(c) provides that "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c)(2000).

In the habeas context, exhaustion "requires only that the same issues, or issues 'substantially equivalent' thereto, have been 'fairly presented' to the state courts." *Bronshtein v. Horn*, No. 99–2186, 2001 WL 767593, at *3 (E.D.Pa. July 5, 2001)(citing *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir.1997)). In order to satisfy the exhaustion requirement, "the petitioner must 'afford each level of the state courts a fair opportunity to address the claim.'" *Laird v. Horn*, 159 F.Supp.2d 58, 69 (E.D.Pa.2001)(quoting *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996); *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir.1999)). "More specifically, a habeas petitioner 'must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.'" *Id.* (quoting *McCandless,* 172 F.3d at 261). It is insufficient to make a "somewhat similar state-law claim." *Id.* (citing *McCandless,* 172 F.3d at 261). The burden of establishing that a habeas claim was fairly presented to the state courts falls upon the petitioner. *See Lines v. Larkins,* 208 F.3d 153, 159 (3d Cir.2000).

Generally, in the case where a petitioner has failed to exhaust all of the claims contained in his federal habeas petition, the federal court must dismiss the petition, allowing the petitioner to return to the state courts and exhaust any unexhausted claims. *Henry,* 218 F.Supp.2d at 682 (citations omitted). "Under the 'futility exception' to the exhaustion requirement, if state procedural rules bar the applicant from seeking further relief on the unexhausted claims in the state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *Id.* (citing 28 U.S.C. § 2254(b); *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Lines,* 208 F.3d at 165–66). However, in the case where "the futility exception applies, the claim is considered to be procedurally defaulted and may only be reached by federal courts if petitioner makes the standard showing of 'cause and prejudice' or establishes a fundamental miscarriage of justice." *Id.* (citing *Lines,* 208 F.3d at 166).

### 2.) *Procedural Default*

As explained above, claims deemed exhausted because of a state procedural rule are considered "procedurally defaulted." *Peterkin v. Horn,* 176 F.Supp.2d 342, 353 (E.D.Pa.2001) (citations omitted). Federal courts may not consider the merits of a procedurally defaulted claim "unless the petitioner demonstrates that (1) the procedural rule was not independent and adequate; (2) cause for his failure to comply with state procedural rules and prejudice resulting therefrom; or (3) that a fundamental miscarriage of justice will occur if not considered." *Id.* (citations omitted).

### a.) *Independent and Adequate State Procedural Grounds*

"The doctrine of procedural default ... prevents a federal habeas court from addressing a question of federal law decided by a state court 'if the decision of that court rests on a state law ground that is

independent of the federal question and adequate to support the judgment.'" *Jermyn v. Horn*, 266 F.3d 257, 278 (3d Cir.2001)(quoting *Coleman*, 501 U.S. at 729, 111 S.Ct. 2546). A state procedural rule is "independent" "when resolution of the state procedural law question [does not] depend [ ] on a federal constitutional ruling." *Laird*, 159 F.Supp.2d at 73 (quotation and internal quotation marks omitted). "[A] state procedural rule is 'adequate' only if the rule is 'consistently or regularly applied.'" *Jermyn*, 266 F.3d at 278 (quoting *Banks v. Horn*, 126 F.3d 206, 211 (3d Cir.1997)) (citations omitted). In order for a state procedural rule to provide an adequate basis to bar federal habeas review, "[t]hese conditions must have existed at the time of the state court procedural default." *Id.* (quotation and internal quotation marks omitted).

### b.) Cause and Prejudice

 Federal courts are precluded from considering the merits of a procedurally defaulted claim, "unless the petitioner 'establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse the default.'" *Lines*, 208 F.3d at 160 (quoting *McCandless*, 172 F.3d at 260) (citation omitted). In order to demonstrate "cause" sufficient to excuse a procedural fault and reach the merits of a petitioner's claim, "the petitioner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Werts*, 228 F.3d at 192–93 (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986))(stating some acceptable examples of "cause" for federal habeas review of a defaulted claim to be: a showing of a factual or legal basis for a claim that was not reasonably available to petitioner's counsel; a showing that procedural compliance was impracticable because of interference by governmental offi-

cials; and a claim of ineffective assistance of counsel that has been presented to the state courts as an independent claim before being used to establish cause for a procedural default). Once "cause" has been successfully demonstrated, petitioner must then prove "prejudice." In order to sufficiently demonstrate "prejudice" as a means of excusing a procedural default, "the habeas petitioner must prove 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 193 (quoting *Murray*, 477 U.S. at 494, 106 S.Ct. 2639) (citation omitted). Basically, this standard mandates that a habeas petitioner establish that he was denied "fundamental fairness" at his trial. *Id.* (citing *Murray*, 477 U.S. at 494, 106 S.Ct. 2639).

### c.) Fundamental Miscarriage of Justice

 "If the petitioner fails to demonstrate cause and prejudice for the default, the federal habeas court may still review an otherwise procedurally defaulted claim upon a showing that failure to review the federal habeas claim will result in a 'miscarriage of justice.'" *Id.* at 193. To demonstrate a "miscarriage of justice" sufficient to excuse a procedural default and reach the merits of a petitioner's claim, "the petitioner must prove that it is more likely than not that no reasonable juror would have convicted him." *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 326, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). This showing is made when "the petitioner presents a colorable claim of actual innocence of the crime for which he was convicted or the sentence imposed." *Terry v. Gillis*, 93 F. Supp.2d 603, 611 (E.D.Pa.2000)(citing *Schlup*, 513 U.S. at 314–15, 115 S.Ct. 851). Consequently, this exception is generally narrow and applicable in extraordinary

cases. *Werts,* 228 F.3d at 193 (citing *Murray,* 477 U.S. at 496, 106 S.Ct. 2639).

### 3. Review of Claims Under 28 U.S.C. § 2254

Once the threshold requirements of exhaustion and procedural default have been satisfied, a federal court may reach the merits of a Section 2254 petition. As mentioned earlier, Petitioner's federal habeas petition seeks relief pursuant to 28 U.S.C. § 2254. With regard to the proper standard of review of Petitioner's claims, Section 2254(d), as amended by the AEDPA, provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2000).

Thus, "Section 2254(d) states that applications for habeas corpus relief 'shall not be granted' unless one of the conditions set forth in subsections (d)(1) and (d)(2) is met." *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 887 (3d Cir.1999)(*en banc* )(citing 28 U.S.C. § 2254(d)). As a result, the conditions for granting habeas corpus relief under the AEDPA are twofold. *Id.* "[F]irst, habeas corpus relief is warranted when the state adjudication resulted in a decision that was 'contrary to' or an 'unreasonable application of' clearly established federal law, as determined by the Supreme Court." *Id.* (citing 28 U.S.C. § 2254(d)(1)). "[S]econd, relief is warranted when the state adjudication resulted in a decision that was 'based on an unreasonable determination of the facts in light of the evidence.'" *Id.* at 887–88 (citing 28 U.S.C. § 2254(d)(2)).

#### a. Analysis of State Court Legal Determinations Under 28 U.S.C. § 2254(d)(1)

According to 28 U.S.C. § 2254(d)(1), a habeas corpus writ may be issued only upon the clear satisfaction of one of the following two conditions, "the state-court adjudication resulted in a decision that (1) 'was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States'" *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "As an initial point, '[t]he threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final.'" [9] *Brand v. Gillis,* 210 F.Supp.2d

---

**9.** According to the AEDPA, "the 'threshold question ... is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state court conviction became final.'" *Holland v. Horn,* 150 F.Supp.2d 706, 761 n. 45 (E.D.Pa.2001)(quoting *Williams,* 529 U.S. at 389, 120 S.Ct. 1495). "The phrase 'clearly established Federal law' refers to the holdings, as opposed to the dicta, of Supreme Court opinions at the time that the state court conviction became final." *Pursell v. Horn,* 187 F.Supp.2d 260, 297 (W.D.Pa.2002)(quotation and internal quotation marks omitted). "A conviction is deemed final under Pennsylvania law 'at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of

677, 682 (E.D.Pa.2002)(quoting *Williams,* 529 U.S. at 390, 120 S.Ct. 1495). Although the "contrary to" and the "unreasonable application of" clauses are both part of 28 U.S.C. § 2254(d)(1), the clauses "should be accorded independent meaning." *Werts,* 228 F.3d at 197 (citing *Williams,* 529 U.S. at 405, 120 S.Ct. 1495). Thus, the application of 28 U.S.C. § 2254(d)(1) calls for a two-step analysis. *Matteo,* 171 F.3d at 891. "First, the federal habeas court must determine whether the state court decision was 'contrary to' Supreme Court precedent that governs the petitioner's claim." *Id.* "Relief is appropriate only if the petitioner shows that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *Id.* (quotation and internal quotation marks omitted). If petitioner fails to make such a showing, "the federal habeas court must ask whether the state court decision represents an 'unreasonable application of' Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified." *Id.* If petitioner is able to successfully make this showing, then the petition should be granted. *Id.*

■■■ In relation to the "contrary to" clause, "a federal habeas court may grant the Writ if the state court arrives at a conclusion opposite to that reached by this [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Brand,* 210 F.Supp.2d at 682–83 (quoting *Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495). Therefore, in order to receive habeas relief under the "contrary to" provision, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo,* 171 F.3d at 888. "This standard precludes granting habeas relief solely on the basis of simple disagreement with a reasonable state court interpretation of the applicable precedent." *Id.* If, after examination of the habeas claim under the "contrary to" clause, it appears that petitioner is not entitled to relief, the federal habeas court should proceed to the second step of the analysis, the "unreasonable application of" clause. *Id.* at 889.

■■■ "Under the 'unreasonable application of' clause, a federal writ may issue when the state court identifies the correct legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of a particular case." *Laird,* 159 F.Supp.2d at 77 (citing *Williams,* 529 U.S. at 413, 120 S.Ct. 1495). Under this standard, the appropriate inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Werts,* 228 F.3d at 196 (quotation and internal quotation marks omitted). Habeas courts may consider the decisions of inferior federal courts when determining whether the state court's application of the Supreme Court precedent is objectively reasonable. *Matteo,* 171 F.3d at 890. It is important to note that an unreasonable application of federal law differs from an incorrect application of that law. *Werts,* 228 F.3d at 196 (citation omitted). "[A] federal habeas

Pennsylvania, or at the expiration of time for seeking the review.' " *Holland,* 150 F.Supp.2d at 761 n. 45 (quoting 42 Pa.C.S.A. § 9545(b)(3)). Petitioner's conviction and death sentence became final on October 15, 1990, the date the United States Supreme

Court denied Petitioner's application for a writ of *certiorari* on his direct appeal. *Porter v. Pennsylvania,* 498 U.S. 925, 111 S.Ct. 307, 112 L.Ed.2d 260 (1990); *see also Holland,* 150 F.Supp.2d at 761 n. 45; *Laird,* 159 F.Supp.2d at 105 n. 25.

court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." *Id.* (citation omitted).

### b. Analysis of State Court Factual Determinations Under 28 U.S.C. § 2254(d)(2)

According to 28 U.S.C. § 2254(d)(2), a federal habeas court may issue a writ based on a claim involving the factual findings of a state court when the decision of the state court "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, state court determinations of fact have a presumption of correctness which can only be refuted thorough a showing of clear and convincing evidence.[10] 28 U.S.C. § 2254(e)(1)(2000). In order to grant relief under 28 U.S.C. § 2254(d)(2), "[t]he district court must conclude that the state court's determination of the facts was objectively unreasonable in light of the evidence available to the state court." *Attica,* 2001 WL 827455, at *3 (citations omitted). Similar to the "unreasonable application of" clause found in 28 U.S.C. § 2254(d)(1), Section 2254(d)(2) requires federal habeas courts to objectively examine the decisions of the state courts for their reasonableness. "Mere disagreement with the state court's determination, or even erroneous factfinding, is insufficient to grant relief if the court acted reasonably." *Id.* (citation omitted).

### c. De Novo Review of State Court Determinations

In some cases, courts may exercise plenary review of the merits of underlying claims. "[B]y its own terms § 2254(d) applies only to claims already 'adjudicated on the merits in State court proceedings.' " *Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001). According to the United States Court of Appeals for the Third Circuit ("Third Circuit"), in instances "when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA and explained in *Williams* do not apply." *Appel,* 250 F.3d at 210 (citations omitted); *see also, Hameen v. State of Delaware,* 212 F.3d 226, 248 (3d Cir.2000)(exercising pre-AEDPA independent judgment on a constitutional claim that the Delaware court did not address, even though it had the opportunity, reasoning that "under the AEDPA the limitation on the granting of an application for a writ of habeas corpus is only with respect to any claim that was adjudicated on the merits in state court proceedings."). In such a case, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." *Id.* (citing *McCandless,* 172 F.3d at 260). However, in these instances, "the state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence." *Id.* (citing 28 U.S.C. § 2254(e)(1)).

### B. Granting an Evidentiary Hearing Under 28 U.S.C. § 2254

A federal evidentiary hearing is intended to ensure that a petitioner has a full

---

**10.** Evidence that satisfies the clear and convincing standard is "evidence that is 'so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' " *Attica v. Frank,* No. 99–5113, 2001 WL 827455, at *3 (E.D.Pa. July 11, 2001)(quoting *United States Fire Ins. Co. v. Royal Ins. Co.,* 759 F.2d 306, 309 (3d Cir. 1985)).

and fair opportunity to have the factual basis of his claim considered. *See Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). "The AEDPA has limited the availability of evidentiary hearings on federal habeas review." *Henry,* 218 F.Supp.2d at 684 (citing *Campbell v. Vaughn,* 209 F.3d 280, 286 (3d Cir. 2000)). As amended, Section 2254(e) provides as follows:

> (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
>
> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—(A) the claim relies on—(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2000).

 Under § 2254(e), the federal habeas court must initially ask "whether the factual basis was developed in the state court, which is 'a question susceptible, in the normal course, of a simple yes or no answer.'" *Henry,* 218 F.Supp.2d at 684 (quoting *Michael Williams,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435

(2000)). In the case where the factual basis was developed, "the federal habeas court must apply the presumption of correctness codified in § 2254(e)(1), which petitioner can only rebut with clear and convincing evidence." *Id.* (citations omitted). "If the factual basis was not developed, then the federal habeas court must determine whether the petitioner failed to develop the factual basis of his claim." *Id.* (citing 28 U.S.C § 2254(e)(2)). In order to determine whether petitioner failed to develop the state court record, "[t]he question is not whether the facts could have been discovered but instead whether the petitioner was diligent in his efforts ... Diligence for purposes of the opening clause [of § 2254(e)(2) ] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 684–85 (quotation and internal quotation marks omitted). "Diligence ... will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Pursell,* 187 F.Supp.2d at 325 (quotation and internal quotation marks omitted).

 If the federal habeas court determines that petitioner failed to develop the state court record, an evidentiary hearing is barred unless petitioner is able to overcome the stringent standard set forth in Section 2254(e)(2)(A) and (B). *Henry,* 218 F.Supp.2d at 685. In the case where "the federal habeas court determines that petitioner did not 'fail' to develop the state court record, then the decision about whether to hold an evidentiary hearing is left to the discretion of the habeas court." *Id.* (citing *Campbell,* 209 F.3d at 286–87). "In exercising its discretion, the court should 'focus on whether a new evidentiary hearing would be meaningful, in that a new

hearing would have the potential to advance the petitioner's claim.' " *Id.* (quoting *Campbell,* 209 F.3d at 287).

## IV. *DISCUSSION*

In his Petition, Petitioner bases his habeas relief on fourteen claims. Petitioner's claims are as follows:

I. Petitioner's death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the jury was not permitted to consider and give effect to mitigating evidence that was presented. In addition, trial and appellate counsel provided ineffective assistance with respect to this issue, and relief is warranted under the Sixth and Fourteenth Amendments.

II. Petitioner was denied effective assistance of counsel at capital sentencing, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

III. Petitioner is entitled to relief from his conviction and sentence because trial counsel was ineffective at the guilt phase for failing to investigate, develop and present diminished capacity and guilty but mentally ill defenses based on Petitioner's brain damage and long history of mental illness.

IV. Petitioner was mentally ill and incompetent at the time of his trial proceedings and his conviction and death sentence therefore violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

V. Petitioner is entitled to relief from his sentence of death because the jury instructions and the sentencing-phase verdict slip indicated that the jury had to unanimously find any mitigating circumstances before it could give effect to that circumstance in its sentencing decision.

VI. Petitioner is entitled to relief from his conviction and sentence because the Commonwealth used its peremptory strikes in a racially discriminatory manner, thus depriving Petitioner of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

VII. The trial court's reasonable doubt instructions deprived Petitioner of due process of law. This erroneous instruction also resulted in the arbitrary imposition of the death penalty in violation of the Eighth and Fourteenth Amendments.

VIII. Unreliable hearsay testimony was admitted against Petitioner in violation of Petitioner's Sixth Amendment right to confrontation. The admission of this evidence resulted in an unreliable determination of guilt in violation of the Eighth and Fourteenth Amendments. Moreover, the admission of this evidence violated Petitioner's right to due process and effective assistance of counsel.

IX. The trial court's failure to instruct the jury that a sentence of life imprisonment would result in Petitioner's lifelong incarceration without possibility of parole violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments.

X. Petitioner's death sentence must be vacated because the Pennsylvania Supreme Court failed to provide him meaningful proportionality review in violation of 42 Pa.C.S. § 9711(h)(3)(iii) and federal constitutional law.

XI. The trial court violated Petitioner's rights to full and meaningful jury consideration of expert mental health mitigating evidence, in contravention of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

XII. Trial counsel rendered ineffective assistance by failing to properly investigate and present evidence that would have established a reasonable doubt about guilt.

XIII. Relief is appropriate because Petitioner was not provided with effective assistance of counsel at trial and on direct appeal.

XIV. Petitioner is entitled to relief from his conviction and death sentence because of the trial court's improper statements about appellate review.

(*See* Pet. Writ Habeas Corpus).

The Court concludes that Petitioner's fifth claim is meritorious. In his fifth claim, Petitioner contends that he is entitled to relief from his death sentence because the penalty phase jury instructions and verdict sheet, when taken together, created a barrier to the sentencer's consideration of all mitigating evidence in violation of the Eighth and Fourteenth Amendments. In light of the Supreme Court's holdings in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and the decision of the Third Circuit in *Banks v. Horn*, 271 F.3d 527, I find that the penalty phase jury instructions and verdict sheet created a "reasonable likelihood that the jury has applied the ... instructions in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. As a result, the Petition is granted with regard to Claim V and Petitioner's death sentence shall be vacated. Claims I, II, IX, X and XI are based solely upon alleged constitutional error regarding the sentencing phase of Petitioner's trial. Since I have vacated Petitioner's death sentence premised upon Claim V, the aforementioned Claims I, II, IX, X and XI are rendered moot and will not be discussed.

Petitioner's remaining claims, Claims III, IV, VI, VII, VIII, XII, XIII and XIV, include a mixture of constitutional claims which are either based solely upon the guilt phase of trial or include a combination of allegations pertaining to both the guilt and penalty phases of Petitioner's trial. I shall address each of Petitioner's claims which allege error solely regarding the guilt phase of trial. As for Petitioner's claims that include a combination of allegations pertaining to both the guilt and penalty phases of trial, I shall exclusively address these claims to the extent that they allege error at the guilt phase.

### A. *Application of Exhaustion and Procedural Default*

Petitioner asserts that all of the claims in his Habeas Petition were exhausted in state post-conviction proceedings. Petitioner argues that some of his claims were raised, and thus exhausted, during the state court direct appeal, while all of his claims were presented in the state court post-conviction proceedings. Regarding Petitioner's Claim XII, concerning trial counsel's alleged ineffectiveness for failing to properly investigate and present alibi evidence, the Commonwealth concedes that it is exhausted because Petitioner raised this claim on direct appeal to the state supreme court. (Commw.'s Mem. Law at 65). Thus, there is no exhaustion issue pertaining to Petitioner's Claim XII. However, the Commonwealth argues that Petitioner failed to exhaust most of his federal constitutional claims. The Commonwealth alleges that the claims raised in Petitioner's PCRA appeal to the state supreme court were all claims of ineffective assistance of *PCRA* counsel, *i.e.*, PCRA counsel should have claimed that direct appeal counsel was ineffective for failing to

raise the numerous claims of trial counsel's ineffectiveness or trial court error raised in the Habeas Petition.[11] Consequently, the Commonwealth argues that Petitioner's habeas claims are not exhausted. The Commonwealth alleges that Petitioner's unexhausted habeas claims are procedurally defaulted because any attempt to raise them in a subsequent PCRA petition at this juncture would be time-barred. 42 Pa.C.S. § 9545. Thus, regarding Petitioner's remaining claims, Claims III, IV, V, VI, VII, VIII, and XIII, the Commonwealth argues that they are not exhausted and, therefore, are procedurally defaulted.[12]

Petitioner has satisfied the exhaustion requirement in this case. The relevant claims in which exhaustion is at issue in this case, Claims III, IV, V, VI, VII and VIII, were presented, in almost verbatim fashion, to the state courts either on direct appeal, *see Porter I*, 524 Pa. 162, 569 A.2d 942, or during PCRA appeal. *See Porter*

*II*, 556 Pa. 301, 728 A.2d 890; Commw.'s Exs., Ex. C (Pet.'s PCRA Appeal Brief). Petitioner's PCRA appeal presented his claims as involving federal constitutional error and, with respect to each individual claim, he discussed the factual and legal basis for those claims. (Commw.'s Exs., Ex. C (Pet.'s PCRA Appeal Brief)). Furthermore, the Commonwealth's response to Petitioner's PCRA appeal reveals that it recognized and responded to Petitioner's claims as federal constitutional claims. (Pet.'s Reply Mem. Exs., Ex. A (Commw.'s PCRA Appeal Br.)). The Commonwealth did not treat Petitioner's PCRA appeal as only involving claims of ineffective assistance of PCRA counsel, but responded by arguing that Petitioner's claims were either meritless under federal constitutional law or waived because they had not been previously presented. (*Id.*). In further support that Petitioner's claims are indeed exhausted, most of Petitioner's federal constitutional claims were adjudicated on

---

11. For the most part, the Commonwealth's lack-of-exhaustion argument is based upon the contention that the claims actually raised by Petitioner and, therefore, the only related claims addressed by the state supreme court, were that post-conviction counsel was ineffective for failing to allege that appellate counsel was ineffective for not alleging that trial counsel was ineffective for not raising the specific constitutional claims. (*See* Commw.'s Mem. Law). The Commonwealth argues that since there is no federal constitutional right to counsel in state collateral proceedings, Petitioner is not entitled to relief because there is no concomitant right to effective assistance of counsel. *Id.* Based on this, the Commonwealth alleges that under 28 U.S.C. § 2254(a), Petitioner is not entitled to federal habeas review of the claim that was actually raised in the state supreme court. *Id.* Upon review of the state court record, including the Commonwealth's own position in the state courts, Petitioner did not raise his claims as claims of ineffective assistance of PCRA counsel, but fairly presented his federal constitutional claims in the state court in a manner that virtually mirrors his Habeas Petition.

12. Petitioner's Claim XIII, a catch-all ineffective assistance of counsel claim based upon the allegations contained within the Habeas Petition, was not presented in verbatim fashion to the state courts. However, Petitioner alleged ineffective assistance of counsel throughout his PCRA appeal regarding nearly every claim. Since Petitioner alleged ineffective assistance with respect to practically every one of his PCRA appeal claims, the Court shall deem Claim XIII exhausted. Regarding Claim XIV, the Commonwealth admits that Petitioner has previously raised this claim in his Pennsylvania Supreme Court brief regarding his direct appeal. However, the Commonwealth argues that Petitioner's claim is procedurally defaulted because Petitioner has never presented his federal claim's factual and legal substance to the state courts in a manner that put them on notice that a federal claim was being asserted. Due to complexity of this issue, the Court has chosen to address the exhaustion of Claim XIV within its analysis of that claim.

the merits by the *Porter II* court. *See Porter II*, 556 Pa. 301, 728 A.2d 890.

As a result of the aforementioned, Petitioner has fairly presented his habeas claims to the state courts. Not only has Petitioner fairly presented his claims to the state courts, but the *Porter II* court addressed the claims, for the most part, on their merits. Since Petitioner has fairly presented Claims III, IV, V, VI, VII and VIII to the state courts, thereby allowing those courts the opportunity to decide and correct the alleged violations of constitutional rights, they are exhausted.[13] *Henderson v. Frank*, 155 F.3d 159, 164 (3d Cir.1998); *see also Pursell*, 187 F.Supp.2d at 288–89 (stating "[a]lthough the Pennsylvania courts held that most of Pursell's claims were waived or time-barred, these claims were exhausted simply because they were presented to the courts for review.... [t]he exhaustion doctrine requires nothing more").

### B. *Evidentiary Hearing*

■ The Court granted Petitioner's requests for an evidentiary hearing regarding Claims III, IV, XII and XIII.[14] Upon review of these claims, I concluded that the factual basis of the claims had not been developed in the state court. Examination of the state court record revealed that Petitioner specifically requested an evidentiary hearing regarding Claims III, IV and XII. (*See* Commw.'s Exs., Ex. C (Pet.'s PCRA Appeal Brief)). As a result, Petitioner was diligent in his efforts to develop the factual bases of the pertinent claims in

the state court. *See Pursell*, 187 F.Supp.2d at 325. That is, in light of the information available at the time, Petitioner made a reasonable attempt to investigate and pursue the claims in state court. Since Petitioner did not fail to develop the state court record, the decision about whether to hold an evidentiary hearing is left to the discretion of this Court. I concluded that an evidentiary hearing on Claims III, IV, XII and XIII would be meaningful because it would have the potential to advance Petitioner's claims. As a result, the Court held a multi-part evidentiary hearing that intermittently took place in July 2002, September 2002 and November 2002.

### C. *Analysis of Petitioner's Claims*

### 1. Petitioner's Sentencing Phase Claim

### a. *Claim V Petitioner is entitled to relief from his sentence of death because the jury instructions and the sentencing phase verdict slip indicated that the jury had to unanimously find any mitigating circumstances before it could give effect to that circumstance in its sentencing decision.*

■ Petitioner asserts that "[i]t is indisputable that in a capital case the sentencer may not be precluded from considering and giving full effect to any mitigating aspect of the defendant's character, background or record, or the circumstances of the offense." (Pet.

---

13. Since this Court has concluded that Petitioner's claims were exhausted in the state courts, the Commonwealth's argument that Petitioner's claims are procedurally defaulted need not be addressed.

14. As previously mentioned, Claim XIII is a catch-all ineffective assistance of counsel claim. As a catch-all claim, Claim XIII con-

tains general terms and does not include specific allegations. Claim XIII includes allegations based upon the other claims in the petition. The Court permitted an evidentiary hearing regarding this claim based upon the claim's interdependence with Claims III, IV and XII, which are, or include, ineffective assistance of counsel claims.

Writ Habeas Corpus, ¶ 100)(citing *Mills v. Maryland*, 486 U.S. at 374–75, 108 S.Ct. 1860). Relying on this basis, Petitioner argues that this fundamental principle of Eighth Amendment jurisprudence was violated in his case because "[t]he trial court failed to advise the jury that any juror who individually found a mitigating circumstance could weigh that circumstance against the aggravating circumstances unanimously found, *even if there was not unanimity as to the existence of that mitigating circumstance.*" (*Id.*, ¶ 101). Petitioner further argues that the penalty phase jury instructions and verdict sheet instructions actually led the jury to wrongfully believe that it had to be unanimous in finding any mitigating circumstance before it could give effect to that circumstance in its sentencing determination. (*Id.*). Relying on *Mills v. Maryland*, 486 U.S. at 375, 108 S.Ct. 1860, Petitioner argues that "the penalty phase jury instructions and verdict sheet indicated that the jury had to unanimously find a mitigating circumstance before it could be given effect in the sentencing decision, and thus created a 'barrier to the sentencer's consideration of all mitigating evidence', in violation of the Eighth and Fourteenth Amendments." (Pet.'s AEDPA Mem. Law at 51)(citing *Mills*, 486 U.S. at 375, 108 S.Ct. 1860). Petitioner's argument for habeas relief centers upon the contention that the Pennsylvania Supreme Court's denial of relief on this claim "was contrary to, and an unreasonable application of, *Mills*." (*Id.*).

### 1.) *Mills v. Maryland*

■ The constitutional prohibition against cruel and unusual punishment mandated by the Eighth Amendment re-

quires that "the sentencer in a death penalty case must be permitted to consider all relevant mitigating evidence that the defendant proffers as counseling less than a sentence of death." *Frey v. Fulcomer*, 132 F.3d 916, 920 (3d Cir.1997)(citing *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). Consequently, a sentencer cannot be prevented from considering any such mitigating evidence. *Id.* (citing *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings*, 455 U.S. at 114, 102 S.Ct. 869). Thus, "Eighth Amendment jurisprudence requires that *each sentencer* be permitted to consider *all mitigating circumstances.*" *Id.* at 921 (emphasis added).

■ Relying on the Eighth Amendment, the United States Supreme Court in *Mills v. Maryland* held that sentencing instructions that create a substantial likelihood that reasonable jurors may believe that they are precluded from considering any mitigating evidence in the absence of unanimity are constitutionally invalid.[15] *Mills*, 486 U.S. at 384, 108 S.Ct. 1860. Based upon this premise, the *Mills* Court vacated a death sentence because there was "a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought that they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* Although *Mills* originally outlined the legal standard for reviewing a challenge to jury instructions in which it is

---

**15.** *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), was clearly established federal law at the time that Peti-

tioner's state court conviction became final in 1990.

claimed that the instruction is ambiguous and open to an incorrect interpretation, the Supreme Court defined the present legal standard in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316.[16] *Frey*, 132 F.3d at 921; *see also*, *Abu–Jamal v. Horn*, —— F.Supp.2d ——, —— n. 80, 2001 WL 1609690, at *115 n. 80 (E.D.Pa.2001)(stating "[t]here is no dispute ... that the standard to be applied to *Mills* claims is that articulated in *Boyde* "). In *Boyde*, the United States Supreme Court clarified the legal standard to be "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. When assessing the possible effect of a challenged jury instruction, it must be viewed in the context of the overall charge because a single instruction to a jury may not be judged in artificial isolation. *Id.* at 378, 110 S.Ct. 1190 (citations omitted).

**16.** *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), was clearly established federal law at the time that Petitioner's state court conviction became final. *Boyde* was decided on March 5, 1990. *See Boyde*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316. As previously mentioned, Petitioner's state court conviction became final upon the denial of *certiorari* on October 15, 1990. Since *Boyde* was decided before Petitioner's state court conviction became final, it was clearly established federal law at the time that Petitioner's state court conviction became final. *See Holland*, 150 F.Supp.2d at 761 n. 45; *Laird*, 159 F.Supp.2d at 105 n. 25.

**17.** In his *Porter II* Brief, Petitioner's *Mills* claim relied upon the unconstitutionally of the jury charge and verdict form. (Commw.'s Exs., Ex. C (Pet.'s PCRA Appeal Br.)). However, the last paragraph of the brief includes an allegation of ineffective assistance of counsel in relation to the claim. (*Id.* at 90). Despite the fact that Petitioner's brief mainly relies on the unconstitutionality of the jury charge and verdict form, the Pennsylvania

### 2.) State Court Decision [17]

In *Porter II*, the Pennsylvania Supreme Court found Petitioner's *Mills* claim to be meritless based upon the premise that the *Porter* penalty phase jury instructions and verdict form mirrored the Pennsylvania death penalty statute, 42 Pa.C.S. § 9711(c)(1)(iv). *Porter II*, 728 A.2d at 900. In support of its ruling, the *Porter II* court solely relied upon two state court opinions, *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 366 (1995), and *Commonwealth v. Hackett*, 534 Pa. 210, 627 A.2d 719 (1993).[18] *Id.* Although the *Porter II* court acknowledged that Petitioner's claim was based upon *Mills*, the opinion is completely devoid of any analysis under *Mills* or *Boyde*. *Id.* As a consequence of the state supreme court's failure to properly analyze Petitioner's claim in accordance with *Mills* and *Boyde*, the Court finds that the *Porter II* court's decision regarding Petitioner's claim was an objectively unreasonable application of *Mills*. *See Banks*, 271 F.3d at 545 n. 21.[19]

Supreme Court framed its opinion on the premise of ineffective assistance of counsel. *Porter II*, 728 A.2d at 900 (stating "[a]ppellant next claims that Attorney Sharper and all prior counsel were ineffective for failing to raise the issue that the jury instructions and the sentencing-phase verdict slip ... violat[ed] the dictates of *Mills v. Maryland* "). Even though the Pennsylvania Supreme Court framed its decision upon the issue of ineffective assistance of counsel, the court addressed Petitioner's *Mills* claim on the merits. *Id.*

**18.** *Commonwealth v. Hackett* was vacated by the Eastern District of Pennsylvania in *Hackett v. Price*, 212 F.Supp.2d 382 (E.D.Pa.2001). In *Hackett v. Price*, the District Court concluded "that the [jury] instructions and [penalty phase] verdict form created a reasonable likelihood that the jury understood the instructions in such a way that it was improperly prevented from considering mitigating evidence." *Hackett*, 212 F.Supp.2d at 400.

**19.** In *Horn v. Banks*, 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002), the United

### 3.) *Analysis of State Court Decision*

#### a.) *Jury Instructions Mirror Death Penalty Statute*

Relying upon 42 Pa.C.S. § 9711(c)(1)(iv), the state court's first explanation for its denial of Petitioner's *Mills* claim is based upon the holding that "the trial judge's charge to the jury virtually mirrored 42 Pa.C.S. § 9711(c)(1)(iv)." *Porter II*, 728 A.2d at 900 (citation omitted). Specifically, the Pennsylvania Supreme Court reasoned that "an instruction that tracks the language of the statute, such as the one given here, cannot be in violation of the *Mills* standard." *Id.* at 900. Thus, the *Porter II* court did not examine Petitioner's jury instructions in the context of a lay jury's interpretation, but examined the instructions in relation to their similarity with 42 Pa.C.S. § 9711(c)(1)(iv).

Similar to the instant case, the Pennsylvania Supreme Court in *Commonwealth v. Banks*, 540 Pa. 143, 656 A.2d 467 (1995), held that the *Mills* claim asserted by Banks was without merit because the "[jury] instruction, which mirrors the language found in the death penalty statute of our Sentencing Code, has previously been reviewed by this court and determined not to violate *Mills*." *Commonwealth v. Banks*, 656 A.2d at 470. Upon review of the state supreme court's decision regarding the jury instruction, the Third Circuit in *Banks v. Horn* pointed out that the Pennsylvania Supreme Court "looked at one part of the instruction and found that it was acceptable because it tracked the permissible statutory provisions and did not 'infer' a requirement of unanimity." *Banks*, 271 F.3d at 546. The Third Circuit also pointed out that the Pennsylvania Supreme Court's "conclusion was based not on how a juror might interpret its content, but on its own previous statutory construction of the language at issue." *Id.* The *Banks* Court concluded that the Pennsylvania Supreme Court ruling involved an unreasonable application of *Mills* because the court "ruled that there was no *Mills* violation without ever really applying the teachings of *Mills*, and by examining the statute, not the potential for confusion by jurors in what they were told to do." *Id.* at 545; *see also Hackett*, 212 F.Supp.2d at 404 (stating that a court that focuses on whether the contested jury instructions mirror a statute "misconstrues the court's task in examining for *Mills* error by focusing on the meaning of the statute rather than on the issue of jury confusion").

Like the Pennsylvania Supreme Court in *Commonwealth v. Banks*, the *Porter II* court incorrectly analyzed Petitioner's *Mills* claim by examining how the jury instructions mimicked the Pennsylvania death penalty statute, not the potential for jury confusion. The *Porter II* court upheld the jury instructions because the language mirrored the statute, however, the

States Supreme Court directed the Third Circuit Court to analyze whether *Mills v. Maryland* could be retroactively applied under the principles articulated in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), for purposes of the Third Circuit Court's collateral review of Bank's conviction and sentence. *See Banks v. Horn*, 316 F.3d 228, 229 (3d Cir.2003). Consequently, the Supreme Court reversed that portion of the Third Circuit's opinion in *Banks v. Horn*, 271 F.3d 527 (3d Cir.2001), dealing with *Teague*. *Id.* In *Banks v. Horn*, 316 F.3d 228 (3d Cir.

2003), the Third Circuit concluded "that *Mills* did not announce a new rule of constitutional law for retroactivity purposes, and thus that our analysis and resolution of Banks's *Mills* claim was proper." *Id.* at 229–30. The Third Circuit clarified that the new opinion regarding the *Teague* issue did not disturb the remainder of its previous opinion, including its discussion and holding regarding the merits of Banks's *Mills* claim. *Id.* at 247. Thus, as stated by the Third Circuit, its "judgment requiring a new penalty phase for Banks will remain unchanged." *Id.*

court failed to examine the effect of the instructions on the minds of the jurors. In so doing, the *Porter II* court performed an incorrect analysis of Petitioner's claim. In light of the flawed analysis performed by the Pennsylvania Supreme Court in *Porter II*, this Court concludes that the *Porter II* court did not analyze Petitioner's *Mills* claim in accordance with the principles set forth by *Mills* and its progeny; thereby, the Pennsylvania Supreme Court ruling involved an unreasonable application of *Mills*.

### b.) State Court Precedent

In *Porter II*, the Pennsylvania Supreme Court supported its denial of Petitioner's *Mills* claim based upon its own precedent. In *Banks*, the Third Circuit noted that a habeas court's task in conducting a habeas review "is to review state court proceedings not to ensure the consistency of the Pennsylvania Supreme Court's application of its law." *Banks*, 271 F.3d at 544. Therefore, while a habeas court is expected to respect and, at times, defer to state court precedent, the court's true task is "to assure proper application of United States Supreme Court teachings." *Id.* As a result, "[t]he Pennsylvania Supreme Court's reliance on its own precedents ... is not sufficient to render its application of *Mills* objectively reasonable." *Henry*, 218 F.Supp.2d at 687. By simply relying upon its own precedents, and failing to examine the effect of the jury instructions and verdict form upon the jury in Petitioner's sentencing trial, the Pennsylvania Supreme Court failed to apply the teachings of *Mills. Id.* at 688.

*Banks* instruction:

Members of the jury, you must now decide whether the defendant in this case is to be sentenced to death or to life imprisonment on each of the Informations upon which you have returned a verdict of guilty of murder

### 4.) *Examination of Penalty Phase Jury Instructions, Burden of Proof Instructions and Verdict Form*

A review of the *Porter II* court's analysis of Petitioner's sentencing phase jury instructions and verdict form demonstrates that the Pennsylvania Supreme Court unreasonably applied *Mills* to Petitioner's case. The Court will examine Petitioner's *Mills* claim in the following fashion: (1) the jury instructions; (2) the burden of proof instructions; and (3) the verdict form.

### a.) Penalty Phase Jury Instructions

■■■ An examination of the *Porter* jury instructions in conjunction with the jury instructions found in *Banks* is instructive in this Court's analysis of Petitioner's *Mills* claim. In *Banks*, the Third Circuit analyzed virtually identical instructions and found them to be in violation of *Mills. Banks*, 271 F.3d at 549. Upon examination of the *Banks* instructions, the Third Circuit stated that "[t]he instructions are in themselves ambiguous, allowing for a jury to infer that the requirement of unanimity applies both to aggravating and mitigating circumstances." *Id.* at 548. The Court then concluded its analysis of the jury instructions with the resounding statement that "[t]here is no way a juror would understand that a mitigating circumstance could be considered by less than all jurors." *Id.*

A side-by-side comparison of the *Banks* jury instructions with the *Porter* instructions reveals material similarities:

*Porter* instruction:

Ladies and gentlemen of the jury, you must now decide whether the defendant is to be sentenced to death or life imprisonment. The sentence will depend upon your findings concerning aggravating and mitigating

in the first degree. The sentence you will impose will depend on your findings concerning aggravating and mitigating circumstances. The Crime Code in this Commonwealth provides that the verdict must be a sentence of death *if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances,* or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances.

\* \* \*

Remember, under the law of this Commonwealth, your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find one or more aggravating circumstances which then outweigh any mitigating circumstances.

*Banks,* 271 F.3d at 546 (emphasis added).

circumstances. The sentencing statute provides that the verdict must be a sentence of death *if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances,* or, if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances, the verdict must be a sentence of life imprisonment in all other cases.

\* \* \*

Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance. Or, if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other indications your verdict must be a sentence of life imprisonment.

*Porter,* N.T. 2/27/86, p. 68–70 (emphasis added).

By comparing the pertinent parts of the jury charges side-by-side, the instructions are virtually identical. Specifically, the relevant portions of the instructions, the clauses stating *"if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances "*, are identical. Regarding the relevant portion in the *Banks* instruction, the Third Circuit concluded that "read in its entirety, the relevant portion of the jury charge emphasizes the importance of a unanimous finding, using the phrase frequently and in close proximity to—within seven words of—the mitigating circumstances clause." *Banks,* 271 F.3d at 547–48. Based upon this close proximity, the *Banks* court found that "the clause is, to the ear and to the mind, one sound bite—it is quite possible that a juror would, regardless of other qualifying language, believe that mitigating circumstances had to be found unanimously." *Id.* at 548.

Mirroring the *Banks* jury charge, the *Porter* jury instructions similarly con-

tained the "sound bite" that the jury could have reasonably believed required that mitigating circumstances be found unanimously. The above comparison with the *Banks* jury instructions demonstrates how the "sound bite", created by the close proximity of the phrase emphasizing the importance of unanimity with the mitigating circumstances clause, allowed for the *Porter* jury to infer that the requirement of unanimity applied both to aggravating and mitigating circumstances. Such an inference is not only incorrect, but constitutionally impermissible according to *Mills.* Bound by the precedent set forth by the Third Circuit in *Banks,* this Court adopts the Third Circuit's finding that "[t]he instructions are in themselves ambiguous, allowing for a jury to infer that the requirement of unanimity applies both to aggravating and mitigating circumstances." *Banks,* 271 F.3d at 548. As a result, "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the con-

sideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190.

*b.) Penalty Phase Burden of Proof Instructions*

Following the auspices of *Boyde*, this Court will not judge the instructions at issue in artificial isolation, but will view them in the context of the overall charge. *Boyde*, 494 U.S. at 378, 110 S.Ct. 1190. Thus, I will now examine the burden of proof instructions employed in Petitioner's case. In its analysis, the *Banks* Court also examined the burden of proof instructions applied in that case. *Banks*, 271 F.3d at 548–49. In *Banks*, the Third Circuit concluded that the charge pertaining to the relevant burdens of proof relating to aggravating and mitigating circumstances increased jury confusion regarding unanimity. *Id.* Like the jury instructions regarding aggravating and mitigating circumstances, the *Porter* burden of proof instructions are also materially identical to the *Banks* instructions. By comparing the pertinent parts of the instructions side by side, the instructions are virtually identical.[20]

*Banks* burden of proof instruction:

The defendant has the burden of proving mitigating circumstances by a preponderance of the evidence. The preponderance of the evidence is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other or, as has been explained to you, a preponderance exists whenever the scales tip ever so slightly.

*Banks*, 271 F.3d at 548.

*Porter* burden of proof instruction:

The defendant has the burden of proving mitigating circumstances, but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other side.

*Porter*, N.T. 2/27/86, p. 69.

In reference to the burden of proof instructions, the *Banks* Court stated that "[a] reasonable juror could readily infer from the fact that the distinctions between the burden of proof were explained, but no mention was made of a distinction between a requirement of unanimity for a finding of aggravating circumstances and the requirement for mitigating circumstances, the same requirement of unanimity applied." *Banks*, 271 F.3d at 548. Upon a reading of all of the jury instructions, including the burden of proof instructions, the Third Circuit held that "[c]onsidered as a whole, the jury instructions leave no doubt that 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Id.* at 549 (quoting *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190).

Since the *Porter* burden of proof instructions are materially identical to the *Banks* instructions, both the analysis and holding found in *Banks* is applicable to the *Porter* instructions. Also, due to the analogous nature of both sets of burden of proof instructions, the *Porter* instructions

---

**20.** Prior to their burden of proof instructions, both trial courts in *Porter* and *Banks* explained the requirement for finding aggravating circumstances. *Porter*, N.T. 2/27/86; *Banks*, 271 F.3d at 548. In *Porter*, the trial court explained that "[t]he Commonwealth has the burden of proving aggravating circumstances beyond a. reasonable doubt." *Porter*, N.T. 2/27/86, p. 69.

suffer from the same infirmity found in the *Banks* instructions. Equivalent to *Banks,* the *Porter* trial court explained the distinctions between the burden of proof, but made no mention of a distinction between a requirement of unanimity for a finding of aggravating circumstances and the requirement for mitigating circumstances. As a result, I adopt the *Banks* decision and find that *Porter* burden of proof instructions plausibly added to jury confusion regarding the requirement of unanimity in the consideration of mitigating circumstances. Evaluated as a whole, the *Porter* burden of proof instructions in conjunction with the jury instructions show that "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190.

#### c.) Penalty Phase Verdict Form

 Petitioner relies upon the *Porter* penalty phase verdict form to further support his argument regarding habeas relief. The verdict form is an important tool "in determining possible jury error in interpreting instructions because there is no extrinsic evidence of what the jury actually thought, and so the court is left with only the verdict form and the judge's instructions." *Hackett,* 212 F.Supp.2d at 409 (citing *Mills,* 486 U.S. at 381, 108 S.Ct. 1860). Although this Court has already considered the language of the particular jury instructions at issue and the additional burden of proof instruction, I will also examine the *Porter* penalty phase verdict form.

In *Porter II*, in conjunction with its *Mills* analysis, the Pennsylvania Supreme Court examined, and subsequently upheld, Petitioner's penalty phase verdict form. *Porter II,* 728 A.2d at 900. The Pennsylvania Supreme Court noted that, similar to the jury instructions, the verdict form "closely tracked the language of the [Pennsylvania death penalty] statute." *Id.* In upholding the constitutionality of Petitioner's penalty phase verdict form, the *Porter II* court relied upon its own precedent in *Commonwealth v. Hackett,* 534 Pa. 210, 627 A.2d 719. *Id.* As mentioned earlier, it is improper to only analyze a *Mills* claim based solely upon state court precedent and the fact that the verdict form language mirrored the language of the Pennsylvania death sentence statute. *See supra* Part IV.C.1.a.3.). Under *Mills,* a court is required "to assess whether a need for a unanimous finding of mitigating circumstances is one that 'a reasonable jury could have drawn from ... the verdict form employed.'" *Banks,* 271 F.3d at 549 (quoting *Mills,* 486 U.S. at 375–76, 108 S.Ct. 1860). Thus, as evidenced by the *Porter II* opinion, the *Porter II* court undertook a different inquiry than that required under *Mills.* By basing its decision upon an improper inquiry, the *Porter II* court conducted an unreasonable application of *Mills.* Upon review of the verdict form in accordance with the proper inquiry under *Mills,* this Court finds that a reasonable juror could have drawn from the verdict form that there was a need for a unanimous finding of mitigating circumstances.

The *Porter* verdict form states as follows:

**We, the jury, having heretofore determined that the above-named defendant is guilty of murder of the first degree, do hereby further find:**

1. ☐ at least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s) is/are _____.

2. ☐ one or more aggravating circumstance(s) which outweigh any mitigating circumstance(s).
The aggravating circumstance(s) is/are _____.
The mitigating circumstance(s) is/are _____.

3. ☐ no aggravating circumstance; or mitigating circumstance(s) which outweigh any aggravating circumstance(s).
The aggravating circumstance(s) is/are _____.
The mitigating circumstance(s) is/are _____.

Therefore, we, the jury, unanimously sentence the defendant to:

☐ death
☐ life imprisonment

_____ _____
 DATE FOREMAN

*Porter* Penalty Phase Verdict Form, p. 1 (emphasis added). Just like my previous analysis of the *Porter* jury instructions, the *Banks* decision also offers direction regarding unconstitutional jury confusion precipitated by a penalty phase verdict form. *Banks*, 271 F.3d at 549–50. Similar to the instant case, the *Banks* Court engaged in an analysis of the verdict form after concluding that the Pennsylvania Supreme Court failed to engage in the proper analysis required by *Mills*. *Id.*

The verdict form utilized in *Banks* states as follows:

1. We the jury unanimously sentence the defendant in the above matter to

 X Death

 ___ Life Imprisonment

2. (To be completed if the Sentence is Death) **We the jury have found unanimously**

____ At least one aggravating circumstance and no mitigating circumstances. The aggravated circumstance(s)(is)(are):

1. ___ In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

2. ___ The defendant has a significant history of felony convictions involving the use or threat of violence to the person.

3. ___ The defendant has been convicted of another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

Or

X One or more aggravating circumstances which outweigh any mitigating circumstance or circumstances.

The aggravating circumstance(s)(is)(are):

1. ___ In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

2. ___ The defendant has a significant history of felony convictions involving the use of threat of violence to the person.

3. X The defendant has been convicted of another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

The mitigating circumstance(s)(is)(are):

1. X The defendant was under the influence of extreme mental or emotional disturbance.

2. ___ The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

3. ___ Any other mitigating matter concerning the character or record of the defendant or the circumstances of his offense.

*Banks,* 271 F.3d at 549–50 (emphasis supplied). The *Banks* Court focused its analysis primarily upon the language of the verdict form. *Id.* Specifically, the Court concentrated on the language found in the introduction to the second question dealing with aggravating and mitigating circumstances. *Id.* The Court determined that since that question began with the phase "We the jury have found unanimously", then "[b]y implication, everything that follow[ed] was found unanimously." *Id.* at 550. On that basis, the Court explained that "[w]hat follows is a reference both to aggravating and to mitigating circumstances, with no additional language that would imply that there is a different standard for aggravating circumstances than there is for mitigating circumstances." *Id.* Noting the absence of any affirmative language explaining that a mitigating circumstance may be found even if only one juror had found that circumstance to exist, the *Banks* Court concluded that "the structure and form of the verdict slip itself runs afoul of the dictates of *Mills.*" *Id.* Based upon the aforementioned, the *Banks* Court found "it only reasonable to conclude that the form itself is at least confusing, and more likely suggestive, regarding the need for unanimity as to mitigating circumstances." *Id.* at 550.

Like the *Banks* verdict form, the language employed in the *Porter* form is confusing and, at the least, is more likely suggestive of a need for unanimity regarding mitigating circumstances. Unlike in *Banks,* the portion of Petitioner's verdict form which specifically dealt with aggravating and mitigating circumstances did not explicitly begin with the phrase "We the jury have found unanimously", but began with "We, the jury, having determined that the above-named defendant is guilty of murder of the first degree, do hereby further find." [21] Admittedly, the *Porter* verdict form is not as misleading as the *Banks* verdict form in regards to unanimity. Nevertheless, the *Porter* verdict form is still confusing in light of the fact that the jury was previously required to unanimously determine that Petitioner was guilty of murder in the first degree. Any confusion concerning unanimity could have been clarified by additional language implying that there is a different standard for aggravating circumstances than there is for mitigating circumstances, however, as was the case in *Banks,* such affirmative language was not employed. Like the *Banks* verdict form, the *Porter* verdict form did not contain any affirmative language explaining that a mitigating circum-

---

**21.** The portion of the *Porter* verdict form which deals with the sentence of death or life imprisonment states, "[t]herefore, we, the jury, unanimously sentence the defendant to." *See Porter* Penalty Phase Verdict Form, p. 1. Even though this section explicitly requires unanimity, whereas the aggravating and miti-

gating circumstances portion failed to use such explicit language, this explicit statement does not clarify the confusion regarding unanimity in relation to the jury's finding of aggravating and mitigating circumstances in the preceding section.

stance may be found even if only one juror had found that circumstance to exist. Based upon review of the *Porter* verdict form, in conjunction with the *Banks* ruling and the *Porter* jury instructions, this Court concludes that a reasonable juror could have drawn from the verdict form that there was a need for a unanimous finding of mitigating circumstances. *Banks*, 271 F.3d at 549 (quoting *Mills*, 486 U.S. at 375–76, 108 S.Ct. 1860).

### 5.) Conclusion

After considering the *Porter* jury instructions in combination with the penalty phase verdict form, and in light of the decision in *Banks v. Horn*, 271 F.3d 527, this Court concludes that there exists "a reasonable likelihood the jury has applied the challenged instructions in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. It is the combined impact of the unclear jury charge and misleading verdict form which requires the Court to grant Petitioner habeas relief regarding his *Mills* claim. Based upon the teachings of *Mills*, its progeny, Supreme Court and Third Circuit precedent, this Court concludes that the *Porter II* court unreasonably applied the dictates of *Mills* and *Boyde* in reviewing the *Porter* penalty phase jury instructions and verdict form. As a result, Petitioner is granted habeas relief on Claim V and his sentence of death is vacated.

### 2. Petitioner's Guilt Phase Claims

### a. Claim III Petitioner is not enti-

*tled to relief from his conviction and sentence because trial counsel was not ineffective at the guilt phase for failing to investigate, develop and present diminished capacity and guilty but mentally ill defenses based on Petitioner's alleged brain damage and alleged history of mental illness.*

Petitioner asserts that trial counsel, Michael Floyd, Esq., rendered ineffective assistance of counsel because he failed to investigate, develop and present diminished capacity and guilty but mentally ill defenses based upon Petitioner's impaired mental health. (Pet. Wit Habeas Corpus, ¶¶ 89–90). Petitioner's argument focuses on the assertion that his alleged mental health impairments, including organic brain damage and a long history of mental illness, "would have presented viable defenses at the guilty phase of the trial—including diminished capacity and/or guilty but mentally ill defenses—had they been properly investigated, prepared and presented by counsel." (*Id.*, ¶ 89). Petitioner claims that the *Porter II* court's denial of his claim was contrary to, and an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). (Pet.'s AEDPA Mem. Law at 49).

### 1.) State Court Decision

In *Porter II*, the Pennsylvania Supreme Court denied Petitioner's claim based upon the ground that, as found on direct appeal, the psychiatric report prepared by Dr. Camiel for the trial court revealed that Petitioner was not mentally ill.[22] *Porter*

---

**22.** The report to which the Pennsylvania Supreme Court refers is a February 28, 1986 mental health evaluation by psychiatrist, Dr. Edwin Camiel. (Pet.'s AEDPA Mem. Law at 43; N.T. 6/26/86, p. 10–14). Dr. Camiel had prepared a prior mental health evaluation of Petitioner for a pre-sentence report in 1979.

(Commw.'s Mem. Law at 5). After the penalty phase and prior to the formal imposition of sentence, the trial court directed Dr. Camiel to evaluate Petitioner. (*Id.*). Petitioner refused to cooperate with Dr. Camiel, therefore, the evaluation lasted approximately five minutes. (Pet.'s AEDPA Mem. Law at 43). In his

II, 728 A.2d at 897. Thus, the *Porter II* court held that "trial counsel was not ineffective for failing to investigate and present diminished capacity and guilty but mentally ill defenses as the contemporary records indicated that such theories were unsupportable."[23] *Id.* Petitioner claims that the *Porter II* court's disposition of his claim was "contrary to, and an unreasonable application of, *Strickland*." (Pet.'s AEDPA Mem. Law at 49).

### 2.) *Strickland v. Washington*

#### a.) *Ineffective Assistance of Counsel Standard*[24]

Under *Strickland*, in order to establish a claim of ineffective assistance of counsel at trial or at a death penalty sentencing proceeding, a convicted defendant must satisfy a two-part test. *Strickland*, 466 U.S. at 687–89, 104 S.Ct. 2052. First, Petitioner must show that counsel's performance was deficient. *Id.* Second, Petitioner is obligated to show that counsel's "deficient performance prejudiced the defense." *Id.* "[T]he burden of proof and persuasion rests with the Petitioner to establish ineffective assistance of counsel at trial." *U.S. v. Lively*, 817 F.Supp. 453, 459 (D.Del. 1993) (citations omitted).

In order to satisfy the first prong of the *Strickland* test, Petitioner must establish that counsel's performance was deficient. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. This requirement consists of "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Thus, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688–90, 104 S.Ct. 2052. The objective standard of reasonableness is measured under "prevailing professional norms." *Id.* In determining the reasonableness of counsel's actions, courts must be highly deferential to counsel's decisions because there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Jermyn*, 266 F.3d at 282 (quoting *Berryman v. Morton*, 100 F.3d 1089, 1094 (3d Cir.1996); *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052)(internal quotation marks omitted). When assess-

---

report, Dr. Camiel stated that "any inferences from [Petitioner's] present mental state are limited to the observations reported above, namely that he showed no gross evidence of psychosis." (*Id.*; N.T. 6/26/86, p. 10). Dr. Camiel acknowledged that his evaluation is necessarily limited because of Petitioner's failure to cooperate, however, Dr. Camiel did conclude that "[t]here was no apparent thought disorder noted" and Petitioner "did not appear to be overly psychotic at the time of my latest examination." (N.T. 6/26/86, p. 10, 13).

**23.** In a footnote, the *Porter II* Court explained the diminished capacity defense as follows: [d]iminished capacity is an extremely limited defense. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 28, 454 A.2d 937, 943 (1982). In asserting a diminished capacity defense,

a defendant is attempting to prove that his mental condition at the time of the crime was such that he was *incapable* of forming the specific intent to kill. If the defendant is successful, first degree murder is mitigated to third degree. *Commonwealth v. Faulkner*, 528 Pa. 57, 70, n. 4, 595 A.2d 28, 35, n. 4 (1991). *Porter II*, 728 A.2d at 897 n. 6.

**24.** Throughout his Habeas Petition, Petitioner raises numerous claims of ineffective assistance of counsel. (*See* Pet Writ Habeas Corpus.). The Court relies on the above *Strickland* standard for all of Petitioner's claims relating to ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

ing counsel's performance, a court must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. "A lack of success is not proof of unreasonableness ... and strategic and tactical decisions are not grounds for an ineffective assistance claim unless counsel displayed ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles." *Holloway v. Horn*, 161 F.Supp.2d 452, 478-79 (E.D.Pa.2001) (citations and internal quotation marks omitted).

The second prong of the *Strickland* test requires Petitioner to show that counsel's ineffectiveness was prejudicial. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. A showing of prejudice requires Petitioner to prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* "Stated differently, there will be no award of relief unless the defendant affirmatively establishes the likelihood of an unreliable verdict." *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir.1993) (citation omitted). When determining the likelihood that the result of the court proceeding may have been different, courts "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. A court must evaluate the "prejudice" prong in light of the totality of the evidence at trial since "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. 2052.

### 3.) *Diminished Capacity Defense*

■ Petitioner argues that trial counsel was ineffective by failing to investigate, develop and present a diminished capacity defense at the guilt phase of his trial. (Pet. Writ Habeas Corpus, ¶¶ 89-90). Petitioner contends that his "many cognitive and mental impairments are so severe that they would have established a diminished capacity defense at the guilt/innocence phase." (Pet.'s AEDPA Mem. Law at 49)(citing Affidavit of Julie Kessel, M.D. ¶ 11; Affidavit of Carol Armstrong, Ph.D. ¶ 7). At the evidentiary hearing, in support of his claim, Petitioner presented the testimony of psychiatrist, Julie Kessel, M.D. ("Dr.Kessel"), and neuropsychologist, Carol Armstrong, Ph.D. ("Dr.Armstrong"). (*See* N.T. 9/5/02). The Commonwealth countered Petitioner's argument with testimony from psychiatrist, John O'Brien II, M.D. ("Dr.O'Brien"), and neuropsychologist, John Gordon, Ph. D. ("Dr.Gordon"), expressing that Petitioner did not suffer from diminished capacity at the time he killed Mr. Fiss. (*See* N.T. 11/25/02 and 11/26/02). Upon consideration of Petitioner's claim, all responses and replies thereto, and in light of the testimony and evidence adduced at the evidentiary hearing, this Court concludes that Petitioner has not established that his counsel was ineffective for failing to assert a defense of diminished capacity. As a result, the Court finds that the *Porter II* court's denial of Petitioner's claim was in agreement with, and a reasonable application of, *Strickland*. Thus, Petitioner's Claim III seeking habeas relief is denied.

#### a.) *Pennsylvania Law Regarding the Diminished Capacity Defense*

■ In order to resolve Petitioner's ineffective assistance of counsel claim, the Court must consider Petitioner's counsel's conduct within the context of Pennsylvania

law regarding the defense of diminished capacity. Pennsylvania recognizes the defense of diminished capacity "to show that a defendant did not have the capacity to possess the state of mind required by the legislature to commit a *particular degree* of the crime charged." *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 295 (3d Cir.1991)(citing *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914, 919–20 (1976))(footnote omitted). Diminished capacity is an extremely limited defense. *See Williams*, 732 A.2d at 1190; *Travaglia*, 661 A.2d at 359 n. 10; *Commonwealth v. Larkins*, 340 Pa.Super. 56, 489 A.2d 837, 843 (1985); *Commonwealth v. Davis*, 331 Pa.Super. 59, 479 A.2d 1077, 1080 (1984). The diminished capacity defense is extremely limited because it "entails the assertion that the defendant's mental condition at the time of the offense was such that he was incapable of forming the specific intent to kill." *Williams*, 732 A.2d at 1190 (citation omitted).

■■■■ "Defendants invoking the defense of diminished capacity ... concede general criminal liability." *Zettlemoyer*, 923 F.2d at 295 (citing *Walzack*, 360 A.2d at 919–20). "Evidence of diminished capacity is admissible at the guilt phase of trial and a jury finding diminished capacity may not find the defendant guilty of first degree murder, but it may find the defendant guilty of third degree murder." *Id.* In order to prove diminished capacity, "only expert testimony on how the mental disorder affected the cognitive functions necessary to form the specific intent is relevant and admissible." *Id.* (citations omitted). Thus, "[t]o prove a claim of diminished capacity, expert psychiatric testimony 'that addresses mental disorders affecting the cognitive functions [of deliberation and premeditation] necessary to formulate specific intent is admissible.' " *Commonwealth v. Moore*, 569 Pa. 508, 805 A.2d 1212, 1217 (2002)(quoting *Commonwealth v. Legg*, 551 Pa. 437, 711 A.2d 430, 433 (1998)).

### 4.) Analysis of Petitioner's Claim

As mentioned before, a showing of ineffective assistance of counsel requires satisfaction of two components. First, counsel must have been so deficient that his "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Second, a petitioner must show that counsel's "deficient performance prejudiced the defense." *Id.*

### a.) Deficient Performance

As explained earlier, *Strickland* requires that Petitioner first show that Mr. Floyd's performance was deficient. *Id.* at 687, 104 S.Ct. 2052. This requirement involves Petitioner proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. In Petitioner's case, the assertion of a diminished capacity defense would have been in direct contradiction to Petitioner's claim of innocence and his theory that someone else had committed the murder. At the evidentiary hearing, Petitioner's trial counsel testified that Petitioner consistently denied any involvement in the murder of Mr. Fiss. (N.T. 9/4/02, p. 64, lines 18–20). When questioned about his actions pertaining to a diminished capacity defense, trial counsel testified as follows:

diminished capacity is totally inconsistent with what my client always told me. He told me that he had nothing to do with this, so if you want to enter a defense of diminished capacity, that to me seems to admit that you participated in a crime. ... [t]here wasn't much of an alternative defense to speak to [Petitioner] about, because he repeatedly told me

that he did not commit this crime, and he told me that he had an alibi, that he knew nothing about it. So based upon that, I don't see what other possible defense is available.

(*Id.*, p. 53–54). Mr. Floyd stated that Petitioner always seemed rational and that there was nothing which led him to believe that there was a potential mental health issue. (*Id.*, p. 64, lines 8–20). Mr. Floyd testified that Petitioner was able to rationally discuss his case "at great length." (*Id.*, p. 64, lines 16–17). Further, Mr. Floyd stated that Petitioner understood the proceedings and "wrote notes to me during the course of trial." (*Id.*, p. 64–65). Mr. Floyd also testified that there was nothing about the facts of the case which made him think that there was some sort of mental health issue. (*Id.*, p. 67, lines 14–17).

As mentioned earlier, "[d]efendants invoking the defense of diminished capacity . . . concede general criminal liability." *Zettlemoyer*, 923 F.2d at 295 (citation omitted). Thus, "[a] defense of diminished capacity is only available to a defendant who admits criminal liability but contests the degree of guilt." *Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 578 (2002) (citations and internal quotation marks omitted). Accordingly, "an accused offering evidence under the theory of diminished capacity concedes general criminal liability and the authority to make such a concession is solely that of the accused." *Commonwealth v. Weaver*, 500 Pa. 439, 457 A.2d 505, 506 (1983)(internal citations omitted). In order for a diminished capac-

ity defense to be asserted in Petitioner's case, Petitioner is required to concede general liability for the murder of Mr. Fiss. There is no evidence that Petitioner has ever conceded guilt in this case. In fact, Petitioner has consistently maintained his innocence.[25] (*See* N.T. 7/9/02, 9/4/02, 9/5/02, 11/25/02). Even as recently as the August 6, 2002 clinical examination by the Commonwealth's expert, Dr. O'Brien, Petitioner upheld his claim of innocence and stated that he had alibi witnesses to prove it. (N.T. 11/25/02, p. 36–37; Ex. C–9 (Dr. O'Brien's Report)). Thus, not only has Petitioner never conceded guilt in this case, but he has consistently upheld his innocence, even sixteen years after the trial. Consequently, the defense of diminished capacity directly conflicts with Petitioner's version of events and claims of innocence.

In light of Petitioner's consistent claims of innocence, Mr. Floyd's strategy at all times during trial was to obtain an acquittal for Petitioner. Mr. Floyd's performance during trial was consistent with the Petitioner's defense of innocence. Thus, had Petitioner's trial counsel sought a diminished capacity defense, it would have been inconsistent and completely undermined his strategy to seek an acquittal based upon Petitioner's innocence. In light of Petitioner's constant claims of innocence, trial counsel's interactions with Petitioner and the specific facts of the case, counsel had a reasonable basis for not presenting a diminished capacity defense.[26] Since the record reflects a rea-

---

**25.** At the evidentiary hearing, the following people testified that Petitioner had declared his innocence to them: Petitioner's mother, Annie Wilson; Petitioner's sister, Dorothy Davis; trial counsel, Michael Floyd; psychiatrist, Julie Kessel, M.D.; and psychiatrist, John O'Brien, M.D. (*See* N.T. 7/9/02, 9/4/02, 9/5/02, 11/25/02).

**26.** The specific facts of the murder and robbery of Mr. Fiss reveal that the crime incorporated multiple and layered steps which require both premeditation and deliberation. *See infra* p. 57. The facts also show that it was not a crime which was committed by someone who was so mentally ill that he was

sonable basis to support Mr. Floyd's trial strategy seeking acquittal based upon Petitioner's own claims of innocence, counsel should not be deemed ineffective for failing to assert a contradictory defense.[27] Accordingly, counsel's representation of Petitioner was not deficient and, therefore, does not constitute ineffective assistance of counsel.

### b.) Prejudice

 The Court concludes that Petitioner has failed to meet his burden of showing that Mr. Floyd's representation was deficient. However, even assuming that Petitioner has proved that Mr. Floyd's performance did fall beneath prevailing professional norms, Petitioner is unable to show that he suffered prejudice as a result of that deficient performance. In order to prove prejudice, Petitioner is required to show that Mr. Floyd's failure to present a diminished capacity defense resulted in "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Petitioner argues that he is organically brain damaged and has a long history of serious mental health illness. (Pet. Writ Habeas Corpus, ¶ 89). According to Petitioner, these mental health impairments are such that they would have presented a viable diminished capacity defense. (*Id.*). The *Porter II* Court rejected Petitioner's

claim of ineffectiveness by finding that Petitioner's diminished capacity claim was unsupportable based upon contemporary records and the psychiatric report prepared for trial. *Porter II,* 728 A.2d at 897. At the evidentiary hearing before this Court, both sides presented testimony from their respective mental health experts regarding Petitioner's mental health. (N.T. 9/5/02, 11/25/02, 11/26/02). In support of his mental health claims, Petitioner presented testimony by Dr. Kessel and Dr. Armstrong asserting that he suffers from serious cognitive dysfunction which creates a pervasive diminished capacity. (N.T. 9/5/02). As for the Commonwealth, it presented testimony by Dr. O'Brien and Dr. Gordon expressing that Petitioner did not suffer from diminished capacity at the time of the murder of Mr. Fiss. (N.T. 11/25/02 and 11/26/02). Upon consideration of the testimony at the evidentiary hearing, the parties' submissions and exhibits, this Court concludes that Petitioner has not shown that he suffered mental impairments severe enough to warrant a diminished capacity defense. As such, Petitioner has not established that he was prejudiced because he has failed to show that a reasonable probability exists that, but for counsel's failure to assert and investigate a diminished capacity defense, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

---

incapable of deliberating or forming the specific intent to kill. *Id.*

**27.** In *Laird v. Horn,* 159 F.Supp.2d 58, the Court upheld the Pennsylvania Supreme Court's denial of an ineffective assistance of counsel claim. *Laird,* 159 F.Supp.2d at 85–86. In *Laird,* the Pennsylvania Supreme Court "concluded that, in order to present a diminished capacity defense, trial counsel would have had to put on a defense that contradicted petitioner's own testimony and that counsel cannot be required to do so." *Id.* at 86 (citation omitted). The state court

went on to further conclude "that, to the extent trial counsel failed to investigate a possible diminished capacity defense, such lack of investigation was reasonable in light of the strategic choices made at trial." *Id.* (citation omitted). Upon review of the state court decision, the District Court concluded that petitioner's claim did not present a basis for the issuance of a federal writ because "[t]he Pennsylvania Supreme Court applied the correct rule of law with respect to this claim in a reasonable manner." *Id.*

At the evidentiary hearing, Petitioner presented the testimony of Dr. Armstrong. (N.T. 9/5/02). Dr. Armstrong performed a neuropsychological evaluation of Petitioner. (*Id.*, p. 16–17). The scope of Dr. Armstrong's testing of Petitioner did not include any discussion about the robbery and murder of Mr. Fiss or Petitioner's criminal history. (*Id.*, p. 61, 79). Dr. Armstrong testified that Petitioner suffers from, among other things, anti-social behavior, cognitive impairments and borderline mental retardation. (*See* N.T. 9/5/02). Relying upon her evaluation of Petitioner, Dr. Armstrong testified that there is evidence that Petitioner has suffered from diminished capacity for a long period of time. (*Id.*, p. 39). Dr. Armstrong went on to state that Petitioner has always had a diminished capacity in all of his actions, including his criminal actions. (*Id.*, p. 51–52). When specifically questioned about whether Petitioner had the capacity to understand and have the intent to rob Mr. Fiss, Dr. Armstrong stated that "it's a misuse of my knowledge about brain function in this case—in this individual's case to ask me to apply that to whether someone knows what's coming in the future in their mind." (*Id.*, p. 58, lines 18–25). When further questioned regarding whether Petitioner was able to understand and form the intent to rob Mr. Fiss, Dr. Armstrong went on to state that she "can't—nor can anyone—take this knowledge and tell you what is in someone's mind at that time." (*Id.*, p. 59, lines 1–8).

In response to direct questions about Petitioner's mental capacity at the time of the murder of Mr. Fiss, Dr. Armstrong testified that she never discussed Petitioner's version of the case. (*Id.*, p. 60–62). Dr. Armstrong explained that her medical

opinion is premised upon what is in the record. (*Id.*, p. 62). Dr. Armstrong asserted that it was not necessary to ask Petitioner about the crime because she was already aware that Petitioner had competency issues at the time of the crime. (*Id.*). When questioned about her role regarding Petitioner's diminished capacity defense, Dr. Armstrong testified that her "role was very clearly to assess whether [Petitioner] has neurocognitive evidence and brain dysfunction." (*Id.*, p. 61).

As for Dr. Kessel, her testimony at the evidentiary hearing revealed that she believed, to a reasonable degree of medical certainty, that Petitioner suffered from diminished capacity at the time of the murder of Mr. Fiss based upon his cognitive impairments, mental retardation and mental disorder. (*Id.*, p. 141–42). Similar to Dr. Armstrong, Dr. Kessel's opinion that Petitioner suffered from a diminished capacity is not based upon the specific facts of the crime, but is based upon the "pervasive state of [Petitioner's] brain damage and impaired mental function, impulse control, difficulty reasoning [and] difficulty with planning an executive function." (*Id.*, p. 180). Dr. Kessel explained that "it's the pervasive state of [Petitioner's] cognitive impairments that make him diminished in his ability to reason, plan and execute complicated activities." (*Id.*, p. 182, lines 14–21). When explicitly questioned about whether Petitioner understood and specifically intended that the bullet he fired at Mr. Fiss would enter Mr. Fiss, hurting and ultimately killing him, Dr. Kessel restated that she believed that Petitioner's capacity to appreciate his actions was substantially diminished by his cognitive impairments.[28] (*Id.*, p. 184).

---

**28.** Dr. Kessel questioned Petitioner about the facts of the crime, but he responded that he was not at the scene of the crime. (N.T.

9/5/02, p. 180–81). Although Petitioner stated that he had not been involved in the murder of Mr. Fiss, Dr. Kessel assumed that Petition-

In response to Petitioner's expert mental health testimony, the Commonwealth presented the testimony of Dr. O'Brien. (N.T. 11/25/02). In contrast to Petitioner's mental health experts, Dr. O'Brien rendered the following diagnosis of Petitioner, "he has an antisocial personality disorder, this is also a diagnosis that appears in his medical records, and that he has a history of alcohol and mixed substance abuse, and that he on psychological testing has what we call borderline intellectual functioning or low average IQ on testing." (*Id.*, p. 8, lines 16–23). After performing a psychiatric evaluation of Petitioner, Dr. O'Brien opined, to a reasonable degree of medical certainty, that Petitioner did not suffer from a diminished capacity at the time he committed the robbery and murder of Mr. Fiss.[29] (N.T. 11/25/02, p. 6–7). Specifically, Dr. O'Brien testified that:

> there is nothing in the materials I reviewed nor in my clinical examination of Mr. Porter that indicated to me that at the time of the alleged offense he was suffering from a diminished capacity; that he was unable to formulate intent or carry out intentional behaviors; that he was substantially impaired in his understanding of right and wrong, or in his ability to conform his conduct to the requirements of the law; or that he was suffering from an extreme mental or emotional disturbance which caused him to have difficulties comprehending his circumstances.

(N.T. 11/25/02, p. 6, lines 13–23). In additional support of his finding that Petitioner did not suffer from diminished capacity, Dr. O'Brien relied upon the facts of the robbery and murder of Mr. Fiss. (*Id.*, p.

37). Regarding the facts of the case, Dr. O'Brien testified that "the crime ... to have taken place involving a number of steps ... and also involving a robbery or some kind of personal gain to Mr. Porter, is not the type of factual scenario that is consistent with an individual who is incapable of carrying out intentional behaviors and then carrying them out successfully." (*Id.*, p. 37, lines 17–24). Thus, Dr. O'Brien went on to state that, in his opinion, "the facts as established in reference to the conviction are not consistent with a conclusion ... that Mr. Porter was suffering from a diminished capacity at the time of the offense." (*Id.*, p. 37–38).

Regarding his interview of Petitioner, Dr. O'Brien testified that he found nothing to suggest that Petitioner suffers from a psychiatric illness or psychosis. (*Id.*, p. 8, lines 12–23). In response to a specific question regarding whether Petitioner's interview suggested psychiatric illness or psychosis, Dr. O'Brien responded, "[p]sychosis, no, absolutely not. There was nothing about the interview that suggested [Petitioner] suffers from a significant or primary psychiatric illness." (*Id.*, p. 8, lines 14–16). Dr. O'Brien also found nothing in Petitioner's interview to suggest that he suffers from brain damage. (*Id.*, p. 8–9). Dr. O'Brien found Petitioner to be "an individual who both by history and on clinical evaluation with me is an individual who attempts to manipulate situations." (*Id.*, p. 9, lines 1–3). During his interview of Petitioner, Dr. O'Brien noticed "regular, consistent inconsistency in [Petitioner's] clinical presentation." (*Id.*, p. 9, lines 15–16). Dr. O'Brien further

---

er robbed and killed Mr. Fiss for purposes of her decision making regarding Petitioner's diminished capacity defense. (*Id.*, p. 181).

**29.** On August 6, 2002, Dr. O'Brien completed a psychiatric evaluation of Petitioner. (*See*

Commw.'s Ex. C–9 (Dr. O'Brien's Report)). In addition to his testimony, Dr. O'Brien submitted his findings regarding Petitioner's mental health in a report. (*Id.*).

testified that "in my opinion, [Petitioner] was attempting to portray himself manipulatively as being impaired when that impairment is not supported by the records and not consistently apparent on clinical examination." (*Id.*, p. 10, lines 10–13).

The Commonwealth also presented the testimony of its other mental health expert, Dr. Gordon. (N.T. 11/26/02). In relation to Petitioner's diminished capacity defense, Dr. Gordon testified that there was nothing about the testing, the facts of Petitioner's case or Petitioner's medical records, that led him to believe that Petitioner suffered from a diminished capacity at the time of the crime.[30] (*Id.*, p. 38, lines 15–19). Based upon Dr. Armstrong's test results, the records and all of the voluminous materials he reviewed in this case, Dr. Gordon opined, to a reasonable degree of medical certainty, that there is no evidence that Petitioner suffered from a diminished capacity or was incompetent at the time of trial. (*Id.*, p. 77). Dr. Gordon disagreed with Dr. Armstrong's conclusion that Petitioner's test results support a diagnosis that Petitioner has brain damage. (*Id.*, p. 13). Dr. Gordon stated that Dr. Armstrong's assessment was based upon testing that utilized inadequate norms. (*Id.*, p. 23–26). According to Dr. Gordon, Dr. Armstrong's assessment did not utilize norms pertaining to Petitioner's educational background, age or intellectual level, but utilized norms relating to elderly people with respect to the dementia rating scale. (*Id.*). Even assuming that Dr. Armstrong's test was an acceptable measuring mechanism, Dr. Gordon testified that her conclusion is not supported by her own data because Petitioner's total score was higher than what would be considered the dementia range. (*Id.*, p. 24, lines 19–25; p. 25, lines 1–5).

Regarding Petitioner's intelligence level, Dr. Gordon testified that Petitioner has borderline to low average IQ and, in no way, should be classified as mentally retarded. (*Id.*, p. 33–34). Based upon the records that are available for review, Dr. Gordon stated that Petitioner does not meet the criteria for being mentally retarded. (*Id.*, p. 56–57). After examining Petitioner's records, including records pertaining to Petitioner's previous hospitalizations, Dr. Gordon asserted that the records reveal that Petitioner had an antisocial personality disorder, not brain damage or psychiatric illness. (*Id.*, p. 27–28).

The aforementioned medical testimony was offered for the issue of whether Petitioner was prejudiced by his trial counsel's failure to raise the defense of diminished capacity. As mentioned beforehand, in order for Petitioner to prove prejudice he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Thus, in this case, Petitioner must establish by a reasonable probability that the diminished capacity defense would have proven successful if trial counsel had advanced it. Upon examination of all of the aforementioned, including all exhibits and testimony, Petitioner has not shown that there is a reasonable probability that if the diminished capacity defense had been asserted the result of Petitioner's trial would have been different.

As noted by the *Porter II* court, diminished capacity is an extremely limited defense. *Porter II*, 728 A.2d at 897 n. 6. The diminished capacity defense is extremely limited because it "entails the assertion that the defendant's mental condition at

---

**30.** In addition to his testimony, Dr. Gordon submitted his findings regarding Petitioner's mental health in a report. (Commw.'s Ex. C–12) (Dr. Gordon's Report).

the time of the offense was such that he was incapable of forming the specific intent to kill." *Williams*, 732 A.2d at 1190 (citation omitted). Thus, the defense of diminished capacity requires the proponent to prove that, at the time of the killing, he was suffering from a mental disease or illness that affected the cognitive functions of deliberation and premeditation necessary to formulate specific intent. *Moore*, 805 A.2d at 1217. After careful consideration, this Court concludes that Petitioner has not proven that he was suffering from a mental disease or illness that precluded his cognitive functions of planning, premeditation and deliberation. Upon weighing all testimony, reports and records, the Court concludes that Petitioner's mental health evidence fails to show that his mental condition was such that he was incapable of forming the specific intent to kill. In light of all of the mental health evidence presented to the Court, especially the Commonwealth's expert testimony and reports, the Court finds that Petitioner did have the mental capacity to understand and form the intent to kill. Thus, Petitioner has not established that he suffered from a diminished capacity at the time he shot and killed Mr. Fiss.

In order to reach its conclusion, the Court weighed all relevant testimony, records and evaluations. In addition to the aforementioned, the Court also looked to the facts of the robbery and murder for insight into Petitioner's mental state at the time of the crime.[31] The facts of the case establish that Petitioner struck early on a Saturday morning, when Mr. Fiss was arriving to open up his shop and before the arrival of any customers. Petitioner pushed Mr. Fiss into his shop, out of sight of the street, against protestations by Mr. Fiss. Away from the front of the shop and the front window, Petitioner forced Mr. Fiss into the back bathroom of the shop. While in the back bathroom, out of view, Petitioner shot, robbed and killed Mr. Fiss. After successfully shooting and robbing Mr. Fiss, Petitioner immediately fled the scene. Petitioner exited the shop, brushing by Catherine Valente, got into Mr. Fiss's automobile which was parked at the front curb and swiftly drove away.[32] As evidenced by the facts of the case, Petitioner's robbery and murder of Mr. Fiss incorporated multiple and layered steps which required both premeditation and deliberation. Petitioner's crime was not a crime committed by someone who was so mentally ill that he was incapable of deliberating or forming the specific intent to kill, but was a crime involving multiple and intentional steps leading to Petitioner's own self gain.

In addition to the facts of the murder and robbery of Mr. Fiss, Petitioner's actions during an armed robbery three days after the crime also shed some light on Petitioner's mental capacity. On April 30, 1985, Petitioner and two other armed men robbed Gentile's Golden Nugget jewelry store. (N.T. 2/21/86, p. 153–77). At Petitioner's trial, Vincent Gentile, the jewelry store owner, testified that Petitioner and

---

31. Since Petitioner has consistently maintained his innocence, there is no version of events from Petitioner as to what actually occurred on the morning of Saturday, April 27, 1985. Therefore, the facts of the murder and robbery of Mr. Fiss have been adduced by police evidence and trial transcripts.

32. It remains unclear how Petitioner was able to start and drive the automobile owned by Mr. Fiss. It can be assumed that Petitioner took the automobile keys when he stole the money from the pocket of Mr. Fiss. However, there appears to be no evidence or testimony regarding exactly how Petitioner was able to start the automobile and drive away. Also, there appears to be no evidence regarding what happened to the automobile.

two other men entered his shop and attempted to rob the store. (*Id.*). Mr. Gentile testified that, during the robbery, Petitioner led him into the residential area in the back of the store. (*Id.*, p. 158). While heading back into the residential area, Mr. Gentile pushed a silent alarm twice to notify police of the robbery. (*Id.*, p. 158). In the residential area, two of Mr. Gentile's friends and one of his employees were seated at a kitchen table having coffee and talking. (*Id.*, p. 155). Petitioner pointed his gun directly at the three people and stated, "Don't look at us or we'll kill you." (*Id.*, p. 159, lines 14–18). Petitioner proceeded to slap the three people in their faces with his hand. (*Id.*, p. 159–60). Petitioner then handcuffed two of Mr. Gentile's friends together. (*Id.*, p. 167, lines 17–19). When everyone was handcuffed, they were instructed to lay down on the kitchen floor. (*Id.*, p. 168). While on the floor, Mr. Gentile felt one of the men take his wallet out of his pocket and a ring from his finger. (*Id.*, p. 168, lines 6–15). After a couple of minutes, the police arrived and the three men ran out the back door. (*Id.*).

As he was being chased by the police, Petitioner discarded a white bag underneath a parked car. (*Id.*, p. 181–82). The bag was discovered to contain jewelry valued at approximately $45,000. (*Id.*, p. 182–83). Also, while being chased, Petitioner discarded his gun under a car.[33] (*Id.*, p. 187–88, 206–207). After the chase, Petitioner was apprehended approximately three blocks from Gentile's Golden Nugget jewelry store. (*Id.*, p. 184, lines 8–16). After Petitioner was apprehended, Mr. Gentile positively identified Petitioner as one of the men with a gun involved in the

armed robbery. (N.T. 2/21/86, p. 169, lines 6–19).

Upon examination of the facts of this particular crime, it is evident that Petitioner does not suffer from a pervasive mental condition that precludes him from forming the cognitive functions of premeditation and deliberation necessary to formulate a specific intent to kill. During the robbery, Petitioner's actions reveal a man who is able to reason, plan and execute complicated activities. Thus, Petitioner's actions regarding the robbery of the jewelry store three days after his murder of Mr. Fiss contradict the expert testimony of Dr. Armstrong and Dr. Kessel that his cognitive functioning is so impaired that he suffers from a pervasive diminished capacity. In fact, the robbery of the jewelry store supports the Commonwealth's medical expert testimony that Petitioner does not suffer from a pervasive diminished capacity, but has the mental capability to both comprehend and intend for his actions and their attendant consequences.

As a result of the aforementioned, the Court concludes that Petitioner has not shown by a reasonable probability that he suffered from a diminished capacity at the time of the robbery and murder of Mr. Fiss. Petitioner has failed to show that there is a reasonable probability that the diminished capacity defense would have proven successful if trial counsel had advanced it. Thus, the jury's failure to hear the diminished capacity evidence does not undermine the confidence in Petitioner's conviction. As a result, Petitioner has not established that he was prejudiced by counsel's failure to present a diminished capacity defense. Consequently, Petitioner has not established ineffective assis-

---

**33.** The recovered gun was identified as a .38 caliber Colt revolver. (N.T. 2/21/86, p. 206). After ballistics testing, the gun was later posi- tively identified as the firearm used to kill Mr. Fiss. (*Id.*, p. 272–74).

tance of counsel because he has failed to meet his burden of showing prejudice.

### 5.) Conclusion

In sum, trial counsel acted reasonably by asserting a defense of innocence, instead of a diminished capacity defense. Thus, Petitioner has not shown that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688–90, 104 S.Ct. 2052. Since Petitioner has consistently maintained his innocence, trial counsel's strategy seeking acquittal for Petitioner was consistent with the defense of innocence. In light of Petitioner's constant claims of innocence, trial counsel's dealings with Petitioner and the specific facts of the case, counsel had a reasonable basis for not presenting a diminished capacity defense. Since a reasonable basis appears on the record for Mr. Floyd's trial strategy seeking acquittal based upon Petitioner's own claims of innocence, counsel should not be deemed ineffective for failing to assert a contradictory defense. Even if counsel had not acted reasonably, Petitioner has not proven that he was prejudiced by counsel's actions. Petitioner has not established by a reasonable probability that the diminished capacity defense would have proven successful if trial counsel had advanced it. The jury's failure to hear the diminished capacity evidence does not undermine the confidence in Petitioner's conviction. Thus, Petitioner has failed to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, under the relevant *Strickland* standards governing ineffective assistance of counsel claims, Mr. Floyd's representation of Petitioner does not constitute ineffective assistance of counsel. Consequently, the *Porter II* Court's denial of Petitioner's ineffective

assistance of counsel claim was not contrary to *Strickland,* but was a reasonable application of *Strickland.* Thus, Petitioner's claim for habeas relief in Count III is denied.

### 6.) Guilty But Mentally Ill Defense

In addition to the diminished capacity defense, Petitioner's claim also relies upon trial counsel's failure to assert the "Guilty But Mentally Ill" defense. (Pet. Writ Habeas Corpus, ¶¶ 89–90). As already stated, the Court held an evidentiary hearing regarding Claim III. (N.T. 9/4/02, 9/5/02, 11/25/02 and 11/26/02). At the evidentiary hearing, the testimony regarding Claim III focused solely upon a diminished capacity defense and did not include testimony concerning the "Guilty But Mentally Ill" defense. (*Id.*). Thus, even though Petitioner's ineffective assistance of counsel claim is based, in part, upon trial counsel's failure to assert a "Guilty But Mentally Ill" defense, Petitioner did not present any evidence or testimony in support of that portion of his claim. Petitioner's failure to support his allegations pertaining to the available "Guilty But Mentally Ill" defense is inconsequential because such an argument is misplaced in this case due to this Court's prior finding that Petitioner is already entitled to a new sentencing or sentencing proceeding. Regarding Claim V, the Court concluded that Petitioner is entitled to habeas relief and granted him a new sentencing or sentencing proceeding. *See supra* Part IV.C.1. As a result of this ruling, since Petitioner is granted relief upon his sentencing phase argument, the Court concluded that it would not address Petitioner's remaining claims concerning the sentencing phase. Instead, this Court focused solely upon Petitioner's claims relating to the guilt phase.

The Pennsylvania Supreme Court has held that "[t]he 'Guilty But Mentally Ill'

defense ... is available in capital cases only in the sentencing phase, and not in the guilt phase." *Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507, 514 (1999)(citing *Commonwealth v. Faulkner,* 528 Pa. 57, 595 A.2d 28, 36 (1991)); *see also Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1190 (1999)(stating that "[i]n a capital case, an assertion of 'guilty but mentally ill' is properly considered only in the penalty phase of trial and is subsumed within the mitigating circumstances set forth at [42 Pa.C.S.] Section 9711(e)(2) and (e)(3))." Since, in the instant case, the "Guilty But Mentally Ill" defense is only available in the sentencing phase, Petitioner's ineffective assistance of counsel claim as to this particular defense has no application in the guilt phase. Because the Court has previously held that it would only address Petitioner's remaining claims pertaining to the guilt phase, any testimony or evidence pertaining to a "Guilty But Mentally Ill" defense would be misplaced. As a result, the Court has solely addressed Petitioner's Claim III as it pertains to a diminished capacity defense.

> **b. Claim IV Petitioner was not mentally ill and incompetent at the time of his trial proceedings and his conviction and death sentence do not violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

Petitioner asserts that his due process right not to be tried while incompetent and his Sixth Amendment right to effective assistance of counsel were violated when he was tried without a competency hearing and without any investigation of his competency by trial counsel. (Pet.'s AEDPA Mem. Law. at 50). Petitioner argues that his due process rights were violated because the trial court failed to make an inquiry into Petitioner's competency despite the court's awareness, prior to the capital sentencing hearing, that Petitioner suffered from a history of mental illness. (*Id.*). Petitioner also argues that trial counsel, Michael Floyd, Esq., rendered ineffective assistance of counsel because he failed to investigate Petitioner's competency or request a competency hearing. (*Id.*).

### 1.) State Court Decision

In *Porter II,* the Pennsylvania Supreme Court stated the relevant law on competency to stand trial. *Porter II,* 728 A.2d at 897 n. 7. In relation to Petitioner's claim, the *Porter II* court refused to "revisit its finding made on direct appeal that there was no evidence that [Petitioner] ever had, or was at the time of direct appeal suffering from, any thought disorder or psychosis." *Id.* (citing *Porter I,* 569 A.2d at 946–47). Previously, on direct appeal, the *Porter I* court stated the following regarding Petitioner's mental health evidence:

> [a]t all events there were no such records that appellant did or ever suffer from a mental defect or injury. Prior to sentencing, the trial court had appellant examined. The examination established that there was then and none before, evidence of thought disorder or psychosis. The court allowed the appellant's mother to testify as to his mental condition. She did as best she could. The court did not err in refusing a continuance when there was no showing that a report favorable to the contention existed.

*Porter I,* 569 A.2d at 946–47. Petitioner alleges that the *Porter II* court's disposition of his claim asserting that he was not actually mentally ill is erroneous and unreasonable. (Pet.'s AEDPA Mem. Law at 51). Thus, Petitioner argues that the *Porter II* court's disposition was "contrary

to, and an unreasonable application of, *inter alia, Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) and *Strickland.*" (*Id.*).

### 2.) *Analysis of State Court Decision*

■■ As previously noted, the Pennsylvania Supreme Court mentioned Petitioner's competency-related arguments, although the basis for its ruling on Petitioner's incompetency claim is difficult to understand. *Porter II*, 728 A.2d at 897. The *Porter II* court's decision seems to be based upon its previous ruling regarding Petitioner's direct appeal in *Porter I.* (*Id.*). The *Porter II* court's reliance upon the direct appeal ruling is problematic because the *Porter I* opinion does not specifically address Petitioner's competency-related claim. The *Porter II* court seems to have interpreted Petitioner's competency-related claim as predicated upon the related, but legally distinct, issue of whether trial counsel was ineffective for failing to timely request Petitioner's psychiatric records for use at the penalty phase. As evidenced by Petitioner's competency claim, it involves both a due process claim against the trial court and an ineffective assistance of counsel claim for failing to investigate Petitioner's competency or request a competency hearing.

Although Petitioner did not make this point in his brief, the Court believes that the Pennsylvania Supreme Court's disposition of Petitioner's competency claim is tantamount to its not having addressed the merits of the claim at all. "Where the state court fails to adjudicate a habeas petitioner's claim on the merits, we have held that AEDPA's deferential standards are inapplicable." *Jermyn*, 266 F.3d at 299–300 (citing *Appel*, 250 F.3d at 210)(finding that state courts mischaracterized petitioner's claim as based on ineffective assistance of counsel rather than a constructive denial of counsel, and thus, petitioner's claim had not been adjudicated properly on the merits in state court). "Thus, if the defendant properly preserves an issue but the state court does not reach the merits of the claim, pre-AEDPA review is appropriate, and we 'must examine, without special heed to the underlying state court decision,' whether the claim has merit." *Id.* (quoting *Appel*, 250 F.3d at 210; *Hameen*, 212 F.3d at 248). Accordingly, the Court must independently examine whether Petitioner's due process rights were violated because the trial court failed to make an inquiry into Petitioner's competency to stand trial and whether Petitioner's Sixth Amendment right to effective assistance of counsel was violated by counsel's failure to investigate his competency or request a competency hearing.

### 3.) *Legal Standards*

#### a.) *Competency to Stand Trial*

■■ Petitioner asserts that his due process right not to be tried while incompetent was violated when he was tried without a competency hearing. (Pet.'s AEDPA Mem. Law at 50). "A defendant has a due process right not to be tried while incompetent." *Jermyn*, 266 F.3d at 283 (citing *Drope*, 420 U.S. at 171–72, 95 S.Ct. 896; *Pate*, 383 U.S. at 385, 86 S.Ct. 836). In order "[t]o be competent to stand trial, a defendant must have 'a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and must possess 'a rational as well as factual understanding of the proceedings against him.'" *Id.* (quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)(per curiam)). "Due Process requires the trial court to inquire *sua sponte* as to the defen-

dant's competence in every case in which there is a reason to doubt the defendant's competence to stand trial." *Id.* (citing *Drope,* 420 U.S. at 173, 95 S.Ct. 896)(finding that Illinois statute, which required a court to grant competency hearing *sua sponte* if there was "reasonable cause to believe" that the defendant was incompetent, comported with due process, and that trial court's failure to hold hearing despite indicia of incompetence violated defendant's right to fair trial); *Pate,* 383 U.S. at 385, 86 S.Ct. 836 (stating that failure to hold competency hearing violated due process where state statute required trial court to order hearing where there was "reason to doubt" defendant's competency, and the evidence was sufficient to put the trial court on notice of potential problem); *United States v. Haywood,* 155 F.3d 674, 680 (3d Cir.1998)(finding that federal competency statute, 18 U.S.C. § 4241, "requires a record-based judicial determination of competence in every case in which there is reason to doubt the defendant's competence to stand trial," and noting that "the Due Process Clause ... requires no less"); *United States v. DiGilio,* 538 F.2d 972, 987 (3d Cir.1976)(stating that "[a]lthough § 4244 does not say so explicitly, due process requires that the trial court inquire *sua sponte* into the defendant's competence if there is reason to doubt it").

Further, "counsel's failure to request the trial court to order a hearing or evaluation on the issue of the defendant's competency, see Pa. Stat. Ann. tit. 50, § 7402(c), (d), could violate the defendant's right to effective assistance of counsel provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered." *Id.* at 283–84 (e.g., *Hull v. Kyler,* 190 F.3d 88, 106 (3d

Cir.1999)(noting that defendant could establish the prejudice prong of an ineffectiveness claim if there were sufficient indicia of incompetence and counsel failed to request a competency hearing).

*b.) Ineffective Assistance of Counsel Standard*

Petitioner's claim also asserts that his Sixth Amendment right to effective assistance of counsel was violated when he was tried without a competency hearing and without any investigation of his competency by trial counsel. (Pet. Writ Habeas Corpus, ¶¶ 94–95). As explained earlier, to successfully present a claim for ineffective assistance of counsel under *Strickland,* Petitioner must establish that: (1) counsel's performance was deficient and (2) he was prejudiced by counsel's deficient performance. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *see supra* Part IV.C.2.a.2.).

*4.) Analysis of Petitioner's Claims*

*a.) Trial Court's Failure to Order Competency Evaluation or Hearing*

Petitioner asserts that the trial court violated his right to a fair trial by failing to order a competency hearing or evaluation pursuant to Pennsylvania law. Petitioner maintains that, as a result of the trial court's omission, he was tried while incompetent. Petitioner asserts that there were sufficient signals to call his competence into question such that the trial court should have held an evidentiary hearing to determine if Petitioner was competent. According to Petitioner, the trial court was made aware, prior to the capital sentencing hearing, that he had "a lifelong history of mental illness, including indications of brain damage, depression and suicidal tendencies, and that he had been committed to mental institutions for psychiatric care several times since the age of twelve."

(Pet.'s AEDPA Mem. Law at 50). In support of his claim, Petitioner also argues that the trial court was informed that Petitioner wanted to absent himself from the sentencing hearing and, at the sentencing hearing, Petitioner's mother testified about Petitioner's lifelong history of mental impairments. (*Id.*). Petitioner relies upon the aforementioned as indicia of incompetency that should have given the court reason to doubt his competence to stand trial.

Upon review of Petitioner's claim, the Court concludes that Petitioner's indicia of incompetency is not sufficient to have instilled doubt in the trial court as to his competency to stand trial. First, there was nothing peculiar or strange about the crime committed by Petitioner. As mentioned earlier, the facts of Petitioner's crime are that Petitioner robbed and murdered Mr. Fiss in the back of his beauty shop. There was nothing about the facts of the crime that are bizarre or would lead anyone to question Petitioner's mental health. Second, the testimony from Petitioner's mother, Annie Wilson, pertaining to his history of mental impairments did not alert the court to potential competency issues. At the sentencing hearing, Ms. Wilson testified that Petitioner has suffered from mental health issues for most of his life. (N.T. 2/27/86, p. 30–44). Ms. Wilson testified that Petitioner suffered from mental illness, but did not specifically testify as to the nature or the severity of his illness. (*Id.*). Upon review of Ms. Wilson's testimony, there is nothing to be construed from the testimony that should have caused the trial court to question Petitioner's competency to stand trial. Also, the Court notes that Ms. Wilson testified at the sentencing phase, therefore, her testimony came after the guilt phase. (*Id.*) Thus, the trial court had previously dealt with Petitioner throughout the entire guilt phase and, necessarily, had

its own insight into Petitioner's competency. In light of the court's own dealings with Petitioner, Ms. Wilson's general testimony about Petitioner's mental health history did not put the court on notice about any potential competency issues.

Third, Petitioner's desire to absent himself from the sentencing hearing would not have alerted the court to potential competency issues. On June 27, 1986, Petitioner's counsel informed the court that Petitioner wished to waive his presence during the sentencing proceedings. (N.T. 6/27/86, p. 8). The court did not allow Petitioner to waive his presence stating that "[h]e's supposed to be here and he should be here. It may jeopardize him by not being here and he may use that as an excuse later on to upset the proceedings." (*Id.*, p. 8, lines 6–9). The sentencing hearing proceeded with Petitioner's presence. Although Petitioner raises his request to be absent from the sentencing hearing as grounds for alerting the trial court to competency issues, he does not show how his request did, in fact, alert the court to competency issues. Upon review of Petitioner's request, this Court concludes that the request would not have alerted the court to any competency issues. As with the testimony of Petitioner's mother, Petitioner's request occurred at the sentencing hearing. Therefore, the trial court had previously dealt with Petitioner at great length beforehand and, necessarily, had some perception about Petitioner's competency. In light of the court's own dealings with Petitioner, Petitioner's request to be absent from the sentencing phase did not put the court on notice about any potential competency issues.

Fourth, during trial, Petitioner did not exhibit any type of strange behavior that should have raised doubts about his competency. "A sane demeanor may alone obviate the need for the court to inquire

into a defendant's competence." *Jermyn*, 266 F.3d at 289 (citing *Drope*, 420 U.S. at 179, 95 S.Ct. 896). During the trial proceedings, the court directly spoke with Petitioner on several instances. (N.T. 2/14/86, 2/20/86, 2/24/02, 2/27/02). Throughout these various times, Petitioner conversed and appropriately responded to the court's inquiries without issue. (*Id.*). During the trial court's colloquy of Petitioner, regarding Petitioner's decision not to take the witness stand, the Commonwealth's attorney stated, for the record, that the Commonwealth did not intend on using Petitioner's prior convictions to impeach Petitioner if he decided to take the witness stand. (N.T. 2/24/86, p. 379–80). In response, Petitioner stated, "[y]ou already used them." (*Id.*, p. 380, lines 24; p. 381, line 1). The Commonwealth's attorney went on to explain, as an example, that he would not use Petitioner's prior conviction for armed robbery against him. (*Id.*, p. 381). When the court asked Petitioner if he understood, Petitioner responded, "[y]es sir. But he already accused me of crimes in front of the jury, which that's against my Constitutional rights." [34] (*Id.*, p. 381, lines 18–20). As evidenced by his statements, Petitioner had a present reasonable degree of understanding of the trial proceedings, as well as a factual understanding of the proceedings against him. Indeed, Petitioner appeared to not only have a rational and factual understanding of his trial, but he also possessed the mental ability to make reasonable constitutional arguments on his own behalf. Thus, not only did Petitioner understand the proceedings against him, but he actively assisted in his own defense.

Another example of Petitioner's understanding of his trial proceedings is during direct examination of the Commonwealth's fingerprint expert, Joseph Grimes. (N.T. 2/24/86). As Mr. Grimes was testifying that he found 39 positive points of comparison between Petitioner's fingerprint and the fingerprint found at the scene of the murder, Petitioner stated, "You put the print there. It's right here. It's my life .... I ain't never been there. How could I have my print there." (*Id.*, p. 353, 354, lines 247; p. 354, lines 1, 6–7). Petitioner's outburst reveals that he was comprehending the damaging testimony and had the wherewithal to state, in support of his defense of innocence, that he was not at the scene of the crime.

Lastly, although Petitioner's psychiatric records may have been indicative of a mental health history, they did not indicate incompetence to stand trial. At the evidentiary hearing, similar to Petitioner's diminished capacity defense, Petitioner presented testimony in support of his competency claim from psychiatrist, Dr. Julie Kessel, and neuropsychologist, Dr. Armstrong. (*See* N.T. 9/5/02). The Commonwealth countered Petitioner's argument with testimony from psychiatrist, Dr.

---

34. The court's colloquy took place after the Commonwealth rested. (N.T. 2/24/86, p. 379–80). Therefore, the colloquy occurred after the presentation of Vincent Gentile's testimony pertaining to Petitioner's robbery of his jewelry store. It appears that Petitioner's reference to the Commonwealth's use of Petitioner's previous crimes relates to the testimony presented by Vincent Gentile. During Mr. Gentile's testimony regarding Petitioner's rob- bery of his jewelry store, Petitioner stated, "What am I on trial for, this one or that one? I'm accused of it." Viewing this outburst in conjunction with Petitioner's statement pertaining to the unconstitutionality of already being accused of crimes in front of the jury reveals that Petitioner understood that he was solely on trial for the robbery and murder of Mr. Fiss, not the robbery of Gentile's Golden Nugget Jewelry Store.

O'Brien, and neuropsychologist, Dr. Gordon. (*See* N.T. 11/25/02 and 11/26/02).

At the evidentiary hearing, Dr. Armstrong testified that Petitioner was incompetent at the time of trial and, therefore, should have been evaluated regarding his competency. (N.T. 9/5/02, p. 56). Dr. Armstrong testified that Petitioner's mental health history raises questions about Petitioner's degree of understanding the proceedings against him and his capacity to deal with his lawyer. (*Id.*, p. 40, lines 19–25). Dr. Armstrong did not find it necessary to question Petitioner about his trial because she believes that the record shows that he was incompetent because he suffers from brain damage. (*Id.*, p. 62–63). In her testimony, Dr. Armstrong stated that Petitioner is "not likely to understand legal sentences, even when put in lay language, because they … always involve a couple of ideas linked together" and "it's likely that [Petitioner] wouldn't understand all the time what's really being asked." (*Id.*, p. 41, lines 24–25; p. 42, lines 1–5). Also, Dr. Armstrong testified that Petitioner "wouldn't understand what … the procedures meant and certainly what the consequences would be." (*Id.*, p. 42, lines 5–7). Regarding Petitioner's incompetency, Dr. Armstrong stated that Petitioner is "not always incompetent, he's not at every moment unable to understand things." (*Id.*, p. 46, lines 24–25, p. 47, line 1). According to Dr. Armstrong, it is possible for Petitioner to seem competent at times because "he's very good at masking his difficulties." (*Id.*, p. 46–47, 105, lines 22–25, p. 106, lines 1–9).

Dr. Kessel also presented testimony regarding Petitioner's competency. (N.T. 9/5/02). Dr. Kessel stated that "based on [Petitioner's] brain damage, his I.Q. assessment, and his impaired adaptive function, and his intermittent psychotic thinking, I'm able to conclude with a reasonable degree of medical certainty that competence should have been at the head of someone's thinking when they evaluated his ability [to] gainfully assist his attorneys in the preparation of a defense and in his basic understanding of what—what he'd been arrested for, what the consequences to him were, what the options available to him were, et cetera." (*Id.*, p. 143, lines 6–15). Dr. Kessel testified that she believed that Petitioner's competency was a substantial issue and that "[i]t's conceivable that [Petitioner] wasn't competent. It's conceivable that he was." (*Id.*, p. 143, lines 16–21). During cross-examination, Dr. Kessel stated that her assessment of Petitioner was based on observations that occurred in the record and, therefore, she "can't conclude or not conclude that [Petitioner] was competent or incompetent at the time." (*Id.*, p. 149, lines 14–17). Dr. Kessel went on to state that she could "conclude that the record does not suggest he was either competent or incompetent." (*Id.*, p. 149, lines 17–18). During the Commonwealth's cross-examination, Dr. Kessel admitted that she is not and cannot give the Court an opinion as to whether Petitioner was competent or incompetent at the time of his trial. (*Id.* p. 157, lines 10–15).

In response to Petitioner's expert mental health testimony, the Commonwealth presented testimony by Dr. O'Brien regarding Petitioner's competency. (N.T. 11/25/02). In contrast to Petitioner's mental health experts, Dr. O'Brien opined, to a reasonable degree of medical certainty, that "at the time of trial, based upon my clinical examination of Mr. Porter, which took place in August of [2002], and my review of materials which predated his trial, that at the time of trial he was not suffering from a clinical condition of any sort that caused him to be unable to understand the nature and object of the proceedings or participate and assist in those

proceedings." (*Id.*, p. 7, lines 5–12). Dr. O'Brien went on to state that "I did render diagnoses to Mr. Porter based upon my clinical examination which he has not either required nor received treatment for. And essentially his clinical condition at the present time or today is the same as his clinical condition would have been or was at the time of his trial and it's my opinion that, as today, he was at the time of his trial able to understand the nature and object of the proceedings and participate and assist in those proceedings." (*Id.*, p. 7, lines 12–19).

Like Dr. O'Brien, Dr. Gordon opined that, to a reasonable degree of medical certainty, that there is no evidence that Petitioner was incompetent at the time of trial. (N.T. 11/26/02, p. 77, lines 16–23). Based upon the records and all of the voluminous materials he reviewed in this case, Dr. Gordon opined that there is no evidence that Petitioner suffered from a diminished capacity or was incompetent at the time of trial. (*Id.*, p. 77). From the testing, the facts of the crime and the other medical records, Dr. Gordon testified that there was nothing that lead him to believe that Petitioner was incompetent at the time of trial. (*Id.*, p. 38, lines 20–24).

Upon examination of all of the aforementioned expert mental health testimony, including all exhibits and testimony, Petitioner has not presented sufficient evidence that he was incompetent to stand trial in February 1986. That is, Petitioner has not shown that he did not have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and did not have a rational and factual understanding of the proceedings against him. Upon weighing all testimony, reports and records, the Court concludes that Petitioner's mental health evidence fails to show either that he was incompetent to stand trial or that

there were sufficient signals to call his competence into question such that the trial court should have held an evidentiary hearing to determine if Petitioner was competent. In light of all of the mental health evidence presented to the Court, especially the Commonwealth's expert testimony and reports, the Court finds that Petitioner did have the mental capacity to understand and assist in the proceedings against him.

In sum, the Court concludes that Petitioner's argument that the trial court violated his right to a fair trial by failing to order a competency hearing or evaluation is without merit. As explained, Petitioner's argument that the court was given sufficient indicia of incompetency to give it reason to doubt his competence to stand trial is mistaken. Petitioner has not shown sufficient signals to the trial court that there was a reason to doubt the Petitioner's competence to stand trial. Petitioner has not made the showing that there was sufficient evidence that should have alerted the court to call his competence into question such that the trial court should have held an evidentiary hearing. The trial court's failure to order a competency hearing or evaluation is insignificant in light of this Court's conclusion that Petitioner's mental health evidence does not show that he was incompetent to stand trial. Upon examination of all of the mental health evidence presented to the Court, especially the Commonwealth's expert testimony and reports, the Court concludes that Petitioner did have the mental capacity to understand and assist in the proceedings against him. Thus, Petitioner has not established that he was incompetent to stand trial. As a result, the trial court did not violate Petitioner's due process rights to a fair trial by failing to order a competency hearing or evaluation pursuant to Pennsylvania law. Accordingly, Petitioner is not entitled to habeas relief on his claim

that the trial court violated his due process rights.

### b.) Counsel's Ineffectiveness in Failing to Seek Competency Evaluation or Hearing

■ Petitioner also claims that his attorney was ineffective in failing to investigate his competency or request a competency hearing and that he was prejudiced by this error. Petitioner argues that "the mental health evidence that counsel could have investigated, developed and presented at the time of the trial proceedings ... shows that Mr. Porter suffered from serious mental infirmities that prevented him from adequately understanding the proceedings and assisting counsel or in his defense." (Pet. Writ Habeas Corpus, ¶ 95). Petitioner argues that counsel should have investigated Petitioner's competency and brought the issue of his competency to the trial court's attention by requesting a competency hearing. (Pet.'s AEDPA Mem. Law at 50).

### Deficient Performance

In order for Petitioner to show that his trial counsel was ineffective, he must first prove that Mr. Floyd's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. At the evidentiary hearing, Mr. Floyd testified "I never at any point in time thought [Petitioner] was not competent." [35] (N.T. 9/4/02, p. 49, lines 7–8). Mr. Floyd stated

that he "never once thought [Petitioner] wasn't competent. If I did, I would have asked for psych." (*Id.*, p. 67, lines 12–13). Mr. Floyd testified that the factors he took into account when assessing whether Petitioner was competent for purposes of trial were "[Petitioner] always knew where he was. He knew that he was facing a capital murder trial. He never seemed to be hallucinating when I was talking to him. He knew what month and year it was." (*Id.*, p. 48, lines 24–24; p. 49, lines 1–2). Mr. Floyd went on to testify that "[Petitioner] had heard various things that were going on in the news out in the City of Philadelphia, so he was aware of general everyday things that most people seem to have knowledge." (*Id.*, p. 49, lines 3–6).

At the evidentiary hearing, Mr. Floyd confirmed that there was nothing about his interaction with Petitioner and the way that he related to him which led him to believe that there was potentially a mental health issue regarding Petitioner. (*Id.*, p. 64, lines 8–14). Mr. Floyd testified that "[P]etitioner always seemed rational during my discussions with him" and Petitioner was able to discuss the case at "great length" with him. (*Id.*, p. 64). At the time of trial, in the courtroom, Mr. Floyd stated that Petitioner appeared to understand and discuss the proceedings and evidence quite well. (*Id.*, p. 65, lines 1–4). During trial, Mr. Floyd testified that he talked to Petitioner at the defense table. (*Id.*, p. 65, lines 5–7). Also, at the defense table, Mr.

---

35. At the time of Petitioner's trial, Pennsylvania law required a criminal defendant to establish his incompetency by clear and convincing evidence. *See* 50 Pa.C.S.A. § 7403. In *Cooper v. Oklahoma,* the United States Supreme Court held that application of a clear and convincing evidence standard to incompetency determinations violates due process. *Cooper v. Oklahoma,* 517 U.S. 348, 369, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). Petitioner argues that "[t]he unconstitutional standard that was in effect may have infected this case, and made counsel hesitant to raise the competency issue." (Pet. Writ Habeas Corpus, ¶ 98). Without delving into whether *Cooper* applies retroactively to this case, in light of Mr. Floyd's testimony that he *never* thought that Petitioner was not competent, the Court concludes that the clear and convincing standard did not play any role in Mr. Floyd's reasoning for not raising the issue of Petitioner's competency to stand trial.

Floyd stated that "I provided [Petitioner] with a legal tablet that I turned sideways. I asked him, as I asked most clients that I'm representing, if they want to tell me something, to write it on the tablet. . . . [Petitioner] wrote notes to me during the course of the trial." (*Id.*, p. 65, lines 7–13). When questioned whether those notes had to do with trial, Mr. Floyd answered in the affirmative. (*Id.*, p. 65, lines 14–15). When questioned whether Petitioner seemed to understand and comply with counsel's request that Petitioner not orally interrupt him, Mr. Floyd responded by stating that "I don't recall him orally interrupting me at all." (*Id.*, p. 65, lines 16–18).

The issue of whether there was such "indicia" of incompetency that, in failing to request a competency hearing or evaluation on behalf of Petitioner, *see* Pa. Stat. Ann. Tit. 50, § 7402(d), trial counsel's representation "fell below an objective standard of reasonableness" can only be assessed by examining what counsel did, and what facts counsel knew that would bear on the issue of Petitioner's competency to stand trial. *Jermyn*, 266 F.3d at 300 (citation omitted). Thus, Mr. Floyd's testimony about what he did and what facts he knew regarding Petitioner's understanding of the proceedings is pivotal. Mr. Floyd's testimony is especially important because of his unique interaction with Petitioner during trial.

Considering Mr. Floyd's testimony, there was not such indicia of incompetence as to provide counsel with "reason to doubt" Petitioner's ability to understand the proceedings, communicate, and assist in his own defense. Mr. Floyd's testimony reveals that Petitioner not only was able to communicate about and understand the proceedings against him, but did in fact actively assist in his own defense. After reviewing Mr. Floyd's testimony, it appears that he did assess Petitioner's com-

petency to stand trial. Mr. Floyd stated that there was nothing about his interaction with Petitioner and the way that he related to him which led him to believe that there was potentially a mental health issue regarding Petitioner. Mr. Floyd clearly stated that he *never* thought, at any time, that there was any competency issue regarding Petitioner's ability to stand trial. Based on the present record, the Court cannot agree with Petitioner's claim that counsel's failure to seek a competency hearing or evaluation constituted deficient performance under *Strickland*.

*Prejudice*

 The Court concludes that Petitioner has failed to meet his burden of showing that Mr. Floyd's representation was deficient. However, even assuming that Petitioner has shown that Mr. Floyd's performance did fall beneath prevailing professional norms, Petitioner is unable to show that he suffered prejudice as a result of that deficient performance. In order to prove prejudice, Petitioner is required to show that there is a reasonable probability that Petitioner would have been adjudicated incompetent to stand trial if a hearing or additional evaluation had been conducted. *See Jermyn*, 266 F.3d at 302 (footnote omitted). Upon weighing all testimony, medical reports and records, this Court has already concluded that Petitioner's mental health evidence fails to show that he was incompetent to stand trial. Thus, Petitioner has not established that there is a reasonable probability that he would have been found incompetent to stand trial. Since Petitioner's has not shown that there is a reasonable probability that he would have been adjudicated incompetent to stand trial, he has failed to show prejudice under *Strickland*. As a result, Petitioner has not established ineffective assistance of counsel. Accordingly, Petitioner is not entitled to habeas relief on his claim

that Mr. Floyd was ineffective for failing to raise the question of Petitioner's incompetence before the trial court by seeking a competency hearing or additional evaluation.

### c. Claim VI Petitioner is not entitled to relief from his conviction and sentence because the Commonwealth did not use its peremptory strikes in a racially discriminatory manner.[36]

▮ Relying upon the United States Supreme Court case, *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Petitioner states that "[t]he Equal Protection Clause of the United States Constitution forbids the prosecutor from striking potential jurors on account of their race or on assumption that African–American jurors will be unable to impartially consider the prosecution's case against an African–American defendant." (Pet. Writ Habeas Corpus, ¶ 112). Petitioner, who is an African–American man, alleges that the Commonwealth violated his constitutional rights because "[t]he Commonwealth used at least eight of its seventeen peremptory challenges to strike African–American jurors from the venire" without any race-neutral reason.[37] (*Id.*, ¶¶ 113–114). As a result, Petitioner claims that the Pennsylvania Supreme Court's denial of his *Batson* claim in *Porter II* was "contrary to, and an unreasonable application of, *Batson*." (Pet.'s AEDPA Mem. Law at 65).

### 1.) State Court Decision

In *Porter II*, the Pennsylvania Supreme Court denied relief based on the conclusion that Petitioner failed to prove a *prima facie* case that the prosecution used its peremptory strikes in a racially discriminatory manner in violation of *Batson*.[38] *Porter II*, 728 A.2d at 900–01. The *Porter II* court concluded that Petitioner's evidence of race discrimination during jury selection was insufficient because it was based upon "the bare allegation" that Petitioner's counsel determined the ethnicity of the eight African–American prospective jurors who were stricken by the Commonwealth by comparing their names against names of people on the voter registration polls. *Id.* at 900. Even accepting Petitioner's evidence as sufficient, the *Porter II* court denied Petitioner's claim on the merits stating that he failed to prove several elements necessary to establish that the prosecution purposefully exercised its peremptory challenges in a racially discriminatory manner. *Id.* Specifically, the court found that Petitioner failed to identify "the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of the jurors acceptable to the Commonwealth

---

**36.** Petitioner's claim includes both the guilt and penalty phases of trial. As explained earlier, the Court will only address Petitioner's claim to the extent that it alleges error at the guilt phase since Petitioner has already been granted habeas relief regarding his sentencing phase. *See supra* Part IV.

**37.** Petitioner is a member of a constitutionally cognizable racial group because he is African–American. *Ramseur v. Beyer*, 983 F.2d 1215, 1230 (3d Cir.1992)(stating that "African–Americans are unquestionably a constitutionally cognizable group").

**38.** Even though Petitioner presented his *Batson* claim in nearly identical terms to his habeas claim, the *Porter II* court framed Petitioner's *Batson* claim as an ineffective assistance of counsel claim. *Porter II*, 728 A.2d at 900. Although the state court framed Petitioner's *Batson* claim as an ineffective assistance of counsel claim, it addressed the merits of Petitioner's claim that the prosecution purposefully exercised its peremptory challenges in a racially discriminatory manner. *Id.* at 900–01.

who were stricken by the defense." *Id.* at 900–01 (citation omitted).

### 2.) *Batson v. Kentucky*

In *Batson v. Kentucky*, the United States Supreme Court reaffirmed the perennial principle that the Equal Protection Clause is violated when prosecutors "challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." [39] *Batson*, 476 U.S. at 89, 106 S.Ct. 1712. The *Batson* Court explained that "[t]he core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race." *Id.* at 97–98, 106 S.Ct. 1712. Thus, one of the principal purposes of *Batson* is "to provide assurance to the defendant and the community that criminal judgments are not tainted by invidious discrimination." *Johnson v. Love*, 40 F.3d 658, 665 (3d Cir.1994). In keeping with this race-neutral principle, the Supreme Court in *Batson* and its progeny has affirmed "the principle that the exclusion of even a single venireperson on the basis of race is a violation of the Equal Protection Clause." *Jones v. Ryan*, 987 F.2d 960, 972 (3d Cir.1993)(citing *Batson*, 476 U.S. at 89, 106 S.Ct. 1712). In fact, the Third Circuit has held that "the exclusion of even one juror on the basis of race may be sufficient to establish a *prima facie* case." *Id.* (citing *United States v. Clemons*, 843 F.2d 741, 747 (3d Cir.1988)).

When trying to assert a *Batson* challenge, "a member of a racial group that has traditionally been the victim of racial discrimination in our society is entitled to rely upon that history as well as on the fact ... that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of mind to discriminate." *Johnson*, 40 F.3d at 665 (quotation and internal quotation marks omitted). However, under *Batson*, a three part test has been formulated to "evaluat[e] claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause." *Jones*, 987 F.2d at 967 (citing *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712). The *Batson* three part test consists of the following:

(1) the defendant must establish a *prima facie* case that the prosecution purposefully exercised peremptory challenges in a racially discriminatory manner;

(2) if the defendant successfully establishes a *prima facie* case, the prosecution must articulate race-neutral explanations for striking specific jurors; and

(3) the court must then determine whether the defendant has established a showing of purposeful discrimination.

*Id.* (citing *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712); *see also Simmons v. Beyer*, 44 F.3d 1160, 1167 (3d Cir.1995). In addition to the above, "one who objects to a challenge on the basis of *Batson* is entitled to rely on 'any other relevant circumstances' tending to support an inference of discrimination." *Johnson*, 40 F.3d at 665 (citing *Batson*, 476 U.S. at 96, 106 S.Ct. 1712).

**39.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was clearly established federal law at the time that Petitioner's state court conviction became final in 1990. Since Petitioner's conviction became final in 1990, the *Batson* standards apply to Petitioner's claim that the Prosecutor used his peremptory challenges in a racially discriminatory manner. *Id.*

The Third Circuit has elaborated on the first prong of the *Batson* analysis by utilizing a five factor test to determine whether a defendant has presented a *prima facie Batson* issue. *Deputy v. Taylor*, 19 F.3d 1485, 1492 (3d Cir.1994)(citing *Clemons*, 843 F.2d at 748; *Jones*, 987 F.2d at 970–71). The five factors are as follows:

(1) how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen

(2) the nature of the crime

(3) the race of the defendant and the victim

(4) the pattern of strikes against racial group jurors in the particular venire

(5) the prosecutor's statements and questions during selection.

*Id.* at 1492 (citing *Jones*, 987 F.2d at 970–71). Mindful of the race-neutral principle behind *Batson,* the Third Circuit has stated that "striking a single black juror might be sufficient to make out a *prima facie* case of racial discrimination even when other blacks were seated on the panel." *Id.* at 1492 (citing *Clemons*, 843 F.2d at 747).

### 3.) *Analysis of Petitioner's Claim*

As mentioned earlier, the *Porter II* court concluded that Petitioner failed to establish a *prima facie* case under *Batson. Porter II,* 728 A.2d at 900–01. The state court specifically found that Petitioner's evidence of discrimination during jury selection was insufficient and that Petitioner failed to prove several elements necessary to establish a *prima facie* case under Pennsylvania law. *Id.* Federal law does not require Petitioner to show additional *prima facie* elements as declared by the Supreme Court of Pennsylvania. That is, in order for Petitioner to have established a *prima facie* case, he was not required to specifically identify "the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of the jurors acceptable to the Commonwealth who were stricken by the defense." *Id.* (quoting *Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468, 475 (1998))(internal quotation marks omitted). Even though federal law does not require Petitioner to have established a *prima facie* case by identifying all of the factors enumerated by the *Porter II* court, this Court agrees with the Pennsylvania Supreme Court's denial of Petitioner's claim. Thus, the *Porter II* court's conclusion that Petitioner failed to prove a *prima facie* case of discrimination during jury selection was neither contrary to, nor an unreasonable application of, *Batson.* The *Porter II* court's decision that Petitioner failed to prove a *prima facie* case under *Batson* was reasonable. Therefore, this Court finds that there has been no constitutional error in the denial of Petitioner's *Batson* claim.

### a.) *Petitioner's Prima Facie Case*

As mentioned beforehand, in order for Petitioner to have a claim under *Batson,* he must first set forth a *prima facie* case establishing that the prosecution purposefully exercised its peremptory challenges in a racially discriminatory manner. To reiterate, the Third Circuit has declared that the following factors are to be considered in determining whether Petitioner has successfully established a *prima facie* case:

(1) how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen

(2) the nature of the crime

(3) the race of the defendant and the victim

(4) the pattern of strikes against racial group jurors in the particular venire

(5) the prosecutor's statements and questions during selection.

*Deputy*, 19 F.3d at 1492 (citation omitted). Applying the five factors set forth above, the Court will now address whether Petitioner has established a *prima facie* case that the prosecution purposefully exercised its peremptory challenges in a racially discriminatory manner.

■ The Court will first address the factors specifically asserted by Petitioner, numbers (3) and (4). Regarding the third factor, Petitioner is an African–American man and the victim of the crime was white.[40] (Pet.'s AEDPA Mem. Law at 64). As for the fourth factor, pertaining to a pattern of strikes against African–American jurors in the venire, Petitioner alleges that "[t]he Commonwealth used at least eight of its seventeen peremptory challenges to strike African–Americans from the venire."[41] (Pet. Writ Habeas Corpus, ¶ 113). In relation to these peremptory strikes, Petitioner argues that "the Commonwealth had no race-neutral reason for striking these African–American prospective jurors." (*Id.*, ¶ 114). Petitioner alleges that "the prosecutor did not treat black and white venirepersons similarly but, instead, struck blacks who had characteristics that would ordinarily be favored by

the Commonwealth and struck whites only when there were obvious reasons to do so." (Pet.'s AEDPA Mem. Law at 64). As a result of the aforementioned, Petitioner has alleged the third and fourth factors in his *Batson* claim.

Regarding the first *prima facie* factor, Petitioner failed to address how many members of the cognizable racial group were in the venire panel from which the petit jury was chosen. Even though Petitioner relies on the contention that the prosecution used at least eight of its seventeen peremptory challenges to strike African–Americans from the venire, he is silent and makes no attempt to approximate the number of African–Americans in the venire panel. Thus, there is no allegation, nor any evidence, pertaining to the number of African–Americans in the venire panel. As for the second factor, Petitioner does not explicitly address the nature of the crime in his claim, nevertheless, the crime involved a killing during the commission of a robbery. In regards to the fifth factor, Petitioner is also silent about the Prosecutor's statements and questions during jury selection. After a review of the voir dire transcripts, there are no statements nor any questions made by the Prosecutor which demonstrate any inference of racial discrimination. (N.T. 2/10/86, 2/13/86, 2/14/86, 2/18/86, 2/19/86).

40. The racial configuration of the crime is relevant to deciphering whether Petitioner has established a *prima facie* case under *Batson*. *See Simmons*, 44 F.3d at 1168 (stating that "[t]he nature of the murder and robbery of an elderly caucasian physician by a young African–American man—contribute significantly to [defendant's] *prima facie* case").

41. Petitioner's numerical determination regarding the peremptory challenges against African–Americans is derived from "comparing the stricken jurors against the voter registration rolls at the Philadelphia Board of Elections." (Pet. Writ. Habeas Corpus at 78 n.

26). Petitioner acknowledges that his evidence may be incomplete due to the ever-changing nature of voter registration. (*Id.*). As for the trial court record, the Court notes the following: (1) the trial in this case took place seventeen years ago; (2) there was no objection at any time pertaining to the Prosecutor's peremptory challenges and, therefore, the trial court provided no opportunity for the Prosecutor to place his reasons for striking prospective jurors on the record; and (3) the trial court record fails to identify any juror or member of the venire panel on the basis of race.

Thus, there is no claim, nor evidence, that the Prosecutor made any statements or questions whatsoever which give rise to any suggestion of racial discrimination. Notably, there is no record which expresses the Prosecutor's reasons for striking prospective jurors. Therefore, the reasoning behind the Prosecutor's specific strikes is unknown. Also notable is the trial court's actions pertaining to voir dire. Throughout the voir dire, the trial court repeatedly informed the venire panel that the crime involved an African–American defendant and a white victim. *Id.* The trial court not only informed the panel of the racial composition of the crime, but also inquired if anyone had an issue or a fixed opinion regarding Petitioner's guilt due to race. *Id.* Thus, the trial court appropriately interrogated the venire panel about issues regarding race and prejudice.

After reviewing the *prima facie* factors which Petitioner did allege, and in light of the factors Petitioner failed to state, this Court concludes that Petitioner has not successfully shown, much less established, the factors that are necessary to establish a *prima facie* case that the prosecution purposefully exercised its peremptory challenges in a racially discriminatory manner. Upon close examination of Petitioner's claim, Petitioner's evidence, the voir dire transcripts and all relevant circumstances tending to support an inference of discrimination, the Court finds that it would have to rely heavily upon speculation in order to conclude that Petitioner has successfully established a *prima facie* case. As a result, the record before the Court fails to make a substantial showing that the *Batson* standard has been violated. Consequently, in finding that Petitioner fails to properly plead his *prima facie* case, the analysis of Petitioner's *Batson* claim ends at the first part of the three part *Batson* test.

In light of this finding, the Court concludes that the *Porter II* court's decision that Petitioner failed to prove a *prima facie* case establishing that the prosecution purposefully exercised its peremptory challenges in a racially discriminatory manner was not unreasonable. As mentioned earlier, although the Pennsylvania Supreme Court's rationale does not explicitly follow federal law, its denial of relief was not a constitutional error necessitating habeas relief. As a result, the Pennsylvania Supreme Court's decision regarding Petitioner's *Batson* claim in *Porter II* was neither contrary to, nor an unreasonable application of, *Batson*.[42] Thus, Petitioner's

---

**42.** Petitioner's *Batson* claim includes a footnote where he alleges that he is also entitled to relief under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). (Pet. Writ. Habeas Corpus at 81 n. 27). Petitioner's *Swain* claim relies upon the allegation that the Philadelphia District Attorney's Office had a systematic prosecutorial practice of using peremptory challenges in a racially discriminatory manner. (*Id.*). As evidence in support of his *Swain* claim, Petitioner relies upon statistics and a jury selection training videotape produced by the Philadelphia District Attorney's Office in 1987. (*Id.; Pet.'s AEDPA Mem. Law at 65 n. 48).

In Petitioner's 1996 Pennsylvania Supreme Court brief, his *Swain* claim included the sta-

tistics contained in his Habeas Petition, but did not include the District Attorney's Office videotape because the videotape had not been released until 1997. (Commw.'s Exs., Ex. C at 95 n. 34 (Pet.'s PCRA Appeal Brief)). After the videotape was released, Petitioner filed in the Pennsylvania Supreme Court an *Application for Permission to File Supplemental Pleading and Motion to Remand to the Post Conviction Relief Act Court on the Basis of Newly Discovered Evidence,* describing the tape and other newly discovered evidence. (*Id.*). The Pennsylvania Supreme Court denied the remand motion on March 16, 1999. (*Id.*). Petitioner neither informed this Court about the reasons for the Pennsylvania Supreme Court's denial of his motion nor alleg-

request for habeas relief based upon Claim VI is denied.[43]

#### d. Claim VII The trial court's reasonable doubt instructions did not deprive Petitioner of due process of law.[44]

 The Due Process Clause of the Fourteenth Amendment requires that the government prove a criminal defendant's guilt beyond a reasonable doubt. That is, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).[45] Petitioner claims that his due process rights were violated by the trial

es that the state supreme court erred in denying the application and motion. As such, this Court cannot deduce whether Petitioner's claim is exhausted or is procedurally defaulted based upon independent and adequate state procedural law grounds. Thus, Petitioner has failed to satisfy his burden of establishing that his habeas claim using the District Attorney's Office videotape as evidence was fairly presented to the state courts. *See Lines*, 208 F.3d at 159. As a result, the Court will not address Petitioner's claim as it relates to the District Attorney's Office jury selection videotape. However, the Court notes that even if it was to consider the videotape in conjunction with Petitioner's claim, the videotape was produced *after* Petitioner's trial. Also, Petitioner has not presented any evidence that the Prosecutor in this case, Assistant District Attorney Michael McGovern, Esq., was aware of the videotape, and if he was, that he adhered to it. *See Peterkin v. Horn*, 988 F.Supp. 534, 541 (E.D.Pa.1997)(stating that "even accepting petitioner's argument as true that the prosecutor ... was so trained, that fact alone does not automatically translate to a finding that he adhered to that training in selecting the jury in this case").

As for the remainder of Petitioner's *Swain* claim, the Pennsylvania Supreme Court dealt solely with Petitioner's *Batson* claim, and did not address his claim as it pertains to *Swain*. *Porter II*, 728 A.2d at 900–01. Although Petitioner exhausted his *Swain* claim by presenting it to the state court in almost verbatim fashion as his Habeas Petition, the *Porter II* court did not address his claim. *Id.* Upon review of Petitioner's *Swain* claim, this Court concludes that the record in the instant case cannot support an inference that the Philadelphia District Attorney's Office, including Assistant District Attorneys, repeatedly engaged in purposeful and systematic striking of African–Americans regardless of trial-related considerations. *Swain*, 380 U.S. at 225–26, 85 S.Ct. 824. Petitioner's evidence fails to show overwhelming and pervasive discrimination as required by *Swain*. *Id.* Since Petitioner has failed to make the requisite showings under *Swain*, his claim pertaining to *Swain* is denied.

**43.** In his Memorandum of Law Regarding AEDPA, Petitioner alleges an ineffective assistance of counsel claim in relation to his *Batson* claim. (Pet.'s AEDPA Mem. Law at 69). This claim is contained in the last sentence of Petitioner's *Batson* claim and fails to include any analysis. (*Id.*). The Court denies Petitioner's ineffective assistance of counsel claim because he has failed to show that counsel's performance was objectively unreasonable and that he was prejudiced as a result—that but for counsel's deficiencies, the outcome of the prior proceeding would have been different. *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In addition, the Court also denies Petitioner's ineffective assistance of counsel claim because the underlying *Batson* claim has not been proven. *See Holloway*, 161 F.Supp.2d at 508 (stating that "*Strickland* instructs that if the petitioner has not shown that [the] underlying claim has merit, counsel cannot have been ineffective for failing to raise it").

**44.** Petitioner's claim includes both the guilt and penalty phases of trial. As explained earlier, the Court will only address Petitioner's claim to the extent that it alleges error at the guilt phase since Petitioner has already been granted habeas relief regarding his sentencing phase. *See supra* Part IV.

**45.** *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) was clearly established federal law at the time that Petitioner's state court conviction became final in 1990.

court's definition of reasonable doubt during the jury charge. (Pet. Writ Habeas Corpus, ¶ 120). Specifically, Petitioner alleges that the trial court's definition of reasonable doubt, which employed the word "restrain" as a substitute for the word "hesitate", "improperly diminished the Commonwealth's burden of proof and infringed upon the presumption of innocence." [46] (*Id.*). On this basis, Petitioner seeks habeas relief alleging that the Pennsylvania Supreme Court's denial of his reasonable doubt jury instruction claim "was contrary to established federal constitutional precedent and was an unreasonable application of the law and determination of the facts." (*Id.*, ¶ 126).

### 1.) *State Court Decision*

In *Porter II*, the Pennsylvania Supreme Court denied Petitioner's reasonable doubt jury instruction claim.[47] *Porter II*, 728 A.2d at 899–900. The *Porter II* court specifically listed the following four reasons for its denial of Petitioner's claim: (1) the Pennsylvania Supreme Court has "not placed [its] imprimatur" on the Pennsylvania Standard Jury Instructions; (2) a trial court has broad discretion in the phrasing of jury instructions and may choose its own wording as long as the law is clearly, adequately and accurately presented to the jury; (3) the distinction between "hesitate before acting" and "restrain before acting"

is *de minimis;* and (4) the Pennsylvania Supreme Court has previously approved a reasonable doubt jury instruction using the word "restrain." *Id.* Based upon these four factors, the state court concluded that there was no basis to object to the jury charge as given. *Id.*

### 2.) *Reasonable Doubt In General*

As mentioned earlier, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364, 90 S.Ct. 1068. In the American scheme of criminal procedure, the reasonable doubt standard plays a vital role. *Id.* at 363, 90 S.Ct. 1068. In fact, the reasonable doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error" and "provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." *Id.* (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895))(internal quotation marks omitted).

Although the reasonable doubt standard is a requirement of due process,

---

**46.** In his Petition for a Writ of Habeas Corpus, Petitioner includes the definitions of the words "hesitate" and "restrain." (Pet. Writ Habeas Corpus, ¶ 125)(citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1061 (1976)). According to Petitioner, the word "hesitate" "implies a pause or other sign of indecision before acting." (*Id.*)(quotation and internal quotation marks omitted). As for the word "restrain", Petitioner argues that it "suggests use of force, pressure, or strenuous persuasion to hold back a person or thing from a course of action to prevent the action itself." (*Id.*)(quotation and internal quotation marks omitted).

**47.** Even though Petitioner presented his reasonable doubt jury instruction claim in nearly identical terms to his habeas claim, the *Porter II* court framed Petitioner's claim as an ineffective assistance of counsel claim. *Porter II*, 728 A.2d at 899–900. Although the state court framed Petitioner's claim as an ineffective assistance of counsel claim, it addressed the merits of Petitioner's claim that the trial court erred in its instruction to the jury on reasonable doubt. *Id.*

"the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994)(citing *Hopt v. People,* 120 U.S. 430, 440–441, 7 S.Ct. 614, 30 L.Ed. 708 (1887)). Thus, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof", as long as "the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt." *Id.* (citations omitted). As a result of the aforementioned, when evaluating the constitutionality of a reasonable doubt instruction, "[t]he constitutional question ... is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Id.* at 6, 114 S.Ct. 1239; *see also United States v. Hernandez,* 176 F.3d 719, 728 (3d Cir.1999); *Laird,* 159 F.Supp.2d at 92. The relevant "inquiry is not, then, whether a particular word or phrase is used, but rather, when taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Laird,* 159 F.Supp.2d at 92 (quoting *Victor,* 511 U.S. at 5, 114 S.Ct. 1239)(internal quotation marks omitted).

### 3.) Analysis of Petitioner's Claim

As previously mentioned, the *Porter II* court denied Petitioner's reasonable doubt jury instruction claim based upon the following four grounds: (1) the Pennsylvania Supreme Court has "not placed [its] imprimatur" on the Pennsylvania Standard Jury Instructions; (2) a trial court has broad discretion in the phrasing of jury instructions and may choose its own wording as long as the law is clearly, adequately and accurately presented to the jury; (3) the distinction between "hesitate before act-

ing" and "restrain before acting" is *de minimis;* and (4) the Pennsylvania Supreme Court has previously approved a reasonable doubt jury instruction using the word "restrain." *Porter II,* 728 A.2d at 899–900. Not categorically accepting all of the reasons set forth by the Pennsylvania Supreme Court for denying Petitioner's claim, this Court finds that the jury instructions, taken as a whole, correctly conveyed the concept of reasonable doubt to the jury. Therefore, I determine that the state court's conclusion denying Petitioner relief on this claim was reasonable. As a result, there has been no constitutional error in the Pennsylvania Supreme Court's denial of Petitioner's claim because the denial was neither contrary to, nor an unreasonable application of, clearly established federal constitutional precedent.

### a.) Petitioner's Reasonable Doubt Jury Instruction Claim

Petitioner's claim is based upon the trial court's substitution of the word "restrain" for the word "hesitate" during its jury instruction defining reasonable doubt. Thus, Petitioner's claim rests solely upon trial court's reasonable doubt jury instruction. During its guilt phase jury charge, the trial court defined reasonable doubt as follows:

[a] reasonable doubt is a doubt that would cause a reasonably careful and sensible person to restrain before acting upon a matter of importance in his own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crime. A reasonable doubt must be a real doubt. It may not be an imagined one, or a speculative one, nor may it be a doubt manufactured to avoid

carrying out an unpleasant duty.[48]
(N.T. 2/26/86, p. 527–28)(emphasis added). Based upon this jury instruction, Petitioner argues that the trial court improperly substituted the word "restrain" for "hesitate" which, in turn, "improperly required doubt to rise to a level that would 'restrain' a juror from acting rather than merely cause the juror to 'hesitate' before acting." (Pet. Writ Habeas Corpus, ¶ 123). Petitioner contends that "[u]nder the proper 'hesitate' standard, a juror should find reasonable doubt if there is enough doubt to cause her to 'hesitate' before acting upon a matter of importance." (*Id.*). Consequently, Petitioner argues, "[u]nder the trial court's improper 'restrain' instruction, the doubt would have to rise to such a great level that it would not just cause the juror to 'hesitate' before acting, but would cause her to 'restrain' from acting—i.e., would stop her from acting at all." (*Id.*). As a result, Petitioner argues that the trial court's reasonable doubt instruction utilizing the word "restrain" required a higher level of doubt than is authorized by due process. (*Id.*).

An examination of Petitioner's claim reveals that his argument is linguistic in nature. Petitioner's claim narrowly focuses on the specific portion of the jury instruction that substitutes the word "restrain" for "hesitate." However, it is the totality of the instruction which must be examined to determine whether there is a reasonable likelihood that the jury understood the instructions to allow a conviction based on proof sufficient to meet the beyond a reasonable doubt standard. *Victor*, 511 U.S. at 5, 114 S.Ct. 1239. Focusing on the totality of the instruction, Petitioner's reasonable doubt jury instruction adequately defined the meaning of reasonable doubt by emphasizing the importance of reasonableness and focusing on the significant role played by evidence. *See Starkes v. Marks*, 524 F.Supp. 37, 40 (E.D.Pa.1981)(examining two Pennsylvania reasonable doubt jury instructions, one using the word "restrain" and the other using the word "hesitate", concluding that due process did not mandate which of the instructions should be used because "[a]lthough there may be a semantic difference between the terms 'restrain' and 'hesitate' when viewed in isolation, it cannot be said ... that there is a substantial difference between these two charges when each term is viewed in the context of the overall charge"); *Laird*, 159 F.Supp.2d at 92 (denying habeas relief because "the trial court's use of the word 'restrain' as opposed to 'hesitate' did not impermissibly lower the government's burden of proof"); *Peterkin v. Horn*, 176 F.Supp.2d 342, 380–81 (E.D.Pa.2001)(after finding that the word "restrain" implies a slightly higher level of doubt than does the word 'hesitate', the Court denied habeas relief based on the conclusion that, when viewing the reasonable doubt jury instruction as a whole, the substitution of "restrain" for "hesitate" did not raise the level of doubt so high as to constitute constitutional error).

---

**48.** At the time of Petitioner's trial, the Pennsylvania standard jury instruction defining reasonable doubt read, in pertinent part, as follows:

[a] reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crime. A reasonable doubt must be a real doubt, it may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant duty.
Pennsylvania Criminal Suggested Standard Jury Instructions § 7.01(3)(last revised June 1975)(emphasis added).

Upon examination of the reasonable doubt jury instruction utilized at Petitioner's trial, the trial court's substitution of the word "restrain" for "hesitate" did not impermissibly raise the level of doubt so as to constitute constitutional error. Taken as a whole, the reasonable doubt jury instruction adequately instructed the jurors on the definition of reasonable doubt and its role in criminal convictions. Thus, this Court concludes that the trial court's reasonable doubt jury instruction correctly conveyed the concept of reasonable doubt to the jury and, therefore, did not violate Petitioner's due process rights. In light of this finding, this Court concludes that the *Porter II* court's decision that Petitioner was not entitled to relief based upon his reasonable doubt jury instruction claim was neither contrary to, nor an unreasonable application of, established federal law. As a result, Petitioner's request for habeas relief is denied because the Pennsylvania Supreme Court's decision denying Petitioner's reasonable doubt jury instruction claim in *Porter II* was reasonable.[49]

### e. Claim VIII Unreliable hearsay testimony was not admitted against Petitioner in violation of his Sixth, Eighth and Fourteenth Amendment Rights.

Petitioner's eighth claim is based upon the contention that unreliable hearsay evidence was admitted and used against him during his trial in violation of his Sixth, Eighth and Fourteenth Amendment rights.[50] (Pet. Writ Habeas Corpus, ¶¶ 127–143). Petitioner argues that in addition to violating Pennsylvania's Rules of Evidence, the admission of the alleged inadmissible hearsay evidence also constituted a separate Confrontation Clause violation.[51] (Pet.'s AEDPA Mem. Law at 72–73). Petitioner seeks habeas relief on both grounds arguing that the Pennsylvania Supreme Court's denial of his claim "was contrary to and an unreasonable application of Supreme Court law." (*Id.* at 73.).

Petitioner's claim relies on the admission of testimony given by several people during the guilt phase of Petitioner's trial. As provided by Petitioner's Habeas Petition

---

**49.** Similar to Petitioner's PCRA Appeal Brief, Petitioner's Petition for a Writ of Habeas Corpus appears to allege ineffective assistance of counsel regarding his reasonable doubt jury instruction claim. (Pet Writ Habeas Corpus, ¶ 126). At the end of paragraph 126 of his Petition, Petitioner states that trial and appellate counsel could not have had tactical reasons for failing to object to the instruction at trial and raise the claim on appeal. (*Id.*). Petitioner fails to offer any analysis in conjunction with his ineffective assistance of counsel claim. (*Id.*). However, in an abundance of caution, the Court will address the implied ineffective assistance of counsel claim in relation to Petitioner's Claim VII. First, the Court denies any ineffective assistance of counsel claim because Petitioner has failed to show that counsel's performance was objectively unreasonable and that he was prejudiced as a result—that but for counsel's deficiencies, the outcome of the prior proceeding would have been different. *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In

addition, the Court also denies Petitioner's implied ineffective assistance of counsel claim because the underlying claim has not been proven. *See Holloway,* 161 F.Supp.2d at 508 (stating that *"Strickland* instructs that if the petitioner has not shown that [the] underlying claim has merit, counsel cannot have been ineffective for failing to raise it").

**50.** Federal Rule of Evidence 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

**51.** The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is made applicable to the states through the Fourteenth Amendment. U.S. CONST. amend. XIV.

and AEDPA Memorandum of Law, the following is a brief synopsis of the specific testimony on which Petitioner's claim rests:

**Police Officer Kent: Inadmissible Hearsay**

Officer Kent testified that he arrived at the scene of the killing soon after hearing a radio dispatch regarding a robbery. (N.T. 2/20/86, p. 49). Upon arrival he was given information "that the man inside the store had just been shot and that the doer had just drove off in his Oldsmobile." (*Id.*). Informants provided a description of the perpetrator and the car. (*Id.*). Officer Kent radioed a description of the perpetrator including his height, age, weight and complexion. (*Id.*, p. 51). Petitioner argues that the testimony regarding the descriptions of the shooter should not have been admitted because it was hearsay.

**Catherine Valente: Improper Bolstering of In–Court Identification**

Catherine Valente, who arrived at the deceased's beauty shop just as a man was leaving the scene of the shooting, made a crucial in-court identification of Petitioner. (N.T. 2/20/86, p. 123). Petitioner contends that Ms. Valente properly testified as to the description of the person that she saw leaving the shop, however, it was improper bolstering for Ms. Valente to then testify that she told this description to the police.(*Id.*, p. 124). Approximately one week after the shooting, Ms. Valente saw Petitioner's picture on television and it occurred to her that the man was the person she saw exiting the beauty shop. (*Id.*, p. 132). Upon viewing the television, Ms. Valente testified that she immediately told her daughter, next door neighbor and grandchildren, "That's him, that's him." (*Id.*). Petitioner further argues that while it was proper for Ms. Valente to testify that she saw Petitioner on television and

recognized him as the man from the beauty shop, it was improper bolstering for her to testify that she told others out of court that this was the man. In addition, Petitioner argues that such improper testimony was again elicited when Detective Checchia testified that Ms. Valente also told him that she had seen the defendant on television. (N.T. 2/26/86, p. 421).

**Vincent Gentile: Improper Bolstering of In–Court Identification**

Vincent Gentile, who testified that Petitioner had robbed his jewelry store a few days after the homicide, made an in-court identification of Petitioner. (N.T. 2/21/86, p. 169). Mr. Gentile's testimony was quite damaging because the prosecution claimed that the gun used in the jewelry store robbery was the same used in the Fiss shooting. Mr. Gentile testified that shortly after the robbery he saw Petitioner in a police van and he "identified him ... [Petitioner] as having been one of" the robbers. (*Id.*). Petitioner contends that it was proper for Mr. Gentile to indicate that he saw Petitioner in the police van, however, it was improper hearsay testimony to state that he had identified Petitioner as having been in the van.

**Detective Brown: Implicit Hearsay**

Mr. Gentile's jacket was stolen during the robbery of his jewelry store. Mr. Gentile was called upon to identify a jacket that had been recovered from Petitioner. Mr. Gentile indicated that the jacket taken from Petitioner belonged to him. (N.T. 2/21/86, p. 175). Detective Brown testified that Mr. Gentile identified the jacket that had been recovered from the Petitioner. (*Id.*, p. 198). After a hearsay objection, the prosecutor rephrased the question. (*Id.*, p. 199). The detective went on to testify that he showed the jacket to Mr. Gentile and immediately following Mr. Gentile's viewing of the jacket, the detec-

tive vouchered it. (*Id.,* p. 202). Petitioner argues that this testimony was implicit hearsay and thus was a clear and improper end-run around the prior sustained hearsay objection.

### Police Officer Gana: Implicit Hearsay

Officer Gana testified about what occurred during his foot pursuit of the men who robbed Mr. Gentile's jewelry store. He testified that he approached two male bystanders after they motioned to him, at which point the prosecutor asked, "Without telling us what they told you, was your attention directed to a certain area?" (N.T. 2/21/86, p. 235). Officer Gana answered in the affirmative and then testified that he and his partner located the weapon used in the Gentile robbery. (*Id.*). Petitioner contends that Officer Gana's testimony clearly implied that the two bystanders told the officers that there was a gun thrown under the car by the person they were chasing. As such, Petitioner argues, this too was improper hearsay. (Pet. Writ Habeas Corpus, ¶¶ 127–143). It is based on the alleged prejudicial admission of the aforementioned testimony, that Petitioner seeks habeas relief for violations of his Sixth, Eighth and Fourteenth Amendment rights and the Confrontation Clause.

### 1.) State Court Decision

■ In *Porter II,* the state supreme court analyzed the statements in controversy and concluded that relief was not warranted.[52] *Porter II,* 728 A.2d at 898–99. Primarily, the *Porter II* court denied relief based on the determination that the admitted statements did not constitute in-

admissible hearsay. *Id.* However, it is important to note, the *Porter II* court exclusively addressed Petitioner's claim as it related to the admittance of hearsay evidence during trial, and did not address the claim as it pertained to constitutional issues or the Confrontation Clause. *Id.* Although Petitioner adequately presented the constitutional nature of his claim to the state supreme court, the *Porter II* court neither mentioned nor addressed that part of Petitioner's claim.

The *Porter II* court's decision pertaining to the portion of Petitioner's claim regarding inadmissible hearsay dealt solely with state law. *Id.* Although Petitioner properly presented the constitutional issues in his claim, the *Porter II* court's decision is void of any analysis under the United States Constitution. Generally, federal habeas courts are not concerned with whether state law was violated because of "the principle that federal habeas corpus relief does not lie for errors of state law." *Kontakis v. Beyer,* 19 F.3d 110, 117 (3d Cir.1994)(quoting *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991))(internal quotation marks omitted). Furthermore, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." *Id.* at 117 n. 12 (quotation and internal quotation marks omitted). Thus, this Court will not review the determinations made by the state supreme court based upon the Pennsylvania Rules of Evidence, but will only concern itself with whether the admission of the testimony violated the Constitution, laws or treaties of the United States. *See* 28 U.S.C. § 2254(a). Since the *Porter II* court did

---

**52.** In Petitioner's *Porter II* Brief, Petitioner alleged ineffective assistance of counsel within his hearsay claim. (Commw.'s Exs., Ex. C (Pet.'s PCRA Appeal Brief)). However, in analyzing the claim, the Pennsylvania Supreme Court framed Petitioner's entire claim as an

ineffective assistance of counsel claim. *Porter II,* 728 A.2d at 898–99. Although the state supreme court framed Petitioner's claim as an ineffective assistance of counsel claim, it addressed the merits of Petitioner's claim based upon hearsay grounds. *Id.*

not address Petitioner's constitutional issues, it did not reach the merits of Petitioner's claim as it is presented to this habeas court. As a result, this Court will review the state court's decision *de novo*. *See supra* Part III.A.3.c.

### 2.) De Novo Review of Petitioner's Claim

Due to the aforementioned, this Court is obligated to independently review Petitioner's claim to determine if habeas relief is justified. Ordinarily, the Court would begin its analysis by separately addressing whether each individual statement constituted inadmissible hearsay. Next, the Court would analyze the admission of any hearsay statements under the proper harmless error standard. *See Lippay v. Christos*, 996 F.2d 1490, 1500 (3d Cir.1993)(stating "[i]nasmuch as [the] testimony included inadmissible hearsay ... we must reverse unless we find that its admission was harmless error"). Regarding Petitioner's Confrontation Clause argument, the Court would separately address whether each individual statement violated the Confrontation Clause. Then, the Court would analyze the admission of any statements it found violated the Confrontation Clause under the proper harmless error standard. *See United States v. Mitchell*, 145 F.3d 572, 579 (3d Cir.1998).

In the interest of judicial economy, the Court will assume *arguendo* that all of the statements in contention constitute inadmissible hearsay and violate the Confrontation Clause. The Court seriously disputes that the admission of all of the statements in contention amount to trial error. Nevertheless, for the sake of brevity, the Court will directly perform a harmless error analysis of the statements since this single analysis addresses both the inadmissible hearsay and the Confrontation Clause portions of Petitioner's claim.

### a.) Hearsay and The Confrontation Clause

As mentioned earlier, hearsay is defined as "a statement, other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). "Hearsay is generally inadmissible because the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined." *United States v. Reilly*, 33 F.3d 1396, 1409 (3d Cir.1994)(quoting *United States v. Console*, 13 F.3d 641, 656 (3d Cir.1993))(internal quotation marks omitted). Just as the evidentiary rule of hearsay is concerned with the integrity of the fact-finding process, so too is the Confrontation Clause. The Confrontation Clause gives the accused, in a criminal prosecution, the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. Not only does the Confrontation Clause secure a defendant's right to confront witnesses against him, but it also secures the right to cross-examine those witnesses. *See Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)(stating that "a primary interest secured by [the Confrontation Clause] is the right of cross-examination"). In fact, the right of confrontation and cross-examination is so significant that it is considered to be "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Barber v. Page*, 390 U.S. 719, 721, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968)(quotation and internal quotation marks omitted).

It is well-established "that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots." *Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)(footnote omitted). However, the two are not identical. *Id.* Even though "the hearsay rule and the Confrontation Clause protect similar values ... the Confrontation Clause has a broader reach barring the admission of some evidence that would otherwise be admissible under exceptions to the hearsay rules." *Mitchell*, 145 F.3d at 578 (citing *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)). Before a hearsay statement will be deemed admissible, "the prosecution must show that it bears adequate 'indicia of reliability.'" *Id.* (quoting *Idaho v. Wright*, 497 U.S. 805, 814–15, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990))(internal quotation marks omitted). "The 'indicia of reliability' requirement can be met if the hearsay statement either falls within a firmly rooted hearsay exception or if it is supported by a showing of 'particularized guarantees of trustworthiness.'" *Id.* (citation omitted).

*b.) Harmless Error Analysis* [53]

It is important to note that "[n]ot all error is reversible." *Mitchell*, 145 F.3d at 579. "An error is harmless if it is highly probable that the error did not contribute to the judgment." *United*

States *v. Saada*, 212 F.3d 210, 222 (3d Cir.2000)(quoting *United States v. Gibbs*, 190 F.3d 188, 213 n. 16 (3d Cir.1999))(internal quotation marks omitted). This standard is met "when the court possesses a 'sure conviction' that the error did not prejudice the defendant." *Id.* (quoting *Gibbs*, 190 F.3d at 213 n. 16)(internal quotation marks omitted). In determining whether trial error is harmless, a habeas court's inquiry is whether the "error had substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 146–147, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Thus, the harmless error inquiry centers on "whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error." *Yohn*, 76 F.3d at 523 (citation omitted). Overall, it is "the impact of the error on the minds of the jurors in the total setting" which is the crucial inquiry. *Id.* at 523 (citation omitted). In the case of a federal judge in a habeas proceeding, "a constitutional trial error is not harmless if the court is in 'grave doubt' as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict." [54] *Hassine*, 160 F.3d at 955 (citing *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

**53.** There are two types of constitutional errors: structural error and trial error. *Hassine v. Zimmerman*, 160 F.3d 941, 949 (3d Cir.1998)(citing *Arizona v. Fulminante*, 499 U.S. 279, 306–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). A "trial error occurs during the presentation of the case to the jury, and may be quantitatively assessed in the context of all other evidence." *Id.* (quoting *Yohn v. Love*, 76 F.3d 508, 522 (3d Cir.1996))(internal quotation marks omitted). "Thus, trial errors are subject to a harmless error analysis." *Yohn*, 76 F.3d at 522 (citation omitted). The constitutional errors

which occurred *arguendo* during Petitioner's trial occurred during the presentation of the case to the jury, therefore, such errors are categorized as trial errors. Accordingly, we will review the trial errors under the proper harmless error standard.

**54.** "Grave doubt exists when, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Hassine*, 160 F.3d at 955 (quoting *O'Neal*, 513 U.S. at 435, 115 S.Ct. 992)(internal quotation marks omitted).

**346**

Under the harmless error standard, the admission of the *arguendo* inadmissible hearsay statements during Petitioner's trial was harmless. After a review of each statement in the context of the entire record, the *arguendo* error of admitting the statements at trial did not have a substantial and injurious effect or influence on the jury's guilty verdict. In Petitioner's Habeas Petition and AEDPA Memorandum of Law, Petitioner argues that the admitted statements were inadmissible hearsay and, on that basis alone, violated his constitutional rights. Petitioner fails to account for how the statements could have had a substantial and injurious effect or influence in determining the jury's guilty verdict. In fact, Petitioner's claim is void of any analysis relating to the impact of the error on the minds of the jurors in the total setting.

■ Upon review of the record and the Notes of Testimony from Petitioner's trial, none of the admitted statements were so significant as to have had a substantial and injurious effect or influence in determining the jury's verdict of guilty. For example, the admission of Officer's Kent's statement regarding the description of Mr. Fiss's shooter was insignificant in light of the in-court description and identification of the shooter which was properly testified to by Ms. Valente. As a result, the admission of Officer's Kent's statement did not have a substantial and injurious effect on the jury's verdict of guilty.

■ Likewise, Petitioner's claim that Ms. Valente properly testified about the description of the man that she saw leaving the beauty shop, but improperly bolstered her testimony by stating that she told the description to the police is insignificant. As acknowledged by Petitioner, Ms. Valente was a crucial identification witness who made an important in-court identification of Petitioner. (Pet. Writ Habeas Corpus, ¶ 134). In light of

Ms. Valente's in-court description and identification of Petitioner, the fact that she testified that she gave the police a description of the shooter did not have a substantial and injurious effect on the jury's verdict. In addition, Petitioner's claim relating to Ms. Valente's testimony that, upon viewing Petitioner's picture on television, she told her daughter, next door neighbor and grandchildren, "That's him, that's him" is similarly inconsequential. Ms. Valente's testimony that she saw Petitioner on television and recognized him from the beauty shop was both proper and damaging. In light of this testimony, the fact that Ms. Valente testified that she told others out of court about her identification was insignificant and did not have a substantial and injurious effect on the jury's verdict of guilty.

■ Petitioner's claim in relation to Mr. Gentile is equally inconsequential. Petitioner contends that it was proper for Mr. Gentile to indicate that he saw Petitioner in the police van, but it was improper bolstering for him to state that he had identified Petitioner as having been in the police van. The admission of Mr. Gentile's testimony regarding his identification of Petitioner in the police van is negligible and, therefore, did not have any substantial and injurious effect on the jury's verdict of guilty.

■ Petitioner's claim regarding Detective Brown's testimony that Mr. Gentile identified the jacket recovered from the Petitioner is also insignificant. During the trial, Mr. Gentile properly testified that his jacket had been stolen during the robbery and that he went to the police station and identified the jacket that was recovered from Petitioner. (N.T. 2/21/86, p. 170–72). Thus, the fact that Detective Brown testified that Mr. Gentile identified the jacket is inconsequential and had neither a substantial nor an injurious effect on the jury's verdict.

■ Lastly, the admission of Officer Gana's testimony that two men directed his attention to where the person that he had been chasing threw a gun under a car is also insignificant. The gun recovered from the chase was ultimately admitted into evidence at the trial and ballistics tests performed by the police revealed that the discarded revolver had fired the bullet that killed Mr. Fiss. As a result, Officer Gana's testimony that two men directed his attention to a certain area where the gun was discovered did not have a substantial and injurious effect on the jury's verdict of guilty.

Based on the above, this Court concludes that the admission of the *arguendo* hearsay statements did not prejudice Petitioner. Despite ample evidence to support the result apart from the alleged error, it is clear that the admission of the *arguendo* hearsay evidence had an insignificant influence, if any, on the jury's guilty verdict. Since this Court has no doubt that the *arguendo* trial error did not have a substantial and injurious effect or influence in determining the jury's verdict, the Court

finds that the *arguendo* error was harmless. In light of the Court's finding that the admission of the hearsay evidence was harmless beyond a reasonable doubt, habeas relief based on Petitioner's Claim VIII is denied.[55]

### f. Claim XII Trial counsel did not render ineffective assistance because he did not fail to properly investigate and present evidence that would have established a reasonable doubt about guilt.

■ Petitioner asserts that trial counsel, Michael Floyd, Esq., rendered ineffective assistance of counsel for failing to properly investigate and present alibi evidence. (Pet. Writ Habeas Corpus, ¶¶ 211–213). Petitioner's argument regarding the alibi evidence focuses on a statement given to the police by Harriet Dawson (the mother of Meredith Barbour, Petitioner's girlfriend at the time of Mr. Fiss's murder).[56] (Pet.'s AEDPA Mem. Law at 86–89). In her affidavit, as in her police statement, Harriet Dawson states that Petitioner was at her house on the morning of Mr. Fiss's murder.[57] (Pet. Writ Habeas

---

55. In his Petition, Petitioner alleges ineffective assistance of counsel regarding Claim VIII. (Pet Writ Habeas Corpus, ¶ 143). However, Petitioner fails to offer any analysis in conjunction with ineffective assistance of counsel. (*Id.*). The Court denies Petitioner's ineffective assistance of counsel claim because he has failed to show that counsel's performance was objectively unreasonable and that he was prejudiced as a result—that but for counsel's deficiencies, the outcome of the prior proceeding would have been different. *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In addition, the Court also denies Petitioner's ineffective assistance of counsel claim because the underlying claim has not been proven. *See Holloway*, 161 F.Supp.2d 452, 508 (stating that *"Strickland* instructs that if the petitioner has not shown that [the] underlying claim has merit, counsel cannot have been ineffective for failing to raise it").

56. At the time of Mr. Fiss's murder, Harriet Dawson was married to Jesse Dawson. (N.T. 7/8/02, p. 41, lines 8–25). Sometime after the murder, Harriet and Jesse Dawson's marriage ended. . (*Id.*). Currently, Harriet Dawson goes by the name Harriet Barbour. (N.T. 7/8/02, p. 36, lines 2–4). For purposes of clarity, the Court will refer to Harriet Barbour as Harriet Dawson throughout this Memorandum Opinion.

57. Specifically, Harriet Dawson's affidavit states:

My name is Harriet Dawson and I live in Philadelphia. Ernest Porter was my daughter's boyfriend in April, 1985. I know him by the name Theodore Wilson.
On May 2, 1985 I was asked to come to the police department, which I did. They asked me about what I knew about the homicide of Raymond Fiss. I told them I did not know Mr. Fiss or know anything about his death.

Corpus, ¶ 212 (Aff. of Harriet Dawson, ¶¶ 1–4)). Specifically, Harriet Dawson states that Petitioner had arrived at her residence on Friday night, the night before the murder, and left the house at 8:45 a.m. on Saturday, April 27, 1985. (*Id.*). Since the murder of Mr. Fiss occurred at approximately 7:30 a.m. on Saturday, April 27, 1985, Petitioner argues that Mrs. Dawson's affidavit, police statement and potential testimony would have provided an alibi in support of Petitioner's claim of innocence. (Pet. Writ Habeas Corpus, ¶ 213). Petitioner argues that relief is appropriate because "trial counsel could have and should have developed such evidence of innocence and supported it with other witnesses and information reflected in police reports." (*Id.*). Based on the aforementioned, Petitioner seeks habeas relief arguing that the *Porter I* and *Porter II* courts' denials of relief based on this claim denied his constitutionally guaranteed right to the effective assistance of counsel and were contrary to established federal law, specifically *Strickland v. Washington.*[58] (AEDPA Mem. Law at 89).

### 1.) State Court Decision

Petitioner's twelfth claim for habeas relief is based upon the contention that the Pennsylvania Supreme Court's denial of Petitioner's ineffective assistance of counsel claim pertaining to trial counsel's failure to properly investigate and present alibi evidence in *Porter I* and *Porter II*

---

> The police officers asked me about the whereabouts of Theodore on the day that Raymond Fiss was killed, which was the preceding Saturday. I told the police that Theodore had gotten to my house before dark the night before, which was Friday night. He left my house at 8:45 a.m. on Saturday morning. I know this because, as I told the police, I had to be somewhere so I was paying attention to the time. Theodore left the house about five minutes before me.
>
> Theodore's attorney never spoke to me. No one talked to me about Theodore until long after his trial. I would have told his attorney what I said to the police. If Raymond Fiss was killed at 7:30 a.m. then Theodore could not have done it on the day that the police were asking me about. He was at my house until 8:45 a.m. I would have testified to that and also answered any other questions about him.

(Pet. Writ Habeas Corpus, ¶ 212)(Aff. of Harriet Dawson, ¶¶ 1–4)(par. numbers omitted) (referring to Petitioner as "Theodore").

**58.** Specifically, Petitioner claims that the denials by the courts in *Porter I* and *Porter II* regarding his ineffective assistance of counsel claim pertaining to alibi evidence violated his constitutionally guaranteed right to the effective assistance of counsel and were contrary to and an unreasonable application of established federal law, namely *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and *Kimmelman v. Morrison*, 477 U.S. 365, 386–87, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). In *Kimmelman*, the Supreme Court utilized the standard in *Strickland* regarding its analysis concerning an attorney who completely failed to conduct pretrial discovery and whose file pertaining to the case was devoid of any trial preparation. *Kimmelman*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305. The Court concluded counsel was constitutionally ineffective because he did not conduct pretrial discovery and therefore was unaware of the need to file a timely suppression motion. *Id.*

In Petitioner's Memorandum of Law, his allegation of ineffective assistance of counsel relies primarily upon *Strickland,* but mentions *Kimmelman.* (Pet.'s AEDPA Mem. Law at 86–89). It appears that Petitioner relies upon *Kimmelman* for the argument that "hindsight cannot be used to supply a 'tactical' reason for counsel's errors." (*Id.* at 87 n. 70) The Court recognizes Petitioner's argument regarding the improper use of hindsight and speculation to supply a tactical reason for counsel's errors in relation to an ineffective assistance of counsel claim. However, after the evidentiary hearing which specifically addressed and elicited trial counsel's testimony relating to his actions and strategic reasoning, the Court focuses on Petitioner's claim according to the ineffective assistance of counsel standard set forth in *Strickland.*

was contrary to established federal law.[59] (*Id.*). In *Porter I*, the Pennsylvania Supreme Court denied Petitioner's claim based upon the ground that counsel made a tactical decision not to call either Mr. or Mrs. Dawson because "[c]ounsel had a statement from [Mrs. Dawson's husband] in which [the husband] admitted the appellant had a gun and they did drugs together." *Porter I*, 569 A.2d at 946. Based upon this reasoning, the *Porter I* court rejected Petitioner's claim for relief stating that "[d]efense counsel's decision not to call [Mr. and Mrs. Dawson] cannot be faulted, when their testimony could be so easily subverted." *Id.* (citations omitted). On PCRA appeal, the *Porter II* court denied Petitioner's claim because it had been previously litigated on direct appeal. *Porter II*, 728 A.2d at 897–98.

### 2.) Ineffective Assistance of Counsel Standard

Petitioner's claim rests upon the allegation that his Sixth Amendment right to effective assistance of counsel was violated. (Pet. Writ Habeas Corpus, ¶¶ 211–213). As explained earlier, to successfully pres-

ent a claim for ineffective assistance of counsel under *Strickland*, Petitioner must establish that: (1) counsel's performance was deficient and (2) he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *see supra* Part IV.C.2.a.2.).

### 3.) Analysis of Petitioner's Claim

■ As already stated, the Court held an evidentiary hearing regarding Claim XII. (N.T. 7/8/02 and N.T. 9/4/02). Petitioner's habeas claim, as well as the Commonwealth's Response, focuses on Floyd's alleged failure to properly investigate and call Harriet Dawson as an alibi witness.[60] (*See* Pet.; Pet.'s AEDPA Mem. Law; Commw.'s Mem. Law). Originally, Petitioner's direct appeal in the state court dealt with the alibi evidence pertaining specifically to Jesse and Harriet Dawson. (Commw.'s Exs., Ex. A (Pet.'s Direct Appeal Brief)). As for Petitioner's PCRA appeal, it dealt solely with the alleged alibi evidence pertaining to Harriet Dawson. (*Id.*, Ex. C (Pet.'s PCRA Appeal Brief). At the evidentiary hearing, Petitioner presented testimony by Harriet Dawson,

---

**59.** Petitioner's claim includes an allegation that the Commonwealth failed to disclose the existence of potential alibi evidence, namely a statement by Harriet Dawson, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Pet. Writ Habeas Corpus, ¶ 213). Although Petitioner alleges that the Commonwealth failed to disclose Mrs. Dawson's statement in his Habeas Petition, he does not address the issue in his Memorandum of Law Regarding AEDPA. (Pet.'s AEDPA Mem. Law at 86–89). The Commonwealth denies Petitioner's allegation and finds his argument "highly inappropriate and disingenuous." (Commw.'s Mem. Law at 65 n. 41). Without providing any argument or substantiation regarding his contention, the Court concludes that Petitioner's allegation in Count XII relating to a violation of *Brady v. Maryland* must be denied. *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

**60.** Generally, "a claim of ineffective assistance of counsel ... applies to actual errors

by counsel during trial." *Blasi v. Attorney General of Com. of Pa.*, 120 F.Supp.2d 451, 474 (M.D.Pa.2000), *aff'd*, 275 F.3d 33 (3d Cir.2001). "However, the *Strickland* test also applies to a claim of ineffective assistance for failure to conduct a pretrial investigation, including interviews of potential witnesses, and to call witnesses at trial." *Id.* (citing *Coss v. Lackawanna County D.A.*, 204 F.3d 453, 462 (3d Cir.2000)(*en banc*), *rev'd on other grounds*, 532 U.S. 394, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001)). In this instance, "[t]he performance of counsel still must be objectively unreasonable, and not as a matter of 'justifiable or strategic decisions.'" *Id.* (citing *Coss*, 204 F.3d at 462 n. 9). As for prejudice, it "is demonstrated by showing that a reasonable probability exists that, if counsel had subpoenaed the witness, the defendant would not have been found guilty." *Id.* (citing *Coss*, 204 F.3d at 462).

Jesse Dawson and Mark Barbour (Harriet Dawson's son). (*See* N.T. 7/8/02). Even though Petitioner's habeas claim solely addresses Harriet Dawson's alibi evidence, there were no objections regarding the testimony of the three potential alibi witnesses at the evidentiary hearing. (*Id.*). In the interest of a complete and thorough review of Petitioner's claim, the Court will address Petitioner's ineffective assistance of counsel claim pertaining to the potential alibi evidence regarding the three alleged alibi witnesses who testified at the evidentiary hearing. The Court will address Petitioner's Claim XII as it relates to each individual alibi witness in the following manner: the Court will initially address Petitioner's argument regarding Harriet Dawson, then Jesse Dawson and, lastly, Mark Barbour.

### a.) Harriet Dawson

### State Court

Petitioner claims that the state court improperly denied his ineffective assistance of counsel claim pertaining to the alibi evidence attested to by Harriet Dawson. In support of his claim, Petitioner proffered Mrs. Dawson's affidavit, police statement and willingness to testify that Petitioner was at her house at the time of the murder. (Pet.'s AEDPA Mem. Law at 86). The *Porter I* Court rejected Petitioner's claim regarding Harriet Dawson stating that counsel had made a tactical decision not to call her because her husband, Jesse Dawson, had admitted that Petitioner had a gun and that they did drugs together. *Porter I,* 569 A.2d at 946. Without first-hand knowledge of counsel's reasoning for failing to call either Mr. or Mrs. Dawson, the state court relied upon counsel's alleged trial strategy as the reasoning behind his failure to call either individual as alibi witnesses. *Id.* Based upon this reasoning, the *Porter I* court rejected Petitioner's claim for relief stating

that "[d]efense counsel's decision not to call [Mr. and Mrs. Dawson] cannot be faulted, when their testimony could be so easily subverted." *Id.* (citing *Commonwealth v. Robinson,* 487 Pa. 541, 410 A.2d 744 (1980))(stating that the failure to call possible witnesses does not constitute ineffective assistance of counsel *per se.*); *Commonwealth v. Smallwood,* 497 Pa. 476, 442 A.2d 222 (1982)(stating the decision to call or not to call a witness is a matter of trial strategy). As mentioned earlier, on PCRA appeal, the *Porter II* court denied Petitioner's claim because it had been previously litigated on direct appeal. *Porter II,* 728 A.2d at 897–98.

In light of the factual record developed during the evidentiary hearing, the Court concludes that Petitioner's claim for ineffective assistance of counsel pertaining to alibi evidence concerning Harriet Dawson must be denied. Although this Court's conclusion is the same as that decided by the *Porter I* court, the instant determination is based, in part, upon different grounds revealed at the hearing. Below the Court will enunciate the reasoning for its denial of Petitioner's claim and will provide justification supporting the *Porter I* court's conclusion that trial counsel's failure to call Mrs. Dawson as an alibi witness was not contrary to *Strickland* as a matter of law.

### Strickland Analysis

As explained earlier, *Strickland* requires that Petitioner first show that Mr. Floyd's performance was deficient. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. This requirement involves Petitioner proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. Petitioner argues that Mr. Floyd's failure to interview and call Mrs. Dawson as a potential alibi witness fell below an objective standard of reasonableness under prevailing professional norms.

(Pet.'s AEDPA Mem. Law at 88). Petitioner states that Mr. Floyd had a duty to interview such a plausibly significant witness because "even if Mr. Dawson's police statement had given counsel some concern as to what Mrs. Dawson might say, that could not relieve counsel from his duty to interview such a potentially important witness." (*Id.*).

At the evidentiary hearing, Mr. Floyd testified that he employed an investigator who made numerous attempts at contacting the Dawsons, however, every attempt was unsuccessful.[61] (N.T. 9/4/02, p. 15, 35). Mr. Floyd stated that the Dawsons "disappeared" and "could not be found." (*Id.*, p. 35, lines 4, 6–9). Mr. Floyd went on to recall that his investigator "[f]or some reason unknown to [Mr. Floyd] ... could not locate either [Mr. or Mrs. Dawson], despite the fact that they were supposed to have been very close friends of Mr. Porter's. They could not be found." (*Id.*, p. 35, lines 6–9). Mr. Floyd remembered being perplexed as to why he could not locate the Dawsons because "[the Dawsons] were supposed to have been very close friends to Theodore.... since they was (sic) supposed to have been family and friends of his." [62] (*Id.*, p. 27, lines 8–12). Review of the testimony of Mr. and Mrs. Dawson and Mark Barbour reveals that the family moved to a new residence a short time after the murder of Mr. Fiss.[63] (*See* N.T. 7/8/02). The Court is unable to definitively conclude when the family moved because, even after being specifically questioned at the evidentiary hearing about their residency shortly after Mr. Fiss's homicide, the Dawson family was

**61.** In relation to this case, Mr. Floyd hired an investigator named Charles Bond. (N.T. 9/4/02, p. 15, lines 10–18). Mr. Floyd could not recall many specifics about his dealings with Mr. Bond, however, he did state that he had confidence in Mr. Bond as a result of their previous work relationship. (*Id.*, p. 36–39).

**62.** During the evidentiary hearing it was revealed that, at the time of Mr. Fiss's murder and Petitioner's trial, Harriet Dawson's sister, Melane, was married to Petitioner's older brother, Jerry Porter. (N.T. 7/8/02, p. 43, lines 1–18). At the evidentiary hearing, it was also disclosed that Mrs. Dawson's daughter, Meredith Barbour, and Petitioner had a daughter who was born within a few weeks of the April 27, 1985 crime. (*Id.*, p. 81, lines 4–17).

**63.** Mr. and Mrs. Dawson, as well as Mark Barbour, had significant difficulty in determining their residence shortly after the commission of Mr. Fiss's murder. (*See* N.T. 7/8/02). Mr. Dawson testified that the Dawsons moved out of their Tasker Homes residence on South 31st Street "about a week or two" after Mr. Fiss's murder. (N.T. 7/8/02, p. 14, line 14–21). Mrs. Dawson testified that, after the incident, the family stayed at the Tasker Homes residence "for at least a couple of more years." (*Id.*, p. 41, lines 1–7). Mark Barbour testified that the family moved from the Tasker Homes residence as soon as the majority of the circumstances took place. (*Id.*, p. 78, lines 6–16). After the move, Mr. Barbour went on to state that he no longer lived with his mother and he believed that Mrs. Dawson continued to reside at the Tasker Homes residence. (*Id.*, p. 78, lines 18–24).

As a result of the aforementioned, the Court is unable to conclusively determine when the Dawson family moved from their Tasker Homes residence. However, it appears that the family moved from the Tasker Homes residence to a new residence on Ranstead Street in West Philadelphia. (N.T. 7/8/02, p. 15–16, 42). The testimony at the evidentiary hearing revealed that the Dawson family rented the residence on Ranstead Street from Petitioner's mother, Annie Wilson. (*Id.*, p. 15, 42). Apparently, Ms. Wilson owned the Ranstead Street residence and rented it to the Dawsons. (*Id.*, p. 42, lines 16–23). Since Ms. Wilson rented the house to the Dawson family, she was aware of their location and new address. (*Id.*, p. 15, 44). In fact, Mr. Dawson testified that at the time of Petitioner's trial in February, 1986, Ms. Wilson was renting the house to the Dawsons, but never contacted the family regarding Petitioner's trial. (*Id.*, p. 16, lines 2–9).

not able to congruously testify as to their dwelling at the time subsequent to the crime.

Since the trial was so long ago, Mr. Floyd had trouble recollecting exactly what occurred relating to his attempts to contact the Dawsons. Pertaining to Mr. and Mrs. Dawson, Mr. Floyd's testimony at the evidentiary hearing revealed that he made numerous attempts to contact them, all of which were unsuccessful.[64] Mr. Floyd did acknowledge that he may have been more interested in potentially calling Mrs. Dawson as a witness than Mr. Dawson, however, he was not able to locate her. (N.T. 9/4/02, p. 32, line 2; p. 32–35). As a result of Mr. Floyd's testimony, the Court is able to reject Petitioner's argument, as well as the reasoning of the *Porter I* court, that Mr. Floyd completely failed to seek out and interview Harriet Dawson because he may have been fearful of her testimony in light of Jesse Dawson's police statement.

In the instant case, it is impossible to completely determine what occurred or what factors precipitated the failure of Mr. Floyd to get in contact with Mrs. Dawson over seventeen years ago. However, Mr. Floyd's testimony at the evidentiary hearing negates Petitioner's argument that counsel totally failed to seek out and interview Mrs. Dawson. The evidentiary hearing record reveals that Mr. Floyd did not categorically decide not to investigate or call Mrs. Dawson as an alibi witness, but was unsuccessful in his attempts to contact her through his hired investigator. (*See*

N.T. 9/4/02). It is possible that Mr. Floyd could or should have done more in locating Harriet Dawson. However, based upon Mr. Floyd's testimony at the evidentiary hearing and the absence of the complete set of essential facts necessary to determine what was actually done and not done in connection with Mrs. Dawson's alibi evidence, the Court is unable to objectively conclude that Petitioner has shown that Mr. Floyd's representation was deficient in terms of reasonableness under prevailing professional norms. As a result, Petitioner has failed to meet his burden of showing that Mr. Floyd's performance was deficient as required to prevail on a claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052.

■ The Court concludes that Petitioner has failed to meet his burden of showing that Mr. Floyd's representation was deficient. However, even assuming that Petitioner has shown that Mr. Floyd's performance did fall beneath prevailing professional norms, Petitioner is unable to show that he suffered prejudice as a result of that deficient performance. In order to prove prejudice, Petitioner is required to show that the absence of Harriet Dawson's testimony resulted in "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. In both her police statement and testimony at the evidentiary hearing, Mrs. Dawson emphatically stated that Petitioner was at her house on the morning of the murder until 8:45 a.m.[65] (N.T. 7/8/02, p. 39,

---

64. At the evidentiary hearing, the Commonwealth's attorney questioned the Dawson family regarding their reasons for not getting in contact with the Petitioner or any person related to Petitioner's case regarding their alibi evidence. (*See* N.T. 7/8/02). When Mr. Dawson was specifically questioned about his knowledge of Petitioner being accused of a murder when he was supposedly innocent, Mr. Dawson responded that "it was their re-

sponsibility to get in contact with me." (*Id.*, p. 14, lines 6–19). As for Mrs. Dawson, she testified that she told the police her statement and did not hear about Petitioner's conviction and death sentence until years after the trial. (*Id.*, p. 56–58).

65. Mrs. Dawson's testimony regarding the 8:45 a.m. time frame is contradicted by Mr. Dawson's testimony that he saw Petitioner

lines 1–4; p. 49–51). Mrs. Dawson stated that she is sure about the time period of 8:45 a.m. because she recalled having to go to a check cashing agency and remembered paying attention to the time. (*Id.,* p. 49–50).

Although Mrs. Dawson is clear that Petitioner exited her residence at 8:45 a.m. on the morning of the crime, she did not state where Petitioner was anytime prior to that time. Apparently, the night before Mr. Fiss's death, Mrs. Dawson had slept upstairs, while Petitioner had spent the night downstairs. (*Id.,* p. 52–53). As a result of Mrs. Dawson spending the night upstairs and Petitioner sleeping downstairs, Petitioner was out of Mrs. Dawson's sight until she came downstairs and saw him on Saturday morning. As mentioned earlier, the murder of Mr. Fiss occurred at approximately 7:30 a.m. on Saturday, April 27, 1985. Mrs. Dawson's testimony that she saw Petitioner leave her residence at 8:45 a.m. on that fateful Saturday morning does not establish Petitioner's whereabouts at the precise time of the murder. Thus, there is no testimony by Mrs. Dawson, or anyone else for that matter, pertaining to the whereabouts of Petitioner at the crucial time of 7:30 a.m. on Saturday, April 27, 1985. Mrs. Dawson's testimony merely places Petitioner leaving her residence at 8:45 a.m., which is one-hour and fifteen minutes after the shooting of Mr. Fiss.

This time frame is significant because, at the time of the murder, the Dawson residence was located within a few blocks of the crime scene. The Dawson residence is located approximately one-half mile from Mr. Fiss's beauty shop, the scene of the murder.[66] As a result of Mr. Fiss's murder occurring at approximately 7:30 a.m., and in light of the fact that the Dawson residence was only approximately one-half mile from the scene of the crime, it is conceivable that Petitioner could have exited the Dawson residence, killed Mr. Fiss and returned to the residence before Mrs. Dawson came downstairs to start her day and encounter Petitioner at 8:45 a.m. Thus, even though Mrs. Dawson's testimony pertains to the morning of Mr. Fiss's murder, it does not place Petitioner away from the scene of the crime until one-hour and fifteen minutes after the crime was committed. Not only does Mrs. Dawson's alibi evidence fail to ascertain Petitioner's location at the time of Mr. Fiss's murder, but it establishes that Petitioner was in close proximity to the scene of the crime.

In conjunction with this prejudice analysis pertaining to Petitioner's case, the Court takes this opportunity to note that the evidence used at trial to convict Petitioner was extensive. Upon examination of the case against Petitioner, it is fair to say that the strength of the Commonwealth's case was substantial. During the evidentiary hearing, Petitioner's own trial counsel testified that he was greatly concerned about Petitioner's case because it struck him "as a case with an overwhelming amount of evidence against Mr. Porter." (N.T. 9/4/02, p. 67, lines 20–23). The Court agrees with Mr. Floyd's assessment

---

leaving his residence at 7:55 a.m. or 8:00 a.m. on Saturday, April 27, 1985. (N.T. 7/8/02, p. 8, lines 15–18). At the evidentiary hearing, Mr. Dawson testified that he was sure of the 7:55–8:00 a.m. time frame and anyone who said a different time would be incorrect. (*Id.,* p. 8, lines 19–24). Mr. Dawson went so far as to explicitly contradict Mrs. Dawson's testimony by testifying that anyone who said that

Petitioner left the residence at 8:45 a.m. would be wrong. (*Id.,* p. 9, lines 3–8).

**66.** The distance from the Dawson residence, located at 1805 South 31st Street, to Mr. Fiss's beauty shop, located at 2701 Mc Kean Street, is approximately 0.53 miles. (*See* map of Philadelphia at www.mapquest.com <http://www.mapquest.com/directions> (visited on February 24, 2003)).

of Petitioner's case. The Court also agrees with the *Porter I* court's opinion that "[t]he evidence at trial, if believed, and it was, was damning and sufficient." *Porter I*, 569 A.2d at 944. As summarized by the *Porter I* court, the Commonwealth proved that Petitioner was the robber and killer of Mr. Fiss, "by *eyewitness testimony, fingerprint* and [*Petitioner's*] *possession of the murder gun.*" *Id.* at 945 (emphasis added).

Considering the totality of the evidence, Petitioner's conviction was not based upon questionable proof, but was the result of a trial where "[t]he evidence was more than sufficient" to prove Petitioner's guilt. *Porter I*, 569 A.2d at 944. The overwhelming amount of evidence presented to the jury regarding Petitioner's involvement in the April 27, 1985 crime, and the inadequacy of Harriet Dawson's testimony that Petitioner exited her residence on the morning of the murder at 8:45 a.m., support the reliability of the result of trial. Thus, upon examination of Petitioner's claim, the Court concludes that Petitioner has not demonstrated that a reasonable probability exists that, if trial counsel had interviewed, subpoenaed and called Mrs. Dawson as an alibi witness, he would not have been found guilty. Furthermore, Petitioner has not shown that trial counsel's alleged failure to properly investigate and call Mrs. Dawson as an alibi witness "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. Accordingly, Petitioner has not met his burden under *Strickland* to prove that he was prejudiced by his counsel's failure to properly investigate and call Mrs. Dawson as an alibi witness.

*Conclusion*

As a result of the above *Strickland* analysis regarding Harriet Dawson's alibi evidence, Petitioner has not shown that Mr. Floyd's failure to investigate or call Mrs. Dawson as an alibi witness was a decision that fell below the wide range of professionally reasonable representation. *Strickland*, 466 U.S. at 687–94, 104 S.Ct. 2052. Furthermore, even if counsel's performance was deficient, Petitioner fails to satisfy the prejudice prong of *Strickland*. *Id.* Accordingly, Petitioner has failed to satisfy either prong of the *Strickland* test for ineffective assistance of counsel. *Id.* By failing to satisfy both prongs of the *Strickland* analysis, Petitioner has not satisfied his burden of showing ineffective assistance of counsel. *Id.* Therefore, the state court's denial of Petitioner's ineffective assistance of counsel claim pertaining to trial counsel's alleged failure to properly investigate and present alibi evidence in *Porter I* and *Porter II* was not contrary to or an unreasonable application of established federal law. Thus, Petitioner's claim for ineffective assistance of counsel claim based on Mr. Floyd's alleged failure to properly investigate or call Mrs. Dawson as an alibi witness must be denied.

*b.) Jesse Dawson*

*State Court*

■ The Pennsylvania Supreme Court's analysis utilized in reference to Harriet Dawson applies equally to Jesse Dawson. In summation, the *Porter I* court rejected Petitioner's claim regarding Mr. and Mrs. Dawson stating that counsel had made a tactical decision not to call either individual because Mr. Dawson had admitted to counsel that Petitioner had a gun and that they did drugs together.[67]

---

**67.** In his statement to the police, Jesse Dawson stated that Petitioner's gun resembled a .38 caliber handgun with a brown handle. (Pet.'s Consolidated Ex. Regarding the Alibi Defense, Ex. 4 (Jesse Dawson's Investigation Interview Record)). Ballistic tests confirm that the .38 caliber revolver thrown under a car by Petitioner during a police chase was

*Porter I,* 569 A.2d at 946. Without first-hand knowledge of counsel's reasoning for failing to call either Mr. or Mrs. Dawson, the court relied upon counsel's alleged trial strategy as the reasoning behind his failure to call either person as alibi witnesses. *Id.* Based upon this reasoning, the *Porter I* court rejected Petitioner's claim for relief stating that "[d]efense counsel's decision not to call [Mr. and Mrs. Dawson] cannot be faulted, when their testimony could be so easily subverted." *Id.* (citations omitted).

In light of the factual record developed during this Court's evidentiary hearing, we conclude that any claim for ineffective assistance of counsel pertaining to alibi evidence regarding Jesse Dawson must be denied. At the hearing, Mr. Floyd testified regarding his reasons for not calling Mr. Dawson as an alibi witness. Mr. Floyd testified that his rationale for not calling Mr. Dawson as an alibi witness was because of his damaging testimony that he had done drugs with Petitioner and knew that Petitioner possessed a gun. (N.T. 9/4/02, p. 23, lines 6–17). Thus, Mr. Floyd's testimony clarified that he decided not call Mr. Dawson as an alibi witness based upon trial strategy. In light of Mr. Dawson's potentially harmful testimony, it is fair to conclude that Mr. Floyd's decision was objectively reasonable. As a result, the *Porter I* court's conclusion that Mr. Floyd's failure to call Mr. Dawson as an alibi witness was based upon a rational tactical decision is proper. Consequently, the *Porter I* court's denial of Petitioner's ineffective assistance of counsel claim pertaining to Mr. Dawson's alibi evidence was not contrary to *Strickland* as a matter of law, but was a reasonable application of federal law. *Porter I,* 569 A.2d at 946.

used to murder Mr. Fiss. (Commonwealth's

*Strickland Analysis*

Under *Strickland,* Petitioner must show that Mr. Floyd's performance was deficient, in other words, that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. At the evidentiary hearing, Mr. Floyd testified that he was aware of Mr. Dawson's statement saying that "he did drugs with Mr. Porter and he knew that Mr. Porter owned a gun." (N.T. 9/4/02, p. 23, lines 10–15). Based on this statement, Mr. Floyd testified that he elected not to call Mr. Dawson because Petitioner's case was a gunshot case involving a homicide with a weapon. (*Id.,* p. 23, lines 14–17). Although Mr. Floyd could not specifically recall when he decided not to call Mr. Dawson as an alibi witness, he stated that he most likely made the decision as soon as he read Mr. Dawson's statement expressing that he knew Petitioner owned a handgun. (*Id.,* p. 25, lines 7–21). As a result of Mr. Floyd's testimony, the Court is able to definitively conclude that Mr. Floyd made a strategic decision not to call Mr. Dawson as an alibi witness because of his statement regarding Petitioner's gun ownership and drug use.

Normally, decisions regarding which witnesses to call to testify are strategic decisions left to counsel. *U.S. v. Ciancaglini,* 945 F.Supp. 813, 823 (E.D.Pa.1996) (citations omitted). "Attorneys are not required to call every witness suggested to them; their expertise leads them to choose only the witnesses likely to assist the case." *Id.* at 823 (citing *U.S. v. Balzano,* 916 F.2d 1273, 1294 (7th Cir.1990); *U.S. v. Griffin,* 1993 WL 34927 (E.D.Pa. Feb.9, 1993), *aff'd,* 16 F.3d 406 (1993)). "Indeed, this is precisely the type of strategic decision which the Court in *Strickland* held to be protected from second-guessing." *Id.* (citation omitted). In order to support a

Mem. Law at 4).

charge of inadequate representation, "[m]ere criticism of a tactic or strategy is not in itself sufficient." *Id.* (citing *U.S. v. Vincent,* 758 F.2d 379, 382 (9th Cir.1985)).

After hearing Mr. Floyd's testimony, the Court agrees with counsel's assessment that Mr. Dawson would not have been a beneficial witness. (N.T. 9/4/02, p. 23, lines 10–17). In fact, it is conceivable that Mr. Dawson's testimony may have been harmful to Petitioner's case. Thus, the Court agrees with the *Porter I* court's assessment that counsel had made a reasonable tactical decision not to call Mr. Dawson because of his statement admitting that Petitioner possessed a gun and that they did drugs together. *Porter I,* 569 A.2d at 946. Petitioner has not shown that Mr. Floyd's conduct fell outside of an objective standard of reasonableness, as is required for a showing of deficient performance under *Strickland.* Consequently, the Court finds that Petitioner has not satisfied his burden of showing that Mr. Floyd's performance was deficient.

Even if the Court was to find that Mr. Floyd's performance was deficient, Petitioner must still establish that he suffered prejudice from that deficient performance in order to prevail on a claim of ineffective assistance of counsel. *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. The Court's preceding analysis pertaining to the prejudice prong of the *Strickland* test regarding Harriet Dawson applies equally to Jesse Dawson. Like Mrs. Dawson, Mr. Dawson is unable to specifically state Petitioner's whereabouts at the precise time of the murder. At the evidentiary hearing, Mr. Dawson testified that he watched a televised basketball game with his stepson, Mark Barbour, and Petitioner on Friday night. (N.T. 7/8/02, p. 5–6). On Saturday morning, Mr. Dawson testified that he saw Petitioner at his home at approximately 7:55 a.m. or 8:00 a.m. (*Id.,* p. 8, lines 15–24; p. 17, lines 15–18). As mentioned earlier,

the murder of Mr. Fiss occurred in close proximity to the Dawson residence at approximately 7:30 a.m. Therefore, Mr. Dawson's testimony, similar to the testimony of Mrs. Dawson, does not place Petitioner away from the scene of the crime until after the crime was committed.

In light of this fact and the overwhelming amount of evidence supporting Petitioner's guilty verdict, the Court concludes that Petitioner has not shown that he was prejudiced by his counsel's alleged failure to properly investigate and call Mr. Dawson as an alibi witness. Furthermore, the Court's conclusion is additionally supported by the potentially damaging testimony that could have been elicited from Mr. Dawson if he had taken the stand. Petitioner fails to demonstrate that a reasonable probability exists that, if trial counsel had interviewed, subpoenaed and called Mr. Dawson as an alibi witness, Petitioner would not have been found guilty. Examination of the case against Petitioner and his instant claim leave the Court to conclude that Petitioner has failed to affirmatively establish the likelihood of an unreliable verdict. *Strickland,* 466 U.S. at 688–898, 691, 694, 104 S.Ct. 2052. Accordingly, trial counsel's alleged failure to properly investigate and call Mr. Dawson as an alibi witness did not "so undermine[ ] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 669, 104 S.Ct. 2052. Petitioner has not shown prejudice and, therefore, he has failed to meet his burden under the second prong of the *Strickland* analysis.

*Conclusion*

As a result of the above *Strickland* analysis regarding Mr. Dawson's alibi evidence, the Court cannot declare that Mr. Floyd's strategic decision not to investigate or call Mr. Dawson as an alibi witness was a decision that fell below the wide

range of professionally reasonable representation. *Strickland,* 466 U.S. at 687–89, 104 S.Ct. 2052. Furthermore, even if counsel's performance was deficient, Petitioner fails to satisfy the prejudice prong of *Strickland. Id.* Accordingly, the Court finds that Petitioner has failed to satisfy either prong of the *Strickland* test for ineffective assistance of counsel. *Id.* Thus, Petitioner's claim for ineffective assistance of counsel claim based on Mr. Floyd's failure to properly investigate or call Mr. Dawson as an alibi witness must be denied. Consequently, the *Porter I* court's denial of Petitioner's ineffective assistance of counsel claim pertaining to Mr. Dawson's alibi evidence was not contrary to *Strickland* as a matter of law, but was a reasonable application of federal law. *Porter I,* 569 A.2d at 946.

c.) *Marc Barbour*

*State Court*

 Petitioner did not raise his ineffective assistance of counsel claim regarding alibi evidence pertaining specifically to Mark Barbour in the state court. As a result, neither the *Porter I* court nor the *Porter II* court addressed Petitioner's ineffective assistance of counsel claim relating to the alleged alibi evidence proffered by Mark Barbour. However, as mentioned earlier, Petitioner did raise an ineffective assistance of counsel claim relating to the investigation and testimony of alibi witness testimony. Also mentioned earlier, the testimony of Mark Barbour pertaining to his alleged alibi evidence was admitted at the evidentiary hearing. In the interest of a complete review of Petitioner's claim, the

Court will address Petitioner's ineffective assistance of counsel claim as it relates to the alleged alibi evidence offered by Mark Barbour.

At the evidentiary hearing, Mark Barbour's testimony focused primarily upon a police statement that he gave to police within days of Mr. Fiss's death and Petitioner's arrest.[68] (*See* N.T. 7/8/02). On May 2, 1985, Mark Barbour gave a police statement stating that on the night before the murder, he was downstairs watching a movie from 5:10 a.m. until 7:15 a.m. (Commw.'s Ex. C–2 (Mark Barbour's Investigation Interview Record)). Mr. Barbour also asserted that he went to sleep at approximately 7:15 a.m. and woke up again at 8:00 a.m. (*Id.* at 3). Mr. Barbour told the police that Petitioner had been asleep on the love seat downstairs for the entire night. (*Id.*). Mr. Barbour also stated that he had never seen Petitioner with a gun. (*Id.* at 4).

After failing a polygraph test, Mark Barbour swiftly gave a second version of his story to the police. (*Id.* at 5–10). This second version completely contradicts his first account. (*Id.*). In his second version, Mark Barbour declared that he went to sleep upstairs in his room at approximately 2:30 a.m. (*Id.* at 6). At this time, he left Petitioner downstairs in the living room by himself. (*Id.*). Mr. Barbour declared that he did not awake and go downstairs until 10:30 a.m. or 11:00 a.m. on Saturday morning. (*Id.* at 5–6). Thus, in direct contradiction to the first version of his story, Mr. Barbour declared that he had not seen Petitioner on Saturday morning until sometime around 10:30 a.m. or 11:00 a.m.[69]

---

**68.** Mark Barbour gave two different accounts of what occurred on Friday night and Saturday morning. (Commw.'s Ex. C–2 (Mark Barbour's Investigation Interview Record)). Both accounts are contained within one "Investigation Interview Record." (*Id.*). Mr. Barbour's first version is contained within

pages one to four of the document. (*Id.* at 1–4). The second version of Mr. Barbour's account is contained within pages five through ten. (*Id.* at 5–10).

**69.** Mark Barbour's second account contained in the "Investigation Interview Record" in-

(*Id.*). Mr. Barbour's second version also declared, in direct contradiction to his first version, that he had seen Petitioner with a .38 caliber revolver on numerous occasions.[70] (*Id.* at 8).

At the evidentiary hearing on July 8, 2002, Mr. Barbour acknowledged that he gave conflicting accounts to the police. (N.T. 7/8/02, p. 74, lines 13–15). Mr. Barbour testified that he gave two different versions because he was scared. (*Id.*). In reference to the conflicting police accounts, Mr. Barbour inexplicably testified that he strived to be truthful on both statements. (N.T. 7/8/02, p. 71–78, p. 77, lines 15–25). The Court finds that Petitioner's ineffective assistance of counsel claim pertaining to the alibi evidence proffered by Mark Barbour must be denied. Petitioner has not met his burden to show that Mr. Floyd's performance fell outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Petitioner likewise neglects to articulate any prejudice suffered as a result of Mr. Floyd's alleged failure to investigate or call Mark Barbour as an alibi witness.

*Strickland Analysis*

Upon review of the evidentiary hearing transcript pertaining to Mr. Floyd's actions regarding alibi evidence, it appears that Mr. Floyd never explicitly testified, nor was questioned, about his actions re-

garding Mark Barbour. Mr. Floyd was questioned and responded to questions regarding the alibi evidence provided by Mr. and Mrs. Dawson, however, the alleged alibi evidence of Mark Barbour was never addressed. Consequently, it remains unknown whether Mr. Floyd choose not to investigate Mr. Barbour's alibi evidence due to a failure of diligence or as a tactical decision, as was the case with Mr. Dawson, in light of Mr. Barbour's potentially damaging testimony. Thus, even though Mark Barbour testified about his alibi evidence during the evidentiary hearing, there is no testimony by Mr. Floyd regarding his actions relating to Mark Barbour. Likewise, Mr. Floyd did not provide testimony regarding any rationalization for not calling Mr. Barbour as an alibi witness during trial.

Due to the fact that Mr. Floyd never testified about his actions pertaining to the alibi evidence proffered by Mark Barbour, and since Petitioner's claim does not include any argument specifically addressing Mark Barbour's alleged alibi evidence, the Court is left to speculate as to counsel's specific actions and reasoning at the time of Petitioner's trial. In light of this fact, the Court is unable to adequately examine Mr. Floyd's performance for deficiency. Thus, the Court cannot ascertain whether counsel's performance was so deficient that his "representation fell below an ob-

---

cludes the declaration that at approximately 10:30 a.m. or 11:00 a.m. on the morning of Mr. Fiss's murder, Petitioner followed Mr. Barbour upstairs. (Commw.'s Ex. C–2 at 5– 6). While upstairs, Mr. Barbour stated that Petitioner changed his clothing. (*Id.* at 6). Specifically, Mr. Barbour stated that Petitioner changed his shirt and pants. (*Id.*). Mr. Barbour then stated that approximately fifteen minutes after changing his clothing, Petitioner left the residence with binoculars. (*Id.* at 7). Petitioner returned to the residence approximately thirty minutes later with an acquaintance. (*Id.*).

**70.** In his police statement, Mr. Barbour stated that he had seen Petitioner with a .38 revolver "about 15 times." (Commw.'s Ex. C–2 at 8). Similar to Mr. Dawson's detrimental testimony regarding Petitioner's ownership of a gun, Mark Barbour's testimony stating that he had seen Petitioner with a .38 revolver "about 15 times" is equally harmful. (*Id.*). Also, potentially damaging, is Mr. Barbour's testimony that he helped Petitioner change his clothing on Saturday morning. (*Id.* at 6–7). From Mr. Barbour's police statement, it appears that Mr. Barbour unexplainably took Petitioner's clothing to his grandfather's house and left the clothing there. (*Id.* at 9).

jective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Accordingly, Petitioner has not met his burden of proof under *Strickland.* Although unable to adequately ascertain whether Mr. Floyd's performance was deficient, the Court is able to deny Petitioner's claim under *Strickland* because he has failed to make the requisite showing of prejudice.

The Court's preceding analysis pertaining to the prejudice prong of the *Strickland* test regarding Harriet and Jesse Dawson applies equally to Mark Barbour. Like Mr. and Mrs. Dawson, Mr. Barbour is unable to specifically state Petitioner's whereabouts at the precise time of the murder. As mentioned earlier, Mark Barbour's first statement declared that he saw Petitioner at approximately 7:15 a.m. and again at 8:00 a.m. on Saturday morning. (Commw.'s Ex. C–2 at 2–3). As for Mark Barbour's second statement, he declared that he went upstairs to bed at approximately 2:30 a.m. on Saturday

morning and he did not see Petitioner again until approximately 10:30 a.m. or 11:00 a.m.[71] (*Id.,* p. 5–6). Mr. Barbour's accounts do not clearly affirm Petitioner's whereabouts at the time of Mr. Fiss's murder.[72] Just as the testimony and statements of Mr. and Mrs. Dawson fail to explicitly place Petitioner away from the crime scene at the time of the murder, so too does Mark Barbour's alibi evidence. However, unlike Harriet and Jesse Dawson's alibi evidence, Mark Barbour's alibi evidence contradicts itself. This contradiction is critical because it casts significant doubt upon Mark Barbour's alibi evidence.

During the evidentiary hearing, Mark Barbour admitted that he changed his story when confronted by detectives who believed that he was lying in his initial police statement. (N.T. 7/8/02, p. 73, lines 2–7). Although the two versions contradict each other, Mark Barbour testified at the evidentiary hearing that both accounts of his story were true to the best of his knowl-

**71.** This version of Saturday morning's events contradicts Mr. Dawson's testimony stating that he saw Petitioner wake Mark Barbour from the sofa downstairs on the morning of Saturday, April 27, 1985. (N.T. 7/8/02, p. 19–20).

**72.** Both of Mr. Barbour's accounts are contradicted by Mr. Dawson's testimony that he saw Petitioner leaving his residence at 7:55 a.m. or 8:00 a.m. on Saturday, April 27, 1985. (N.T. 7/8/02, p. 8, lines 15–18). At the evidentiary hearing, Mr. Dawson testified that he was sure of the 7:55–8:00 a.m. time frame and anyone who said a different time would be incorrect. (*Id.,* p. 8, lines 19–24). Mr. Dawson went so far as to explicitly contradict Mr. Barbour's testimony by testifying that anyone who said Petitioner left around noon on Saturday would be wrong. (*Id.,* p. 8–9). In addition to contradicting Mr. Dawson's testimony, Mr. Barbour's accounts are in direct contradiction to Mrs. Dawson's resolute testimony that Petitioner left the Dawson residence at 8:45 a.m. on Saturday morning. (*Id.,* p. 39, 49–51).

As evidenced by the aforementioned, the accounts by the three alibi witnesses pertaining to Petitioner's location on Saturday morning, April 27, 1985, contradict each other. As mentioned earlier, the three alibi witness' testimony regarding their residence shortly after Mr. Fiss's murder and before Petitioner's trial also do not concur. Another subject in which the witnesses' testimony differ is the amount of time Petitioner spent at the Dawson residence while he was dating Meredith Barbour. Mr. Dawson testified that Petitioner spent the night at the residence a couple of times, but did not live there. (N.T. 7/8/02, p. 12, lines 4–14). Mrs. Dawson testified that Petitioner stayed overnight at the Dawson residence "maybe one or two times." (*Id.,* p. 54, lines 1–19). Mark Barbour testified that the number of times Petitioner stayed over varied. (*Id.,* p. 80, lines 2–7). However, Mr. Barbour stated that Petitioner would sometimes stay at the residence for a couple of days at a time. (*Id.,* p. 80, lines 7–17).

edge. (*Id.*, p. 71–78, p. 77, lines 15–25). Even given the opportunity at the evidentiary hearing to clarify the truth, Mr. Barbour failed to meaningfully explain his contradictory accounts pertaining to the morning of Mr. Fiss's murder. Consequently, it is unclear which version of Mr. Barbour's stories should be believed. In fact, in light of the foregoing, it is unclear whether any of Mr. Barbour's testimony and alibi evidence should be accepted as credible. Thus, the contradictory police statement and testimony of Mark Barbour significantly undermine his credibility as an alibi witness.

Mark Barbour's questionable credibility and contradictory police statements, including their potentially damaging assertions, coupled with the strength of the Commonwealth's case against Petitioner leave the Court to conclude that Petitioner has not shown that he was prejudiced by Mr. Floyd's failure to investigate or call Mr. Barbour as an alibi witness. Petitioner fails to demonstrate that a reasonable probability exists that, if trial counsel had interviewed, subpoenaed and called Mr. Barbour as an alibi witness, Petitioner would not have been found guilty. Trial counsel's alleged failure to properly investigate and call Mark Barbour as an alibi witness did not "so undermine[ ] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 669, 104 S.Ct. 2052. As a result, Petitioner has not met his burden under *Strickland* to prove prejudice.

### Conclusion

In relation to Mark Barbour's alibi evidence, Petitioner has failed to met his burden of showing that Mr. Floyd's performance was deficient. *Strickland*, 466 U.S. at 687–89, 104 S.Ct. 2052. That is, Petitioner has not proven that Mr. Floyd's performance fell below the wide range of professionally reasonable representation.

*Id.* Furthermore, even if counsel's performance was deemed to be deficient, Petitioner has failed to satisfy the prejudice prong of *Strickland*. *Id.* In light of the overwhelming amount of evidence against Petitioner, there can be no doubt that any impact of Mr. Floyd's not calling Mark Barbour as an alibi witness does not call into question the reliability of the guilty verdict. As a result of the aforementioned, Petitioner has failed to satisfy either prong of the *Strickland* test for ineffective assistance of counsel. Accordingly, Petitioner's claim for relief based on ineffective assistance of counsel for Mr. Floyd's alleged failure to properly investigate and present alibi evidence must be denied.

### g. Claim XIII Relief is not appropriate because Petitioner was not provided with the effective assistance of counsel at trial and direct appeal.

Petitioner's thirteenth claim is a catch-all claim regarding ineffective assistance of counsel. The basis of the claim is that "[i]n failing to raise and properly litigate the issues presented by this petition, trial counsel and direct appeal counsel rendered ineffective assistance of counsel, which was prejudicial to Petitioner, in violation of the Sixth and Fourteenth Amendments to the United States Constitution." (Pet. Writ Habeas Corpus, ¶ 215). Thus, Petitioner's claim rests upon the blanket assertion that his trial counsel and direct appeal counsel were ineffective to the extent that they failed to raise the issues raised in the instant Habeas Petition. As a result, Claim XIII solely relies upon the previous claims contained in the Habeas Petition and does not present any separate issue of its own. Since the Court has individually addressed Petitioner's ineffective assistance arguments with respect to all relevant claims, we refrain from repeating our

analyses here. Therefore, Petitioner's Claim XIII is denied in accordance with our conclusions.

### h. Claim XIV Petitioner is not entitled to relief from his conviction because the trial court did not make improper statements about appellate review.[73]

 Petitioner's last claim for relief centers on two statements made by the trial judge during Petitioner's trial regarding appellate review. The first statement in contention, made by the trial judge while he was instructing the jury panels during jury selection, is the following, "If the court is mistaken on the law, that will be corrected on review or appeal." (N.T. 2/10/86 at 4; N.T. 2/13/86 at 4; N.T. 2/18/86 at 4; N.T. 2/19/86 at 119). The second statement in contention involves the trial judge's response to an objection made by defense counsel pertaining to a trial court ruling, and goes as follows, "You make your objections, I make my rulings. You have an automatic exception. The appellate court will review anything that I do." (N.T. 2/26/86 at 440). Relying on *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), Petitioner argues that he is entitled to habeas relief because "[s]uch comments about appellate review have been uniformly condemned when made by the prosecutor, because they diminish the jury's sense of responsibility for its determination of guilt and/or sentence."[74] (Am. Pet. Writ Habeas Corpus, ¶ 218). Petitioner claims that "[t]he trial court's references to appellate review violated Petitioner's due process and Eighth Amendment rights and

require that he be granted a new trial and sentencing." (*Id.*). Based on the aforementioned, Petitioner seeks habeas relief arguing that the *Porter I* court's denial of relief based on this claim was contrary to established federal law. (AEDPA Mem. Law at 91).

### 1.) Exhaustion

The Commonwealth admits that Petitioner has previously raised this claim in his Pennsylvania Supreme Court brief regarding his direct appeal. (Commw.'s Mem. Law at 69; *see also* Commw.'s Exs., Ex. A (Pet.'s Direct Appeal Brief)). However, the Commonwealth argues that Petitioner's claim is procedurally defaulted because "[P]etitioner has never presented his federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." (*Id.*)(quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999))(internal quotation marks omitted). The Commonwealth contends that "[b]ecause [P]etitioner has not 'fairly presented' his claim to the state courts, the claim in not exhausted." *Id.* (citation omitted). The Commonwealth argues that the claim is therefore procedurally defaulted "because a claim based on these remarks has been previously litigated as a state law claim, a newly-minted federal claim is not cognizable under the PCRA and [P]etitioner no longer has a remedy available for its consideration." *Id.* (citations omitted).

 Petitioner's claim is not procedurally defaulted because Petitioner fairly presented the claim to the state courts.

---

73. Petitioner's claim includes both the guilt and penalty phases of trial. As explained earlier, the Court will only address Petitioner's claim to the extent that it alleges error at the guilt phase since Petitioner has already been granted habeas relief regarding his sentencing phase. *See supra* Part IV.

74. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), was clearly established federal law at the time that Petitioner's state court conviction became final in 1990.

To exhaust available state court remedies, a petitioner must fairly present all of the claims that he will make in his habeas corpus petition to the state courts. *Henderson*, 155 F.3d at 164. In order to "fairly present" a claim, "a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless*, 172 F.3d at 261 (citations omitted). Without explicitly referencing specific portions of the federal constitution or statutes, a petitioner may communicate to the state court that he is asserting a federal claim through "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* (quoting *Evans v. Court of Common Pleas, Del. County, Pa.*, 959 F.2d 1227, 1232 (3d Cir.1992))(internal quotation marks omitted).

Petitioner's Direct Appeal Brief did not explicitly state a federal claim. (*See* Commw.'s Exs., Ex. A (Pet.'s Direct Appeal Brief)). However, Petitioner's claim that the trial court's statements about judicial review could "lead the jury to shirk its responsibility for its decision" is the same legal theory as *Caldwell*. Also, the primary case cited in Petitioner's brief is *Commonwealth v. West*, 358 Pa.Super. 609, 518 A.2d 307 (1986), *vacated,* 518 Pa. 120, 541 A.2d 739 (1988), which cites and discusses both *Caldwell* and *Commonwealth v. Baker*, 511 Pa. 1, 511 A.2d 777 (1986)(containing an extended discussion of *Caldwell* and granting relief on a *Caldwell* claim). (*Id.; see West*, 518 A.2d at 310 n. 6; *Caldwell*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231; *Baker*, 511 A.2d at 787–91). Petitioner's reliance upon *West* is important for exhaustion purposes because of its utilization of both *Caldwell* and *Baker*, which include constitutional analyses in a similar fact situation. Thus, even though Petitioner's Direct Appeal Brief did not explicitly reference *Caldwell*, Petitioner did communicate that he was asserting a federal claim through his utilization of the same legal theory as *Caldwell* and his reliance on *West*. As a result, Petitioner's Claim XIV was fairly presented before the Pennsylvania Supreme Court on direct appeal and, therefore, is exhausted and available for federal review.

### 2.) *State Court Decision*

In *Porter I*, the Pennsylvania Supreme Court denied Petitioner's claim by stating that they could not say how the trial court's statement that "[i]f the court is mistaken on the law, that will be corrected on review or appeal" prejudiced Petitioner. *Porter I*, 569 A.2d at 946. The *Porter I* court concluded that the statement "merely emphasized the importance of the jury's role in applying the law given them by the trial judge." *Id.* Although the *Porter I* court's decision did not cite to any law, the *Porter I* court addressed and decided Petitioner's claim on the merits.

### 3.) *Caldwell v. Mississippi*

In *Caldwell,* the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. 2633. The *Caldwell* decision is premised upon the prosecutor's statement to the sentencing jury that the defendant's attorneys "would have you believe that you're going to kill this man and they know—they know that your decision is not the final deci-

sion.... **Your job is reviewable.** They know it." *Id.* at 325, 105 S.Ct. 2633 (emphasis added). Based upon this statement, the Supreme Court vacated the sentencing jury's imposition of the death sentence. *Id.* at 328–29, 105 S.Ct. 2633. The Court concluded that the jury's sentence of death did not meet the standard of reliability required by the Eighth Amendment because the Court was unable to say that the prosecutor's attempt to minimize the jury's sense of responsibility for determining the appropriateness of death had no effect on the sentencing decision. *Id.* at 341, 105 S.Ct. 2633.

The Supreme Court has subsequently read *Caldwell* as "relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright,* 477 U.S. 168, 183, 106 S.Ct. 2464, 91 L.Ed.2d 144 n. 15 (1986); *see also Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) In order "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano,* 512 U.S. at 9, 114 S.Ct. 2004 (quotation and internal quotation marks omitted); *see also Zettlemoyer v. Fulcomer,* 923 F.2d 284, 306 (3d Cir.1991)("*Caldwell* was concerned with the shifting of the responsibility in the mind of the jury from it to the appellate court.").

### 4.) Analysis of Petitioner's Claim

In the present case, the trial court's statements did not create a *Caldwell* violation. In fact, there are several factors which distinguish Petitioner's case from *Caldwell.* First and foremost, the trial court's statements did not mislead the jury regarding its role in the sentencing process. The trial judge's statements, "If the court is mistaken on the law, that will be corrected on review or appeal" and "You make your objections, I make my rulings. You have an automatic exception. The appellate court will review anything that I do" deal with the judge's role in the trial process, not the jury's role. (N.T. 2/10/86 at 4; N.T. 2/13/86 at 4; N.T. 2/18/86 at 4; N.T. 2/19/86 at 119; N.T. 2/26/86 at 440). Since the judge's comments centered upon **his role** during trial, the comments did not mislead the jury regarding **its role** in the sentencing process. Thus, the jury's sense of responsibility was not diminished. Since the statements did not deal with the jury's role in sentencing, they did not improperly describe the role assigned to the jury by local law.

Second, the two comments in controversy were made by the judge during jury selection and in response to an objection during the guilt phase of Petitioner's trial. Thus, the comments were not made during the sentencing phase, as was the case in *Caldwell,* and did not mislead the jury as to its role in the sentencing process. Thus, the jury was not mislead to feel less responsible than it should have for its sentencing decision.

Third, the trial court's jury instructions during the sentencing phase clearly informed the jury of their awesome responsibility regarding Petitioner's sentence. The trial judge began his instructions to the jury with, "Ladies and gentlemen of the jury, you must now decide whether the defendant is to be sentenced to death or life imprisonment." (N.T. 2/27/86 at 68). The trial court went on to instruct the jury that, "Now, the verdict is for you, members of the jury. Remember and consider all of the evidence, giving it the weight to which it is entitled. Remember that you are not really recommending a punishment. The verdict you return will actually fix the punishment at death or life imprisonment." *Id.* at 70. As evidenced by the

trial court's sentencing phase jury instructions, the jury was properly informed regarding its role and responsibility in Petitioner's sentence. Thus, the jury was not mislead regarding its crucial role in the sentencing process.

As a result of the aforementioned, the Court finds that Petitioner has failed to establish a *Caldwell* violation. Petitioner has not shown that the trial court's remarks to the jury mislead the jury regarding its role in the sentencing process in a way that allowed the jury to feel less responsible than it should have for Petitioner's sentencing decision. Upon review of the record, the jury was properly informed regarding its role and responsibility in Petitioner's sentence. Therefore, Petitioner has failed to establish a *Caldwell* violation because he has not proven that the trial court's remarks to the jury improperly described the role assigned to the jury by local law. Since Petitioner has failed to establish a *Caldwell* violation, the *Porter I* court's denial of relief based on this claim was neither contrary to, nor involved an unreasonable application of, *Caldwell.* Accordingly, Petitioner's fourteenth claim for habeas relief is denied.[75]

### *ORDER*

AND NOW, this 26th day of June, 2003, upon consideration of Petitioner's Petition for Writ of Habeas Corpus (Doc. No. 14), all Responses and Replies thereto, all documents filed in support thereof and in opposition thereto, the record of Petitioner's case in state court, the expanded record, and evidence presented at the evidentiary hearing, it is hereby ORDERED, consistent with the foregoing opinion, that:

1. Petitioner Ernest Porter's Petition for Writ of Habeas Corpus is GRANTED as to Claim V, which relates to the Court's determination that there is a reasonable likelihood the jury interpreted the penalty phase jury instructions and verdict form in a way that prevented the consideration of constitutionally relevant evidence;

2. the Petition is DENIED in all other respects;

3. Petitioner's death sentence is VACATED;

4. the execution of the writ of habeas corpus is STAYED for 180 days from the date of this Order, during which period the Commonwealth of Pennsylvania may conduct a new sentencing hearing in a manner consistent with this opinion;

5. after 180 days, should the Commonwealth of Pennsylvania not have conducted a new sentencing hearing, the writ shall issue and the Commonwealth shall sentence Petitioner to life imprisonment;

6. in accordance with 28 U.S.C. § 2253, a certificate of appealability is GRANTED to Petitioner regarding

---

**75.** In Petitioner's Amendment To Petition For A Writ Of Habeas Corpus, he alleges ineffective assistance of counsel regarding Claim XIV. (Am. Pet. Writ Habeas Corpus, ¶ 218). However, Petitioner fails to offer any analysis in conjunction with ineffective assistance of counsel. (*Id.*). The Court denies Petitioner's ineffective assistance of counsel claim because he has failed to show that counsel's performance was objectively unreasonable and that he was prejudiced as a result—that but for counsel's deficiencies, the outcome of the prior proceeding would have been different. *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In addition, the Court also denies Petitioner's ineffective assistance of counsel claim because the underlying *Caldwell* claim has not been proven. *See Holloway,* 161 F.Supp.2d at 508 (stating that "*Strickland* instructs that if the petitioner has not shown that [the] underlying claim has merit, counsel cannot have been ineffective for failing to raise it").

Claims III, IV, VI, VII, VIII, XII, XIII and XIV; and

7. if either Petitioner or Respondents file an appeal to the United States Court of Appeals for the Third Circuit, the entry of this Order will be stayed pursuant to Eastern District of Pennsylvania Local Rule 9.4(12) pending the disposition of that appeal.